Greg Adler, SBN 234142
GREG ADLER P.C.
35111F Newark Blvd., Ste 500
Newark, CA 94560
Phone: 844-504-6587
Email: greg@adler.law

Alfred G. Rava, SBN 188318
RAVA LAW FIRM
3667 Voltaire Street
San Diego, CA 92106
Phone: 619-238-1993
Email: alrava@cox.net

Attorneys for Plaintiffs and the Putative Class

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUCIANO ALEXANDRE, CHRISTINE LOUISE JOHNSON, ERIC NELSON, and NAM BE on behalf of themselves, and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>AMAZON.COM, INC., and DOES 1-10,<br><br>Defendants. | Case No. 3:22-cv-01459-MMA-WVG<br><br>**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT AMAZON.COM, INC.'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**<br><br>Judge: Hon. Michael M. Anello<br>Courtroom: 3C<br>Date and Time: To Be Determined By The Court Or Taken Under Submission |

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

Pursuant to Federal Rules of Evidence 201, Plaintiffs request the Court take judicial notice of the following federal and California state court filings submitted in

---

Request For Judicial Notice In Support Of Plaintiffs' Opposition To Defendant Amazon.Com, Inc.'s Motion To Dismiss Plaintiffs' First Amended Complaint
Case No. 3:22-cv-01459-MMA-WVG

support of Plaintiffs' concurrently filed Opposition to Defendant Amazon.com's Motion to Dismiss Plaintiffs' First Amended Complaint, and are attached as follows:

- Exhibit 1: A true and correct copy of the Second Amended complaint filed in the U.S. District Court for the Eastern District of Texas, Case Number 4:22-cv-615-ALM, *Bolduc v. Amazon.com, Inc.*

- Exhibit 2: A true and correct copy of the First Amended Complaint filed in the U.S District Court for the Southern District of California, Case Number 3:21-cv-01833-BTM-MDD, *Correll v. Amazon.com, Inc*.

- Exhibit 3: A true and correct copy of the ORDER RE: PENDING MOTION filed in the U.S. District Court for the Central District of California, Case Number 2:21-cv-04972-FMO-MAA, *Entertainment Studios Network, Inc., et al. v. McDonald's USA, LLC.*

- Exhibit 4: A true and correct copy of the April 1, 2022, COURT ORDER filed in the Los Angeles County Superior Court, Case Number 20STCV37513, *Crest et al. v. Padilla*.

- Exhibit 5: A true and correct copy of the May 13, 2022, Verdict filed in the Los Angeles County Superior Court, Case Number 19STCV27561, *Crest et al. v. Padilla*.

Under Federal Rules of Evidence 201, "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it: is generally known with the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b).

Exhibits 1, 2, and 3 are judicially noticeable because they are docketed court filings in United States district courts. Exhibits 4 and 5 are judicially noticeable because they are docketed court filings in a superior court of the State of California. *Peacock v. 21st Amendment Brewery Café, LLC*, No. 17-01918, 2018 WL 452153, at *3 (N.D. Cal. Jan. 17, 2018) (Tigar, J.) (taking judicial notice of publicly available government

documents published by the Department of the Treasury Alcohol and Tobacco Tax and Trade Bureau). These documents are submitted in support of and are relevant to Plaintiffs' Opposition to Defendant Amaxon.com, Inc.'s Motion to Dismiss Plaintiffs' First Amended Complaint.

For the foregoing reasons, Plaintiffs respectfully request the Court take judicial notice of these five documents attached as Exhibits 1 through 5 herein.


Respectfully submitted,

Dated: April 24, 2023                    GREG ADLER P.C.


By:   /s/ *Greg Adler*
          Attorney for Plaintiffs

# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| **Crystal Bolduc**, | |
| Plaintiff, | |
| v. | Case No. 4:22-cv-615-ALM |
| **Amazon.com Inc.**, | |
| Defendant. | |

## SECOND AMENDED CLASS-ACTION COMPLAINT

Amazon.com enters into contracts with "delivery service partners" (DSPs) to bring packages to its patrons. It also engages in patently unlawful racial discrimination by providing a $10,000 bonus to "Black, Latinx, and Native American entrepreneurs" who participate its delivery-service-partners programs, while withholding this stipend from Asian-Americans and whites who own DSP businesses. Plaintiff Crystal Bolduc brings suit to enjoin Amazon.com from continuing these racially discriminatory practices.

## JURISDICTION AND VENUE

1. The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

2. Venue is proper because a substantial part of the events giving rise to the claims occurred in this judicial district. *See* 28 U.S.C. § 1391(b)(2).

3. The Court has personal jurisdiction over the defendant because Amazon.com's contacts with the state of Texas satisfy the minimum-contacts standard, and Ms. Bolduc's claims against Amazon.com arise out of those contacts.

## PARTIES

4.    Plaintiff Crystal Bolduc is a citizen of Texas who resides in Denton County.

5.    Defendant Amazon.com Inc. is a corporation organized under the laws of Delaware. It may be served at 410 Terry Avenue North, Seattle, Washington 98109.

## STATEMENT OF FACTS

6.    Amazon.com Inc. (Amazon) delivers packages to its patrons by entering into contracts with "delivery service partners."

7.    Amazon allows individuals who want their companies to become delivery service partners to apply through its website. *See* https://logistics.amazon.com (last visited on February 21, 2023). A copy of this webpage is attached to the complaint as Exhibit 1.

8.    Amazon discriminates against whites and Asian-Americans, and in favor of blacks, Latinos, and Native Americans, who want their companies to become delivery service partners. On its website, under the heading "Commitment to Diversity," Amazon says:

> We're proud to announce a Diversity Grant to help reduce the barriers to entry for Black, Latinx, and Native American entrepreneurs—a $1 million commitment toward funding startup costs, offering $10,000 for each qualified candidate to build their own businesses in the U.S. With the launch of this grant program, we're investing in building a future for diverse business owners to serve their communities. If interested, please complete the diversity questions in the Financial Details section of the Application.

Exhibit 1.

9.     This means that companies owned by blacks, Latinos, or Native Americans receive a $10,000 stipend from Amazon to become delivery service partners, while companies owned by whites and Asian-Americans receive no such stipend and must foot the entire bill for their startup costs.

10.   This is not the only instance of unlawful racial discrimination at Amazon. Amazon has also been operating a "Black Business Accelerator" program since June of 2021.

11.   Amazon claims that this program is "dedicated to helping build sustainable diversity and provide growth opportunities for Black-owned businesses." Exhibit 2.

12.   Amazon uses this program to engage in unlawful racial discrimination against non-black owned business and in favor of black-owned businesses that sell products through Amazon.

13.   For example, Amazon uses this program to give black-owned businesses a "$500 credit to assist with start-up and operational costs for eligible newly-launched sellers." Exhibit 2. Non-black-owned businesses are ineligible for this credit.

14.   Amazon also uses this program to give black-owned businesses "[a]dvertising credits to increase exposure" for their businesses. Exhibit 2. Non-black-owned businesses are ineligible for these advertising credits.

15.   Amazon uses this program to give black-owned businesses "FREE imaging services for up to 50 products to help showcase [their] products." Exhibit 2. Non-black-owned businesses are ineligible for these free imaging services.

16.   And Amazon uses this program to provide black-owned businesses with "cash grant opportunities for select sellers." Exhibit 2. Non-black-owned businesses are ineligible for these cash grant opportunities.

17.   Amazon also uses this program to provide "business education, coaching, and mentorship," as well as "marketing and promotional support," to black-owned businesses that it refuses to provide non-black-owned businesses.

18.   Details of this racially discriminatory program can be found on Amazon's website at: https://sell.amazon.com/programs/black-business-accelerator (last visited February 21, 2023).

19.  Amazon asks all applicants to its delivery service program to identify their race in the financial-details portion of the application.

## FACTS RELATED TO MS. BOLDUC

20.  Plaintiff Crystal Bolduc wishes to participate in Amazon's delivery-service-partner program, and she is "able and ready to apply." *See Carney v. Adams*, 141 S. Ct. 493, 499–500 (2020); *Gratz v. Bollinger*, 539 U.S. 244, 261 (2003).

21.  Ms. Bolduc is a 44-year-old entrepreneur and has started and owned her own business selling insurance in the past. Over the past five years, however, Ms. Bolduc was battling cancer and lived on disability-insurance payments. She is now fully recovered and eager to re-enter the workforce. Ms. Bolduc is currently enrolled in the vocational rehabilitation center of Texas, which is providing education and training so that Ms. Bolduc can resume her career as an entrepreneur. She is also enrolled at the University of North Texas and started classes there on January 7, 2023, to obtain the education needed to be successful in her future business.

22.  Amazon's delivery service partner program presents an ideal opportunity for Ms. Bolduc to re-start her career as an entrepreneur. Amazon does not require its delivery service partners to hold any credentials or skills other than a high-school diploma. Amazon also offers business coaching and allows its delivery service partners to rent vehicles and needed capital directly from the company. Ms. Bolduc wants to own a delivery-service-partner company so that she can quickly jump-start her new business, and she intends to hire veterans and other people to work as drivers for her business once it becomes a delivery service partner. The $10,000 stipend that Amazon offers to some (though not all) of its delivery service partners would make the program even more attractive if Amazon did not selectively withhold this stipend from whites and Asians.

23.  Ms. Bolduc first learned about Amazon's delivery service partner program in 2021 when she saw advertisements about work opportunities at Amazon. She first noticed Amazon's seller program and has opened an Amazon seller's account.

24.  When Ms. Bolduc learned about Amazon's delivery service partner program, she decided that she wanted to apply. She has attended Amazon's introductory webinar for prospective delivery service partners, and she has watched all of the relevant videos and read all of the relevant materials on Amazon's website.

25.  Ms. Bolduc has already started the online application process by filling in the first and second pages of the online application form. Ms. Bolduc has also gathered all of the financial and background information needed for the application. Her online application remains active, although she has not yet finalized or submitted it.

26.  The only reason that Ms. Bolduc paused the online application process was because she learned that she would not be eligible for the $10,000 stipend that Amazon awards to some of its delivery service partners to offset their startup costs.

27.  Ms. Bolduc meets each of the threshold eligibility requirements for an Amazon delivery service partner. She has access to at least $30,000 in liquid assets. Her credit score is excellent and consistently over 750. Her most recent credit score was 754. She has no debt apart from her home mortgage and car loan. She carries no credit-card debt or other high-interest debt. She is skilled and careful at handling her money and finances.

28.  Ms. Bolduc would easily pass any background check of her character or driving record. She has never been in trouble with the law, and her driving record is spotless. She has never been in a car accident and never received a speeding ticket.

29.  Even beyond these minimum threshold requirements, Ms. Bolduc is an exceptionally strong candidate for the delivery-service-partner program. Ms. Bolduc

would be accepted into the program if she were to complete the application and interview process, and a reasonable opportunity for further investigation or discovery is likely to confirm that.

30.  Ms. Bolduc is a natural entrepreneur and a hands-on leader with rich and deep experience as a manager. Ms. Bolduc worked for Crossmark, which has a fleet of 200 vehicles, where she was responsible for the replacement of old vehicles and the procurement of new vehicles once they reached 70,000 miles. Ms. Bolduc also handled the necessary insurance, and responded to all accidents and injuries related to Crossmark's fleet of vehicles. Ms. Bolduc also managed two employees during her time at Crossmark.

31.  Ms. Bolduc also worked for Charter Insurance, where she gained additional experience dealing with insurance claims. She also dealt extensively with customer service while working at Charter.

32.  Ms. Bolduc has experience managing profit-and-loss statements, and she has excellent budgeting and financial skills.

33.  Ms. Bolduc even has experience as a recruiter. She worked for Pinnacle as a recruiter and succeeded in getting one of its applicants hired by Frito Lay.

34.  Ms. Bolduc interviews very well and has never interviewed for a job that she hasn't received an offer for. She has good people skills and has often been promoted into management by employers after starting in entry-level positions. She is a hard worker who has never quit at anything in her life, and she has beaten cancer despite a double mastectomy.

35.  Ms. Bolduc has been taking marketing classes to further develop her skills as an entrepreneur, manager, and recruiter.

36.  Ms. Bolduc is capable of performing all of the tasks required of a delivery service partner, such as recruiting, hiring, and coaching a team of hourly employees, managing a fleet of delivery vehicles, and adapting to demand throughout the year.

37. Ms. Bolduc is active in her community and known by everyone in her Caloma Creek neighborhood. She is active with Meals on Wheels, and she helps them deliver food to elderly people in her community.

38. Ms. Bolduc would be open to having her business serve as an Amazon delivery service partner in any location, although she was especially intrigued by the opening available in Fort Worth when she initially learned about the DSP program.

### FACTS RELATED TO STANDING

39. Because Ms. Bolduc is white, she is ineligible for the $10,000 stipend that Amazon awards to blacks, Latinos, and Native Americans to offset their startup costs.

40. Ms. Bolduc is suffering present-day injury in fact because: (1) Ms. Bolduc must pay $10,000 more to start a delivery-service-partner business because she is white rather than a member of the Amazon-preferred racial categories; (2) Ms. Bolduc's ineligibility to recoup the $10,000 in startup costs on account of her race makes her unwilling to apply to Amazon's delivery-service-partner program; (3) The $10,000 stipend that Amazon promises to companies owned by blacks, Latinos, and Native Americans places Ms. Bolduc at a competitive disadvantage in the application process by drawing in minority applicants who would otherwise sit out or pursue other career opportunities; (4) The black, Latino, and Native American applicants who will compete against Ms. Bolduc for acceptance into the DSP program have more credible applications because they will automatically have an extra $10,000 in startup capital if their companies become delivery service partners; and (5) Ms. Bolduc cannot apply to the DSP program or have her company become an Amazon delivery service partner without subjecting herself to racial discrimination.

41. Ms. Bolduc will not apply to the Amazon delivery-service-partner program until Amazon eliminates this racially discriminatory policy, either by extending its $10,000 benefit to whites and Asians or curtailing or eliminating the benefit entirely.

Ms. Bolduc, however, is prepared to apply immediately to the Amazon delivery-service-partner program and will apply if and when Amazon permanently revokes its racially discriminatory policies.

42. Ms. Bolduc needs a judicial declaration of her rights under 42 U.S.C. § 1981 and federal civil-rights law before she invests additional time and money into her efforts to become a delivery-service-partner business owner. *See* 28 U.S.C. § 2201(a); *Chevron U.S.A., Inc. v. Traillour Oil Co.*, 987 F.2d 1138, 1154 (5th Cir. 1993) ("The purpose of the Declaratory Judgment Act is to settle 'actual controversies' *before* they ripen into violations of law or breach of some contractual duty." (emphasis added) (citations and internal quotation marks omitted)).

43. Each of Ms. Bolduc's injuries is traceable to Amazon and its racially discriminatory policies, and they will be redressed by the damages and prospective relief sought in this lawsuit.

44. The injuries giving rise to Ms. Bolduc's claims occurred in the Eastern District of Texas, which gives this Court venue under 28 U.S.C. § 1391(b)(2).

## CLASS-ACTION ALLEGATIONS

45. Ms. Bolduc seeks to represent a class that consists of: All white and Asian individuals who stand "able and ready to apply" to Amazon's "delivery service partners" program, either now or in the future. Ms. Bolduc reserves the right to modify, narrow, or refine this class definition when she moves for class certification, if necessary to accommodate the requirements of Rule 23 or any objections that the defendant might raise to the proposed class definition.

46. Ms. Bolduc brings this class action under Rule 23(b)(2) and Rule 23(b)(3) of the federal rules of civil procedure.

47. The number of members in the class makes joinder of the individual class members impractical.

48.   There are questions of law common to the class, such as whether the racially discriminatory stipend that Amazon offers only to blacks, Latinos, and Native Americans violates federal civil-rights laws, including 42 U.S.C. § 1981.

49.   Ms. Bolduc's claims are typical of other members of the class, as each of the class members wishes to be free from racial discrimination when participating as an Amazon delivery service partner.

50.   Ms. Bolduc adequately represents the interests of the class, and she has no interests antagonistic to the class.

51.   A class action is appropriate under Rule 23(b)(2) because the defendants are acting on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

52.   A class action is also appropriate under Rule 23(b)(3) because the questions of law or fact common to class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## CAUSE OF ACTION

53.   42 U.S.C. § 1981 prohibits Amazon from engaging in racial discrimination in the making and enforcement of contracts.

54.   Amazon is violating 42 U.S.C. § 1981 by awarding $10,000 to its black, Latino, and Native American contractors, while withholding this benefit from its white and Asian contractors.

55.   42 U.S.C. § 1981 provides Ms. Bolduc with a private right of action to sue for both damages and prospective relief. *See Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 459–60 (1975).

56.   Amazon's racially discriminatory contracting practices are the but-for cause of Ms. Bolduc's present-day and ongoing injuries. *See* paragraphs 40–41, *supra*.

## DEMAND FOR RELIEF

57.   Ms. Bolduc respectfully requests that the court:

    a.    certify the class described in paragraph 45;

    b.    declare that Amazon is violating 42 U.S.C. § 1981 by excluding whites and Asian-Americans from the $10,000 stipend that it provides to the black, Latino, and Native American contractors in its delivery-service-partners program;

    c.    enjoin Amazon from discriminating against or giving preferential treatment to any person or entity on account of race;

    d.    award nominal and compensatory damages to Ms. Bolduc and the class;

    e.    award costs and attorneys' fees;

    f.    award all other relief that the Court deems just, proper, or equitable.

Respectfully submitted.

 /s/ Jonathan F. Mitchell

ADAM K. MORTARA*
Illinois Bar No. 6282005
Lawfair LLC
125 South Wacker Drive, Suite 300
Chicago, Illinois 60606
(773) 750-7154
adam@mortaralaw.com

GENE P. HAMILTON*
Virginia Bar No. 80434
Vice-President and General Counsel
America First Legal Foundation
300 Independence Avenue SE
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org

JONATHAN F. MITCHELL
*Lead Attorney*
Texas Bar No. 24075463
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

* admitted *pro hac vice*

Dated: February 21, 2023

*Counsel for Plaintiff*

# CERFICIATE OF CONSENT

I certify that I have conferred with counsel for the defendant and they have consented in writing to our filing of this second amended complaint. *See* Fed. R. Civ. P. 15(a)(2).

/s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I certify that on February 21, 2023, this document was served through CM/ECF

upon:

Angela C. Zambrano
Sidley Austin LLP
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
(214) 981-3405 (phone)
angela.zambrano@sidley.com

Deron R. Dacus
Texas Bar No. 00790553
The Dacus Firm, P.C.
821 ESE Loop 323, Suite 430
Tyler, Texas 75701
903-705-1117 (phone)
903-581-2543 (fax)
ddacus@dacusfirm.com

*Counsel for Defendant*

/s/ Jonathan F. Mitchell
Jonathan F. Mitchell
*Counsel for Plaintiff*

# EXHIBIT 2

1  Greg Adler, SBN 234142
2  Greg Adler P.C.
3  35111F Newark Blvd. Ste 500
   Newark, CA 94560
4  Phone: (844) 504-6587
   Email: greg@adler.law
5
6  Attorney for Plaintiff Jonathan Correll and the Proposed Classes
7
8            UNITED STATES DISTRICT COURT
9            SOUTHERN DISTRICT OF CALIFORNIA
10
11 JONATHAN CORRELL, on behalf of      Case No. 3:21-cv-01833-BTM-MDD
12 himself and all others similarly situated,
                                        **FIRST AMENDED CLASS ACTION**
13            Plaintiff,                **COMPLAINT FOR INJUNCTIVE**
14 v.                                   **RELIEF AND DAMAGES FOR:**
15 AMAZON.COM, INC., and DOES 1-10,     1. **Violation of Civil Rights Act of**
16                                         **1866 (42 U.S.C. § 1981);**
              Defendant.                2. **California Unruh Civil Rights Act**
17                                         **(California Civil Code § 51); and**
18                                      3. **Violation of California Civil Code**
19                                         **§ 51.5.**
20
21
22     Plaintiff Jonathan Correll, on behalf of himself and all others similarly situated,
23 brings the following allegations against Defendant Amazon.com, Inc. ("Amazon"):
24         **NATURE AND BASIS OF UNEQUAL TREATMENT AND**
                       **DISCRIMINATION CLAIMS**
25
26     1.    If Amazon created a procedure where buyers could log into their accounts
27 and check a few boxes so products sold by heterosexual White males were highlighted
28

                                    1
   **FIRST AMENDED COMPLAINT - Case No. 3:21-cv-01833-BTM-MDD**

and appeared at the top of the buyers' search results, there would be cries of homophobia, racism, and sexism. And it would be just as heterophobic, racist, and sexist if the situation were reversed and buyers could check a few boxes so their search results highlighted and preferred products sold by everyone except straight White male sellers. But this is exactly what Amazon has been brazenly and unabashedly doing for some time.

2.    If Amazon had entire sections of its website devoted to showcasing, promoting, and increasing the visibility of straight White male sellers, the general public, especially equal rights activists, would not merely bristle with indignation, they would be up in arms, and rightfully so. And it would be just as abhorrent if the situation were reversed and Amazon had entire sections of its website devoted to showcasing, promoting, and increasing the visibility of everyone except straight White male sellers. Yet Amazon has actually been openly and proudly doing the latter now for at least a year.

3.    If Amazon created programs that gave financial assistance, mentorship, and marketing and promotional support to only straight White male sellers, the general public, especially equal rights advocates, would be furious, and understandably so. And it would be just as infuriatingly racist to give financial assistance, mentorship, and marketing and promotional support to sellers of only one race and not the others. Yet Amazon has been openly and proudly doing that too.

4.    And all women, including transgender women, as well as non-binary persons wanting to sell their products on Amazon, would be justifiably offended if Amazon only created sections of its website devoted to promoting products sold exclusively by male sellers. But Amazon created sections of its website devoted to promoting products sold exclusively by female sellers, which is just as offensive to male, including transgender male, and non-binary sellers.

5.    Amazon has blatantly created, advertised, marketed, and employed several race-, sex-, and LGBT status-based policies and programs for its website that entice,

2

**FIRST AMENDED COMPLAINT - Case No. 3:21-cv-01833-BTM-MDD**

steer, and direct consumers away from Amazon's disfavored sellers who are, or who are majority-owned by, heterosexual people, White people, and males (but especially heterosexual White males), and towards Amazon's preferred and privileged sellers who are LGBT, Black, Hispanic, Asian-American, Native American, Pacific Islander American, and/or female.

6. Amazon's sexist policies and programs deny full and equal accommodations, advantages, facilities, privileges, or services to sellers who unfortunately are male, non-binary, or transgender men. For example, on the Main Menu of Amazon's home page, under Programs & Features, Small & Medium Businesses, Amazon created a link for customers called "Discover Women-Owned Businesses." [Exh. 1.] This Amazon link took the user to a page that showcases sellers who are, or seller entities majority-owned by, women. [Exh. 2.] Amazon created this separate page to cater to the preferences of customers who want to do business with only women and not with men, non-binary persons, or transgender men. Amazon does not provide a link for the consumers – whether they be male, female, or non-binary – to discover Amazon's disfavored male, non-binary, or transgender male sellers. A webpage that promotes, highlights, showcases, or otherwise increases the visibility of sellers and their products based solely on their female sex denies equal accommodations, advantages, facilities, privileges, or services to non-female sellers, or at least aids in the boycotting, blacklisting, refusal to buy from, or refusal to contract or trade with, any person who is not female, is sexist. And such a sex-based business practice is contrary to the State of California's strong public policy to eradicate sex discrimination, partly evidenced in the State's many anti-discrimination statutes, including California Civil Code sections 51 (the codification of the Unruh Civil Rights Act) and 51.5, violations of which are alleged in this Complaint.

7. From Amazon's Discover Women-Owned Businesses page, a user could select "Meet the Business Owners," which then gave the user the option to select "Black-Owned." [Exh. 3.] This took the user to a page that reads "Shop products from

3

Black-owned small businesses" and listed countless thousands of consumer products – everything from shower curtains and cell phone chargers to exercise equipment and bottled water – all of which have been sold exclusively by sellers Amazon has determined are Black. [Exh. 4, https://www.amazon.com/gcx/Black-Owned-Small-Businesses/gfhz/events/ref=s9_acss_bw_cg_SBP_2d1_w?categoryId=small-business-event&ref=sbp_01_bhm_bblcat_bo&pf_rd_m=ATVPDKIKX0DER&pf_rd_s=merchandised-search-5&pf_rd_r=S9JGQFRAZ2050D8HPECQ&pf_rd_t=101&pf_rd_p=aa3bd0fb-e290-424c-b8c7-923080100086&pf_rd_i=21429428011, last visited October 19, 2021.] On the "Meet the Business Owners" page, there are no links to products listed for sale by sellers of any other races. A webpage that promotes, highlights, showcases, or otherwise increases the visibility of sellers and their products based solely on their race, and denies equal accommodations, advantages, facilities, privileges, or services to members of other races, is racist and violates 42 U.S.C. § 1981 and California Civil Code sections 51 and 51.5.

8.    Amazon has had a section of its website called "Minority Report." [Exh. 5, amazon.com/shop/minorityreporttvshow, last visited October 19, 2021.] It had featured on an ongoing basis a list of thousands of consumer products being sold on Amazon by Black-owned businesses. On this "Minority Report" section of Amazon's website, there have been several subcategories: Men's Clothing, Women's Clothing, skin care, etc. Two of the subcategories have been titled "Misc. BOB ['Black Owned Business'] Products" and "Buy Black," pages that list everything from cosmetics and candles, to supplements, tea, books, food, kitchenware, toothpaste, and jewelry, all sold exclusively by Black sellers. [Exh. 6.] There has been no equal webpage, section of Amazon's website, or program for sellers of other racial groups, i.e., there is no "Buy Latinx," "Buy Native American," "Buy Asian," or "Buy Caucasian" page. A webpage that promotes, highlights, showcases, or otherwise increases the visibility of sellers and their products based solely on their race, and denies equal accommodations, advantages,

4

facilities, privileges, or services to members of every other race, is racist and violates 42 U.S.C. § 1981 and California Civil Code sections 51 and 51.5.

9.   Amazon has had an additional "Buy Black" page on its website. [Exh. 7, https://www.amazon.com/gcx/Buy-Black:-Black-History-Month/gfhz/events/ref=sxts_snps_0_0_230b70e9-0194-444e-8905-465dd16645a2?ots=1&slotNum=0&imprToken=ecbe4dbe-e8bb-91a9-64d&tag=advancesilive-20&linkCode=w50&categoryId=black-history-month&pd_rd_r=52aa315c-a98a-40a9-af96-05e170e76f17&pd_rd_w=wS5dI&pd_rd_wg=8Wd2S&pf_rd_p=230b70e9-0194-444e-8905-465dd16645a2&pf_rd_r=NQPN6BSRDEN3ZK63C91S&qid=1613594222&scrollState=eyJpdGVtSW5kZXgiOjAsInNjcm9sbE9mZnNldCI6NTk3LjM1OTM3NX0%3D&sectionManagerState=eyJzZWN0aW9uVHlwZUVuZEluZGV4Ijp7fX0%3D, last visited October 19, 2021.] Amazon initiated this "Buy Black" campaign during Black History Month in February 2021 and the page has remained active months later, into at least October 2021. This "Buy Black" page on Amazon's website lists thousands of consumer products such as tea, HDMI cables, cloth face masks, and shoelaces, sold exclusively by Black sellers. There is no equal webpage, section of Amazon's website, or program for sellers of other racial groups, i.e., there is no "Buy Latinx," "Buy Native American," "Buy Asian," or "Buy Caucasian" page. A webpage that promotes, highlights, showcases, or otherwise increases the visibility of sellers and their products based solely on their race, and denies equal accommodations, advantages, facilities, privileges, or services to members of every other race, is racist and violates 42 U.S.C. § 1981 and California Civil Code sections 51 and 51.5.

10.   Perhaps the most brazen example of Amazon's racist programs has been Amazon's Black Business Accelerator program. [Exh. 8, https://sell.amazon.com/programs/black-business-accelerator, last visited October 19, 2021.] The program offers valuable business benefits to only Black sellers - no matter

5

their wealth or success in business - and is advertised as follows:

**Financial assistance**
Access services and grants to help jump-start business growth and customer acquisition. Opportunities include:

- **$500** credit to assist with start-up and operational costs for eligible newly-launched sellers.

- **$400** in Sponsored Products advertising credits to increase exposure for your business.

- **FREE** imaging services for up to 50 products to help showcase your products.

- **Cash grant opportunities** for select sellers, offered in partnership with Hello Alice, an organization dedicated to helping entrepreneurs launch and grow their businesses. Sign up for alerts.

**Business education & mentorship**
Access a minimum of one year of strategic advisory services to get the coaching, training, and insights you need to take your business to the next level. Connect with a dedicated network of business mentors, including Amazon experts and small business thought leaders, to continue to accelerate your business growth.

**Marketing & promotional support**
Access new opportunities to be featured in the Black-owned business storefronts for Amazon retail customers and Amazon Business customers and promotions featuring Black-owned businesses that will help customers find products from your business throughout the shopping experience.

**Who can sign up for Amazon's Black Business Accelerator?**
All sellers in the U.S. who a) have an Amazon Professional Sellers account, b) have a physical product(s) ready to promote and sell, and c) have uploaded a valid minority-owned business registration or certification to their account in Seller Central from the National Minority Supplier Development Council, U.S. System for Award Management, U.S. Small Business Administration, or Supplier GATEWAY, demonstrating the business is Black-owned based on

6

**FIRST AMENDED COMPLAINT - Case No. 3:21-cv-01833-BTM-MDD**

the criteria of the certifying body, can sign up for Amazon's Black Business Accelerator.

These accommodations, advantages, facilities, privileges, or services are not available to sellers who are members of other races. In fact, Amazon openly prohibits sellers of other racial groups, such as Hispanics, Asians, American Indians, or Caucasians from even applying for Amazon's exclusive Black Business Accelerator. A program that provides financial assistance, business education and mentorship, and marketing and promotional support to sellers of one race, and denies equal accommodations, advantages, facilities, privileges, or services to members of every other race, is racist and violates 42 U.S.C. § 1981 and California Civil Code sections 51 and 51.5.

11.   In apparent temporary recognition of Hispanic Heritage Month from September 15-October 15, 2021, Amazon placed a link titled "A Hispanic Celebration" on its homepage in the upper right-hand corner. [Exh. 9.] That link took the user to a page where the headline reads "Shop Hispanic & Latino Goods; Choose from a selection of top sellers and Hispanic-owned brands." The page contains countless thousands of consumer products such as hair conditioner, wine glasses, nail polish, and Frito-Lay chips, all of which are sold exclusively by sellers Amazon has determined are Hispanic. The products are not listed on this page because the nature of the products are inherently Hispanic, e.g. items that would be found in the Hispanic foods section at a supermarket, but instead are listed on this page solely because of the race of the sellers. There are no links on this webpage to products listed for sale by sellers who are members of any other races, such as Blacks, Asians, American Indians, or Caucasians. A webpage that promotes, highlights, showcases, or otherwise increases the visibility of sellers and their products based solely on their race, and denies equal accommodations, advantages, facilities, privileges, or services to members of every other race, is racist and violates 42 U.S.C. § 1981 and California Civil Code sections 51 and 51.5.

**FIRST AMENDED COMPLAINT - Case No. 3:21-cv-01833-BTM-MDD**

12.     Amazon reserves its worst discrimination and distaste for heterosexual White males. This, despite the fact that on its website Amazon trumpets, "Diversity, equity, and inclusion are good for business—and more fundamentally—simply right." Amazon's purported commitment to diversity, equity, and inclusion is more virtue-signaling than reality because Amazon's heterophobic, racist, and sexist policies and programs are anything but diverse, equitable, and inclusive regarding sellers who are heterosexual White males, or business entities that are majority-owned by heterosexual White males.

13.     Only Amazon sellers with the preferred and privileged LGBT status, race, or sex, such as lesbians, gays, bisexuals, transgenders, Blacks, Hispanics, Asian-Americans, Native Americans, Pacific Islander Americans, and women – but not straight White guys – are eligible for Amazon's Seller Certification program and Guided Buying policy.

14.     An Amazon Seller Certification is a seller attribute recognized by Amazon based on certifications issued by the government or other standard-defining organizations approved by Amazon. Amazon's Seller Certification program recognizes the following certifications relating to a person's LGBT status, race, or sex:

- LGBT Business Enterprise
- Minority-Owned Business
- Women-Owned Business Enterprise
- Woman-Owned Small Business
- Economically Disadvantaged Women-Owned Small Business

15.     Amazon Seller Certifications allow sellers to display on the sellers' product listing page one or more of the sellers' certifications such as LGBT status, race, or sex certifications. These certifications are seen by Amazon Business customers on the Amazon website. Amazon also uses these certifications "to promote diverse sellers to all Amazon customers," meaning the race-, sex- and sexual orientation-based preferences and promotions are not limited to business-to-business transactions, but

8

**FIRST AMENDED COMPLAINT - Case No. 3:21-cv-01833-BTM-MDD**

permeate Amazon's entire website. (See https://sellercentral.amazon.com/gp/help/external/help.html?itemID=201649850&language=en_US&ref=efph_201649850_relt_201649830, last visited October 19, 2021.)

16. These certifications create an environment wherein buyers are encouraged, directed, and enabled to select only those sellers based on certain otherwise legally protected personal characteristics such as LGBT status, race, and sex, who the buyers prefer to buy from and contract and transact business with based on the sellers' LGBT status, race, or sex. This at least aids, incites, and/or facilitates the efforts of buyers, including prejudiced and bigoted buyers, who prefer doing business with only sellers who are LGBT, Black, Hispanic, Asian-American, Native American, Pacific Islander American, or female, and at least aids, incites, and/or facilitates the efforts of buyers, including prejudiced and bigoted buyers, who want to boycott or blacklist, not contract or trade with, not buy from, and otherwise not do business with sellers who are heterosexual, White, or male, or any combination thereof. Giving prospective buyers such an option – to choose who they buy from based on the seller's race, sex, or sexual orientation – violates public policy, 42 U.S.C. § 1981, and Civil Code sections 51 and 51.5, and would never be allowed if Amazon were to make a notation on a White seller's page that read, "White-owned business." But, for some reason, when the situation is reversed, Amazon feels entitled to wave a magic "diversity" wand and impair "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship" to White heterosexual males. 42 U.S.C. § 1981(b).

17. Amazon's Guided Buying policy encourages, enables, and allows businesses to guide and direct their employees to buy from only certified sellers such as LGBT-owned, minority-owned, or women-owned businesses. Amazon accomplishes this through an interface that allows Business Account administrators to check boxes for the types of seller certifications they prefer, which highlights search results for products from only those sellers who have those certifications. In other words, Amazon has given priority and preference to those sellers of the preferred and

9

**FIRST AMENDED COMPLAINT - Case No. 3:21-cv-01833-BTM-MDD**

privileged race, sex, and/or LGBT status by highlighting the products sold by those sellers in search results and pushing those sellers' products to the top of the search result list. [Exh. 10.]

18. For example, Amazon's Seller Certification program and Guided Buying policy encourage, enable, and allow Amazon Business buyers to check a box so that searches for products on Amazon's website return highlighted, preferred search results from sellers who are certified Minority-Owned Businesses, such as the search results for outdoor light timers sold by "certified minority-owned business" S&F Corporation. [Exh. 11.] According to Indeed.com (https://www.indeed.com/cmp/S&F-Corporation/reviews?fcountry=US&floc=Woodbury%2C+MN) and Dun & Bradstreet (https://www.dnb.com/business-directory/company-profiles.sf_corporation.849c05191085ef830126c9f7761cd997.html), S&F Corporation, the seller of the items in Exhibit 11, is an Asian-owned business with annual revenues of $23 million dollars. Therefore, a buyer who checks the box for "Minority-Owned Business" in their user interface and searches for these outdoor light timers will receive search results from Amazon highlighting products sold by this $23 million seller solely because Amazon has determined this well-heeled seller is a minority. However, if the seller had the misfortune of being born White and was selling the exact same product, that White seller's listing would appear further down in the search results and would not be given any highlights or preferences. Similar results occur when the buyer checks boxes in the user interface for LGBT-Owned business or Woman-Owned Business, i.e., products sold by Amazon's disfavored heterosexual or male sellers, respectively, would receive no highlights or preferences in the search results and their products would be listed further down in the list of search results. A system created to encourage and enable buyers to choose who they do business with based on sellers' race, sex, or LGBT status is abhorrent and violates 42 U.S.C. § 1981 and a host of California's anti-discrimination laws, and perhaps other states' similar anti-discrimination laws.

**FIRST AMENDED COMPLAINT - Case No. 3:21-cv-01833-BTM-MDD**

19.     The foregoing policies, programs, practices, and promotions provide preferential accommodations, advantages, facilities, privileges, and/or services to only those whom Amazon prefers based on their LGBT status, race, or sex – no matter their wealth or business acumen or success – and result in class-based generalizations about groups of people contrary to the laws at issue in this case. The following list of highly successful and wildly wealthy businesspersons would exclusively benefit from Amazon's foregoing LGBT-status-, race-, and sex-based policies, programs, and practices, and helps illustrate the absurdity, irrationality, and arbitrary nature of these discriminatory practices:

- Openly transgender Jennifer Pritzker, Hyatt hotel heiress with a net worth of $2 billion; David Geffen, the gay co-founder of DreamWorks, who is worth $9.9 billion; according to Forbes; and Apple CEO Tim Cook who is also gay and whose net worth is $1.3 billion according to Forbes.

- Jensen Huang, ranked in the world's top 100 wealthiest people by Forbes with a net worth of $20.8 billion; Black American businessman David Stewart, majority owner of Worldwide Technology, worth an estimated $11.2 billion; Basketball legend Michael Jordan, worth $1.9 billion; and Oprah Winfrey, worth an estimated $2.7 billion.

- Alice Walton, daughter of Wal-Mart founder Sam Walton, whose net worth is $61.8 billion; MacKenzie Bezos, ex-wife of Amazon founder Jeff Bezos, whose net worth is an estimated $52 billion; and Meg Whitman, former CEO of eBay, who is worth an estimated $6.7 billion.

20.     Shockingly, Amazon has created a business practice wherein a White male billionaire would qualify for Amazon's Seller Certification program and Guided Buying policy so long as he is also gay (e.g., DreamWorks' David Geffen or Apple CEO Tim Cook); a heterosexual male billionaire would qualify as a Minority-Owned Business if he was a person of color (e.g., computer chips magnate Jensen Huang or basketball legend Michael Jordan)); and a heterosexual White billionaire would qualify as a

11

**FIRST AMENDED COMPLAINT - Case No. 3:21-cv-01833-BTM-MDD**

Woman-Owned Business Enterprise if the person was female (e.g., MacKenzie Bezos or Meg Whitman.)

21. Therefore, by being lucky enough to possess any one of Amazon's preferred personal characteristics, these LGBT, minority, or female billionaires would qualify for Amazon's above-referenced policy and program and be eligible for all of the related exclusive benefits, but under no circumstances could a heterosexual White male qualify for the program based on Amazon's LGBT, race, or sex criteria, even if he is a person of humble, unprivileged means who is simply trying to earn an income to support his family. Such a result is heterophobic, racist, sexist, abhorrent, and illegal, all in one. This type of disparate treatment based on generalizations about an individual's sexual orientation and/or LGBT status, race, or sex, instead of being based on an individual's character, abilities, or capabilities, is precisely the type of behavior anti-discrimination laws were enacted to interdict.

22. Amazon charges monthly and transactional fees to be an Amazon Business seller. Amazon then offers those Business sellers the option to advertise with sponsored ads. Amazon's website reads, "What are Sponsored Products? Sponsored Products are keyword- or product-targeted ads that promote your individual listings and appear in the shopping results and on product detail pages on Amazon," and goes on to ask and answer, "Why should I use Sponsored Products? Sponsored Products can help you increase visibility and sales of your products by displaying ads when shoppers are looking for products like yours. There are no monthly fees; you pay only when shoppers click your ad, which takes them to the product detail page where your offer is listed. Consider using Sponsored Products for product visibility, new offers, unique selections, offers with low glance views, clearance items, and seasonal promotions." Amazon's website continues with, "Where will my ads be displayed? Sponsored Products may be displayed on top of, alongside, or within shopping results. Ads may appear on both desktop and mobile." Amazon's website lastly asks and answers, "What is CPC advertising? Cost-per-click advertising is a type of paid advertising where ads display

12

at no charge – ad impressions, or views, are free – and the advertiser is charged only when customers click the add. Sponsored ads, such as Sponsored Products and Sponsored Brands, run on the CPC model." [https://sell.amazon.com/advertising, last visited October 19, 2021.] Essentially, Amazon charges sellers advertising fees to increase the visibility of the sellers' products in search results on Amazon's website. Amazon profits mightily from the increased visibility service it markets to sellers. Yet Amazon offers its increased visibility service to LGBT persons, businesses owned by members of certain preferred races, and female sellers for free by highlighting and showcasing their products and seller pages without charging the sellers any extra advertising or cost-per-click fees. This results in a valuable increase in visibility to potential buyers – free advertising worth millions of dollars to certain preferred and privileged sellers – but not to sellers who have the misfortune of being heterosexual White males.

23. Amazon, through its "Discover Women-Owned Businesses" webpage, denies full and equal accommodations, advantages, facilities, privileges, or services to sellers who are, or who are majority-owned by, non-females (males such as Plaintiff and non-binary persons), in violation of California Civil Code section 51, which is the codification of California's Unruh Civil Rights Act.

24. Amazon, through its "Discover Women-Owned Businesses" webpage, discriminates against, boycotts, blacklists, and refuses to contract or trade with men and non-binary persons in violation of California Civil Code section 51.5.

25. Amazon, through its "Meet the Business Owners/Black-Owned" webpages, violates 42 U.S.C. § 1981 by denying non-Black sellers the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship Black sellers have with Amazon, thus impairing the right of non-Black sellers to make and enforce contracts, which includes "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). But for the race of Plaintiff and members

13

of the Class, Plaintiff and the Class would not have been denied the same opportunity to have their seller pages showcased on the basis of their race.

26. Amazon, through its "Meet the Business Owners/Black-Owned" webpages, denies full and equal accommodations, advantages, facilities, privileges, or services to sellers who are, or who are majority-owned by, non-Black people such as Plaintiff, in violation of California Civil Code section 51. But for the race of Plaintiff and members of the Class, Plaintiff and the Class would not have been denied equal treatment by Amazon.

27. Amazon, through its "Meet the Business Owners/Black-Owned" webpages, discriminates against, boycotts, blacklists, and refuses to contract or trade with non-Black people in violation of California Civil Code section 51.5. But for the race of Plaintiff and members of the Class, Plaintiff and the Class would not have been denied equal treatment by Amazon.

28. Amazon, through its "Minority Report feat. Black Owned Businesses," "Misc. BOB Products," and "Buy Black" webpages violates 42 U.S.C. § 1981 by denying non-Black sellers the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship Black sellers have with Amazon, thus impairing the right of non-Black sellers to make and enforce contracts, which includes "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). But for the race of Plaintiff and members of the Class, Plaintiff and the Class would not have been denied the same opportunity to have their seller pages showcased on the basis of their race.

29. Amazon, through its "Minority Report feat. Black Owned Businesses," "Misc. BOB Products," and "Buy Black" webpages, denies full and equal accommodations, advantages, facilities, privileges, or services to sellers who are, or who are majority-owned by, non-Black people such as Plaintiff, in violation of California Civil Code section 51.

14

**FIRST AMENDED COMPLAINT - Case No. 3:21-cv-01833-BTM-MDD**

30.     Amazon, through its "Minority Report feat. Black Owned Businesses," "Misc. BOB Products," and "Buy Black" webpages, discriminates against, boycotts, blacklists, and refuses to contract or trade with non-Black people in violation of California Civil Code section 51.5.

31.     Amazon, through its Black Business Accelerator program, violates 42 U.S.C. § 1981 by denying non-Black sellers the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship Black sellers have with Amazon, thus impairing the right of non-Black sellers to make and enforce contracts, which includes "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). But for the race of Plaintiff and members of the Class, Plaintiff and the Class would not have been denied the same benefits, privileges, terms, and conditions of the Black Business Accelerator.

32.     Amazon, through its Black Business Accelerator program, denies full and equal accommodations, advantages, facilities, privileges, or services to sellers who are, or who are majority-owned by, non-Black people such as Plaintiff, in violation of California Civil Code section 51.

33.     Amazon, through its Black Business Accelerator program, discriminates against, boycotts, blacklists, and refuses to contract or trade with non-Black people in violation of California Civil Code section 51.5.

34.     Amazon, through its "A Hispanic Celebration" webpage violates 42 U.S.C. § 1981 by denying non-Hispanic sellers the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship Hispanic sellers have with Amazon, thus impairing the right of non-Hispanic sellers to make and enforce contracts, which includes "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). But for the race of Plaintiff and members of the Class, Plaintiff and the Class would not have been denied the same opportunity to have

15

**FIRST AMENDED COMPLAINT - Case No. 3:21-cv-01833-BTM-MDD**

their seller pages showcased on the basis of their race.

35. Amazon, through its "A Hispanic Celebration" webpage, denies full and equal accommodations, advantages, facilities, privileges, or services to sellers who are, or who are majority-owned by, non-Hispanic people such as Plaintiff, in violation of California Civil Code section 51. But for the race of Plaintiff and members of the Class, Plaintiff and the Class would not have been denied equal treatment by Amazon.

36. Amazon, through its "A Hispanic Celebration" webpage, discriminates against, boycotts, blacklists, and refuses to contract or trade with non-Hispanic people in violation of California Civil Code section 51.5. But for the race of Plaintiff and members of the Class, Plaintiff and the Class would not have been denied equal treatment by Amazon.

37. Amazon, through its Seller Certification program and Guided Buying policy, violates 42 U.S.C. § 1981 by denying heterosexual White males the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship non-White heterosexual male sellers have with Amazon, thus impairing White heterosexual males' right to make and enforce contracts, which includes "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). But for the race of Plaintiff and members of the Class, Plaintiff and the Class would not have been excluded from, and denied the benefits and privileges of, the Seller Certification program and Guided Buying policy.

38. Amazon, through its Seller Certification program and Guided Buying policy, denies full and equal accommodations, advantages, facilities, privileges, or services to sellers who are, or who are majority-owned by, heterosexual White males such as Plaintiff, in violation of California Civil Code section 51.

39. Amazon, through its Seller Certification program and Guided Buying policy, discriminates against, boycotts, blacklists, and refuses to contract or trade with straight White men in violation of California Civil Code section 51.5.

16

**FIRST AMENDED COMPLAINT - Case No. 3:21-cv-01833-BTM-MDD**

40.     Moreover, at a minimum, Amazon at least aids or incites the denial of the rights secured by Civil Code sections 51 and 51.5 by creating, promoting, marketing, and employing the above-referenced webpages, programs, policies, and practices, including those that allow buyers to discriminate against, distinguish between, boycott, blacklist, and refuse to contract or trade with heterosexual White males.

41.     Amazon has created, advertised, marketed, and employed its LGBT status-based, race-based, and sex-based Seller Certification program and Guided Buying policy to increase business and, thereby, profits.

42.     In the summer and fall of 2021, Plaintiff, who is a heterosexual White male, visited Defendant's Amazon.com website with the intent to become an Amazon seller, and encountered the above-referenced webpages and programs, including Amazon's Seller Certification program and Guided Buying policy terms or conditions, all of which denied him and other heterosexual White males full and equal access to Amazon's services based on LGBT status, race, and sex.

43.     By prohibiting Plaintiff from participating in Amazon's Seller Certification program and Guided Buying policy based solely on ("but for") the Plaintiff and the proposed class's LGBT status, race, and sex, Defendant Amazon.com, Inc. has been violating 42 U.S.C. § 1981 and California's Civil Code sections 51 and 51.5.

44.     Amazon's above-referenced LGBT status-based, race-based, and sex-based Seller Certification program and Guided Buying policy has (1) caused discontent, divisiveness, animosity, harm, resentment, and envy among Amazon sellers and prospective Amazon sellers, (2) constituted intentional, arbitrary, unreasonable, and/or invidious discrimination, (3) applied and employed prohibited class-based generalizations and stereotypes about both the disfavored heterosexual White male sellers and Amazon's preferred lesbian, gay, bisexual, transgender, Black, Hispanic, Asian, Native American, Pacific Islander American, and female sellers, and (4) contravened the State of California's historical effort and compelling public policy, as evidenced in part by Civil Code sections 51 and 51.5, to eradicate discrimination based

17

**FIRST AMENDED COMPLAINT - Case No. 3:21-cv-01833-BTM-MDD**

on protected personal characteristics.  It also violated Amazon's own much-publicized and touted commitment to diversity and inclusion, found at https://www.aboutamazon.com/workplace/diversity-inclusion, which reads as follows:

> We are a company of builders who bring varying backgrounds, ideas, and points of view to inventing on behalf of our customers. Our diverse perspectives come from many sources including gender, race, age, national origin, sexual orientation, culture, education, and professional and life experience. We are committed to diversity and inclusion and always look for ways to scale our impact as we grow.

45.     However, as at least evidenced by Amazon's LGBT status-based, race-based, and sex-based Seller Certification program and Guided Buying policy with their divisive and restrictive eligibility requirements, heterosexual White males have been and continue to be excluded from Amazon's supposed commitment to diversity and inclusion.

46.     By this action, Plaintiff and all others similarly situated, as defined in the below class definition, seek redress for Amazon's Guided Buying policy and Seller Certification program that have (1) denied and deprived heterosexual White males the full and equal accommodations, advantages, facilities, privileges, or services based on their sexual orientation, race, and sex in violation of Civil Code section 51, (2) discriminated against, boycotted, blacklisted, and refused to contract or trade with heterosexual White males based on their sexual orientation, race, and sex in violation of Civil Code section 51.5, (3) marginalized heterosexual White males, and (4) at least aided in this denial, deprivation, discrimination, distinction, and marginalization.

47.     In a slew of discrimination cases, California courts have repeatedly ruled against businesses that have employed policies or practices that favor women over men, certain races or skin colors over others, and members of the LGPTQ+ community over heterosexuals. Earlier this year, in the Los Angeles County Superior Court Case of *Crest v. Padilla* (Case No. 19CV27561, May 13, 2022) ("*Crest v. Padilla I*"), Judge Maureen Duffy-Smith issued a bench trial verdict holding that California Senate Bill 826

18

1   requiring publicly held corporations to place a minimum number of women on boards
2   to increase diversity violated the Equal Protection Clause of the California Constitution
3   prohibiting sex discrimination. The court ruled the State of California failed to carry its
4   burden and show that the law meets the required strict scrutiny test of accomplishing a
5   compelling state interest.

6       48.    The loss for the State's interest in valuing diversity over equality in *Crest
7   v. Padilla I* came on the heels of a similar earlier loss for the State's interest in putting
8   diversity over equality in another Los Angeles County Superior Court case, *Crest v.*
9   *Padilla* (Case No. 20STCV37513, April 1, 2022) ("*Crest v. Padilla II*"), in which Judge
10  Terry A. Green granted the plaintiffs' motion for summary judgement challenging
11  California Assembly Bill 979 requiring publicly held corporations to include people
12  from "underrepresented communities" on their board. Judge Green held this diversity
13  mandate violated the Equal Protection Clause of the California Constitution. Under
14  Assembly Bill 979, members of "underrepresented communities" are defined as "an
15  individual who self-identifies as Black, African-American, Hispanic, Latino, Asian,
16  Pacific Islander, Native American, Native Hawaiian, or Alaska Native, or who self-
17  identifies as gay, lesbian, bisexual, or transgender." Judge Green questioned why
18  those races, skin colors, or sexual orientations were included in the "underrepresented
19  communities" while other identity groups, such as Indians, Jews, Middle Easterners
20  and Iranians, were not.

21      49.    The rulings in *Crest v. Padilla I* and *Crest v. Padilla II* that under
22  California law equality trumps diversity are consistent with the California Supreme
23  Court's repeated recognition of California's strong public policy to eradicate
24  discrimination in the landmark Unruh Act discrimination case of *Koire v. Metro Car*
25  *Wash* (2007) 40 Cal.3d 24. Examples of the California Supreme Court's recognition
26  of California's strong public policy of eradicating sex discrimination include the
27  following:

28

**FIRST AMENDED COMPLAINT - Case No. 3:21-cv-01833-BTM-MDD**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Public policy in California strongly supports eradication of discrimination based on sex. The Unruh Act expressly prohibits sex discrimination by business enterprises. (§ 51.) The California Fair Employment and Housing Act prohibits sex discrimination in employment. (*Gov. Code, § 12900* et seq.) Numerous other statutes stand as evidence of this strong public policy. (See, e.g., *Lab. Code, § 1197.5* [Equal Pay Act]; *Ed. Code, § 89757* [prohibiting use of public funds by university or college for membership or participation in private organizations with discriminatory membership practices].)

(*Koire,* 40 Cal.3d at 36.)

In short, public policy in California mandates the *equal* treatment of men and women.

(*Id.* at 37.)

Strong public policy supports application of the Act in this case.

(*Id.* at 39.)

## **PARTIES**

50.    At all times relevant hereto, Plaintiff Jonathan Correll has been a heterosexual White male businessman residing in San Diego, California who visited Defendant Amazon.com, Inc.'s Amazon.com website in the summer and fall of 2021 with the intent to use Amazon's internet-based sales services to sell products on Amazon.com, when he encountered Amazon's above-referenced programs, policies, practice, promotions, and webpages, and their respective terms or conditions, that (1) denied him and other heterosexual White males full and equal access to Amazon's services based on sexual orientation, race, and sex, (2) caused or enabled Amazon to discriminate against, boycott, blacklist, and refuse to contract or trade with Mr. Correll and other heterosexual White males based on sexual orientation, race, and sex, (3)

**FIRST AMENDED COMPLAINT - Case No. 3:21-cv-01833-BTM-MDD**

marginalized heterosexual White males, and (4) at least aided in this denial, deprivation, discrimination, distinction, and marginalization concerning heterosexual White males.

51.     At all times relevant hereto, Plaintiff has been a seller of collectibles such as coins and comic books, which are commonly sold on Amazon.com, and Plaintiff was and continues to be able and ready to sell his collectibles on Amazon.com. At all times relevant hereto, Plaintiff has listed and/or sold his collectible coins and comic books on at least one online sales platform, researched and reviewed other online sales platforms to sell his collectible coins and comic books, and Plaintiff has sold over one hundred of his collectible coins and comic books in-person to buyers.  Plaintiff sought to increase his profits by trying a platform with a larger buyer base, which led him to Amazon, the world's largest retailer.  Plaintiff had and continues to have the direct and specific intent to establish an Amazon Professional Seller account and sell his products on Amazon.com.  However, upon reviewing the Amazon website, Plaintiff discovered Amazon offered several programs, benefits, and privileges on the basis of race, sex, and LGBT status, and that Plaintiff was ineligible for any of these programs, benefits, and privileges – all of which Plaintiff wanted to enjoy as well – for no reason other than his race, sex, and sexual orientation.  Thus, Plaintiff knew his business would be at a competitive disadvantage because of Amazon's impairment of his legal right to make and enforce contracts and sought to right an egregious, socially regressive wrong.

52.     At all times relevant hereto, Defendant Amazon.com, Inc. has been a Delaware-registered domestic corporation with its headquarters in the State of Washington and with operations in San Diego, California. Upon information and belief, through Defendant's Amazon.com platform, Amazon dominates the online retail sales market, controlling between 50-70% of all online retail sales in the U.S. For many Americans, Amazon.com is overwhelmingly the first place they turn to buy something online.

53.     The above-named Defendant, and its subsidiaries and agents, are collectively referred to as "Amazon.com, Inc.," "Amazon," or "Defendant." The true

21

names and capacities of the Defendants sued herein as DOE DEFENDANTS 1 through 10, inclusive, are currently unknown to Plaintiff, who therefore sues such Defendants by fictitious names. Each of the Defendants designated herein as a DOE is legally responsible for the unlawful acts alleged herein. Plaintiff will seek leave of Court to amend the Complaint to reflect the true names and capacities of the DOE Defendants when such identities become known.

54.     Plaintiff is informed and believes, and thereon alleges, that at all relevant times, each and every defendant was acting as an agent and/or employee of each of the other Defendants, and was the owner, agent, servant, joint venturer and employee, each of the other and each was acting within the course and scope of its ownership, agency, service, joint venture and employment with the full knowledge and consent of each of the other Defendants. Plaintiff is informed and believes, and thereon alleges, that each of the acts and/or omissions complained of herein was made known to, and ratified by, each of the other Defendants.

55.     Unless otherwise alleged, whenever reference is made in this complaint to any act of "defendant," "defendants," or to a specifically named defendant such as "Amazon.com, Inc." or "Amazon," such allegation shall mean that each defendant acted individually and jointly with the other defendant named in the complaint.

56.     At all times mentioned herein, each and every defendant was the successor of the other and each assumes the responsibility for each other's acts and omissions.

## JURISDICTION AND VENUE

57.     This Court has subject matter jurisdiction over Plaintiff's 42 U.S.C. § 1981 claim. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.  Jurisdiction is also proper under 28 U.S.C. § 1332 because Plaintiff is a citizen of the State of California, Defendant is a citizen of the State of Washington, and the amount in controversy exceeds $5,000,000 exclusive of interest and costs, and therefore federal question and diversity jurisdiction and the damages

**FIRST AMENDED COMPLAINT - Case No. 3:21-cv-01833-BTM-MDD**

threshold under the Class Action Fairness Act of 2005 ("CAFA") are present, giving this Court jurisdiction.

58.  Venue is proper pursuant to 28 U.S.C. § 1391 for the following reasons: (i) the conduct complained of herein occurred within this judicial district; and (ii) Defendant conducted business within this judicial district at all times relevant.

59.  Because Defendant conducted business within the State of California at all times relevant, personal jurisdiction is established.

60.  This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

## CLASS ALLEGATIONS

61.  Plaintiff brings this class action on his own behalf and on behalf of all other persons similarly situated under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3) as follows:

a.  A "Nationwide Class" consisting of (1) all non-Black people who visited the Amazon.com website with the intent to use Amazon's internet-based sales services and encountered Amazon's "Black Business Accelerator" program and were denied full and equal participation in or the benefits from Amazon's "Black Business Accelerator" program based on race; (2) all heterosexual White males who visited the Amazon.com website with the intent to use Amazon's internet-based sales services and encountered Amazon's Seller Certification program and Guided Buying policy terms or conditions that excluded heterosexual White males from the full and equal access to Amazon's Seller Certification program and Guided Buying policy services based on race; (3) all non-Black people who visited the Amazon.com website with the intent to use Amazon's internet-based sales services and encountered Amazon's "Buy Black" or "Misc. BOB Products" program and were denied full and equal participation in or the benefits from Amazon's "Buy Black" or "Misc. BOB

23

Products" program based on race; and (4) All non-Hispanic or non-Latino people who visited the Amazon.com website with the intent to use Amazon's internet-based sales services and encountered Amazon's "A Hispanic Celebration" program and were denied full and equal participation in or the benefits from Amazon's "A Hispanic Celebration" program based on race (collectively, the "Nationwide Class") at any time from the period beginning on October 28, 2017 through the date of final judgment in this action.

b. A "California Class" consisting of:

    i. All heterosexual White males who, while in California, (1) visited the Amazon.com website with the intent to use Amazon's internet-based sales services and encountered Amazon's Seller Certification program and Guided Buying policy terms or conditions that excluded heterosexual White males from the full and equal access to Amazon's Seller Certification program and Guided Buying policy services based on sexual orientation/LGBT status, race, and/or sex, or (2) have used or contracted with Amazon to sell or market their products on the Amazon.com website and were denied full and equal participation in or the benefits from Amazon's Seller Certification program and Guided Buying policy based on sexual orientation/LGBT status, race, and/or sex (collectively, the "California Seller Certification Class") – collectively at any time from the period beginning on October 28, 2018 through the date of final judgment in this action.

    ii. All non-Black people who, while in California, (1) visited the Amazon.com website with the intent to use Amazon's internet-based sales services and encountered Amazon's "Black

24

**FIRST AMENDED COMPLAINT - Case No. 3:21-cv-01833-BTM-MDD**

Business Accelerator" program and were denied full and equal participation in or the benefits from Amazon's "Black Business Accelerator" program based on race (collectively, the "California Black Business Accelerator Class") at any time from the period beginning on October 28, 2018 through the date of final judgment in this action.

iii. All non-Black people who, while in California, (1) visited the Amazon.com website with the intent to use Amazon's internet-based sales services and encountered Amazon's "Buy Black" or "Misc. BOB Products" program and were denied full and equal participation in or the benefits from Amazon's "Buy Black" or "Misc. BOB Products" program based on race (collectively, the "California Buy Black Class.") at any time from the period beginning on October 28, 2018 through the date of final judgment in this action.

iv. All non-female people who, while in California, (1) visited the Amazon.com website with the intent to use Amazon's internet-based sales services and encountered Amazon's "Discover Women-Owned Businesses" program and were denied full and equal participation in or the benefits from Amazon's "Discover Women-Owned Businesses" program based on sex (the "Non-female Class") at any time from the period beginning on October 28, 2018 through the date of final judgment in this action.

v. All non-Hispanic or non-Latino people who, while in California, (1) visited the Amazon.com website with the intent to use Amazon's internet-based sales services and encountered Amazon's "A Hispanic Celebration" program and were denied

25

**FIRST AMENDED COMPLAINT - Case No. 3:21-cv-01833-BTM-MDD**

full and equal participation in or the benefits from Amazon's "A Hispanic Celebration" program based on race (the "California Non-Hispanic Class") at any time from the period beginning on October 28, 2018 through the date of final judgment in this action.

62. Not included in the Class are the following individuals and/or entities: Amazon and its parents, subsidiaries, affiliates, officers and directors, current or former employees, and any entity in which Amazon has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; all judges and their staff members assigned to hear any aspect of this litigation, as well as such judges' immediate family members; and Plaintiff's counsel and anyone employed by Plaintiff's counsel.

63. Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

64. This action has been brought and may properly be maintained pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2) and (b)(3) for the below reasons.

65. The Class is so numerous that joinder of all members is impracticable. Upon information and belief, there are thousands of Class members.

66. There are questions of law and fact common to the Class and these questions predominate over any questions affecting only individual members. Common questions include, for each class, among others: (1) Whether Amazon's LGBT status-based, race-based, and sex-based programs, policies, practices, and promotions described herein deprive Plaintiff and the Class of rights under 42 U.S.C. § 1981 and/or California Civil Code sections 51 and 51.5; (2) whether Plaintiff and the Class suffered harm by reason of Amazon's unequal treatment of and discrimination against those who have intended to use or contract with Amazon to use the Amazon.com website, as well as those who have used the Amazon.com website to market or sell their products, based on LGBT status, race, and sex; (3) whether Plaintiff and the Class are entitled to

26

**FIRST AMENDED COMPLAINT - Case No. 3:21-cv-01833-BTM-MDD**

statutory damages under California Civil Code section 52; (4) whether Plaintiff and the Class are entitled to equitable and injunctive relief, and if so, what equitable and injunctive relief is warranted; and (5) the scope of permanent public injunctive relief that may result.

67. Plaintiff's claims are typical of the claims of the Class because Amazon's programs, policies, practices, and promotions described herein have denied Plaintiff the right to make and enforce contracts, as well as denied Plaintiff full and equal accommodations, advantages, facilities, privileges, and/or services, and have caused or enabled Amazon to discriminate against, boycott, blacklist, and/or refuse to contract or trade with Plaintiff on the basis of Plaintiff's sexual orientation or LGBT status, race, and sex. Furthermore, Amazon at least aided or incited the denial of the rights secured by Civil Code sections 51 and 51.5 by creating, promoting, and employing the programs, policies, practices, and promotions described herein that allow buyers to discriminate against, boycott, blacklist, and refuse to contract or trade with sellers on the basis of sexual orientation or LGBT status, race, and sex. Each of these claims is substantially shared by every Class member. The unequal treatment and discrimination claims arise from the same course of conduct by Amazon, and the relief sought is common.

68. Members of the Class are unlikely to be aware of their rights under 42 U.S.C. § 1981 and Civil Code sections 51 and 51.5.

69. Amazon has acted on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

70. Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has no conflict with any Class Member. Plaintiff is committed to the goal of ending Amazon's systemic and institutional discrimination by having Amazon change its business practices to stop discriminating against Plaintiff and others whom Amazon has denied full and equal accommodations, advantages, facilities, and privileges, and has discriminated against, boycotted, blacklisted, and/or refused to

27

**FIRST AMENDED COMPLAINT - Case No. 3:21-cv-01833-BTM-MDD**

contract or trade with based on the Plaintiff and Class members' sexual orientation, race, and sex.

71.     Plaintiff has retained counsel competent and experienced in complex discrimination class actions, including class actions with causes of action for violating the antidiscrimination laws at issue in this case.

72.     The people affected by Amazon's unequal treatment is ascertainable through Amazon's company records and its website records, logs, and data and therefore the proposed class is ascertainable.

73.     Class certification is appropriate pursuant to Fed. R. Civ. P.  23(b)(3) for monetary damages and Fed. R. Civ. P.  23(b)(2) because Amazon has acted and/or refused to act on grounds generally applicable to the class, making appropriate declaratory, equitable, and public injunctive relief with respect to Plaintiff and the Class as a whole. Amazon excludes members of the Class from participating in and benefitting from Amazon's above-referenced practices, programs, policies, or promotions due solely to the Class members' sexual orientation/LGBT status, race, and sex. The Class members are entitled to declaratory, equitable, and public injunctive relief to end Amazon's common, unfair, and unlawful, LGBT status-based, race-based, and sex-based discriminatory practices, programs, policies, or promotions.

74.     Class certification is also appropriate pursuant to Fed. R. Civ. P. 23(b)(3) because common questions of fact and law predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation since joinder of all members is impracticable. The Class members have been damaged and are entitled to recovery of damages because of Amazon's common, unfair, and unlawful, sexual orientation-based, race-based, and sex-based discriminatory practices, programs, or policies. Damages are capable of measurement on a class wide basis for all causes of action. This Complaint does not seek actual damages for the violations of Civil Code sections 51 and 51.5, it only seeks the mandatory minimum $4,000 in statutory damages

28

**FIRST AMENDED COMPLAINT - Case No. 3:21-cv-01833-BTM-MDD**

for each and every offense pursuant to Civil Code section 52, and these statutory damages are readily capable of measurement on a class-wide basis. Plaintiff and the members of the Class will rely on common evidence to resolve their legal and factual questions, including Amazon's applicable LGBT status or sexual orientation-based, race-based, and sex-based practices, programs, and policies in the relevant period. Amazon has been engaging in continuous, permanent, and substantial activity in California and nationwide. There will be no undue difficulty in the management of this litigation as a class action.

75.    A class action is superior to other available methods for the fair and efficient adjudication of the present controversy. Class members are likely to have little interest in individually controlling the prosecution of separate actions because the individual statutory damages claims of each Class member are not substantial enough to warrant the attorneys' fees and court costs associated with individual filings and prosecution of their individual claims. In sum, for many, if not most, Class members, a class action is the only feasible mechanism that will allow them an opportunity for legal redress and justice. The conduct of this action as a class action in this forum, with respect to some or all of the issues presented herein, presents fewer management difficulties, conserves the resources of the parties and of the court system, and protects the rights of each Class member.

76.    Moreover, individualized litigation would also present the potential for varying, inconsistent, or incompatible standards of conduct for Defendant, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. The adjudication of individual Class members' claims would also, as a practical matter, be dispositive of the interests of other members not parties to the adjudication, and could substantially impair or impede the ability of other Class members to protect their interests.

///

///

# FIRST CAUSE OF ACTION
## Violation of the Civil Rights Act of 1866 - 42 U.S.C. § 1981

77.    Plaintiff incorporates in this cause of action the allegations contained in the preceding paragraphs of this Complaint as if they were set out in full herein.

78.    Plaintiff brings this cause of action on behalf of himself and the Nationwide Class.

79.    Plaintiff and Class Members have the right to make and enforce contracts free from race discrimination, which includes "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

80.    Amazon intentionally discriminated against Plaintiff and Class Members but for their race by denying them the opportunity to make and enforce contracts.

81.    Amazon's intentional discrimination against Plaintiff and Class Members impaired their right to make and enforce contracts with Amazon.

82.    Amazon's policies and practices of refusing to allow Plaintiff and Class Members to make and enforce contracts based on race harmed Plaintiff and Class Members and constitutes unlawful race discrimination in the making and enforcing of contracts in violation of 42 U.S.C. § 1981.

83.    Plaintiff and Class Members have no plain, adequate, or complete remedy at law to redress the wrongs alleged herein, and the injunctive relief sought in this action is the only means of securing complete and adequate relief. Plaintiff and Class Members have suffered and continue to suffer injury caused by Amazon's discriminatory conduct.

84.    Amazon's conduct has caused, and continues to cause, Plaintiff and Class Members substantial losses of income and business opportunity realized by sellers of other races, as well as the other benefits Amazon provides to its sellers. Amazon's intentional discrimination thus impaired Plaintiff and the Class Members' right to make and enforce contracts.

30

## SECOND CAUSE OF ACTION

### Violation Of The Unruh Civil Rights Act, California Civil Code Section 51

85.     Plaintiff incorporates in this cause of action the allegations contained in the preceding paragraphs of this Complaint as if they were set out in full herein.

86.     Plaintiff brings this cause of action on behalf of himself and the California Class.

87.     Amazon is a "business establishment" within the meaning of California Civil Code section 51.

88.     By intentionally denying Plaintiff and the Class full and equal accommodations, advantages, facilities, privileges, and/or services by denying Plaintiff and the Class access to and participation in Amazon's Black Business Accelerator program, and Amazon's other sexual orientation/LGBT status-, race-, and/or sex-based policies, programs, practices, or promotions discussed above, based on the Plaintiff and the Class members' sexual orientation/LGBT status, race, and sex, Amazon has been violating California's Unruh Civil Rights Act, which is codified as California Civil Code section 51.

89.     A substantial motivating reason for Amazon's conduct was the sexual orientation/LGBT status, race, and sex of Plaintiff and the Class.

90.     Amazon's denying Plaintiff and the Class access to and participation in Amazon's Black Business Accelerator program, and Amazon's other sexual orientation/LGBT status-, race-, and/or sex-based policies, programs, practices, or promotions referenced herein based on the Plaintiff and the Class members' sexual orientation/LGBT status, race, and sex, harmed and damaged Plaintiff and the Class.

91.     Amazon's denying Plaintiff and the Class access to and participation in Amazon's Black Business Accelerator program, and Amazon's other sexual orientation/LGBT status-, race-, and/or sex-based policies, programs, practices, or promotions based on the Plaintiff and the Class members' sexual orientation/LGBT

31

**FIRST AMENDED COMPLAINT - Case No. 3:21-cv-01833-BTM-MDD**

status, race, and sex was a substantial factor in causing harm and damages to Plaintiff and the Class.

92.    Pursuant to Civil Code section 52, Amazon is liable to Plaintiff and the members of the Class for the statutory damages mandated by Civil Code section 52 for each and every offense, and attorneys' fees that may be determined by the court in addition thereto.

93.    Pursuant to Civil Code section 52, public injunctive relief is necessary and appropriate to prevent Amazon from continuing and repeating its discriminatory actions as alleged above. Plaintiff is entitled to public injunctive relief on behalf of himself and the Class.

## THIRD CAUSE OF ACTION

### Violation Of California Civil Code Section 51.5

94.    Plaintiff incorporates in this cause of action the allegations contained in the preceding paragraphs of this Complaint as if they were set out in full herein.

95.    Plaintiff brings this cause of action on behalf of himself and the California Class.

96.    Amazon is a "business establishment" within the meaning of California Civil Code section 51.5.

97.    By intentionally denying Plaintiff and the Class full and equal accommodations, advantages, facilities, privileges, and/or services by denying Plaintiff and the Class access to and participation in Amazon's Black Business Accelerator program, and Amazon's other sexual orientation-, race-, and/or sex-based policies, programs, practices, or promotions discussed above, based on the Plaintiff and the Class members' sexual orientation/LGBT status, race, and sex, Amazon has been violating California Civil Code section 51.5, which prohibits businesses from discriminating against, boycotting, blacklisting, and refusing to contract or trade based on the personal characteristics enumerated in Civil Code section 51.

**FIRST AMENDED COMPLAINT - Case No. 3:21-cv-01833-BTM-MDD**

98.     A substantial motivating reason for Amazon's conduct was the sexual orientation/LGBT status, race, and sex of Plaintiff and the Class.

99.     Amazon's denying Plaintiff and the Class access to and participation in Amazon's Black Business Accelerator program, and Amazon's other sexual orientation/LGBT status-, race-, and/or sex-based policies, programs, practices, or promotions based on the Plaintiff and the Class members' sexual orientation, race, and sex harmed and damaged Plaintiff and the Class.

100.    Pursuant to Civil Code section 52, Amazon is liable to Plaintiff and the members of the Class for the statutory damages mandated by Civil Code section 52 for each and every offense, and attorneys' fees that may be determined by the court in addition thereto.

101.    Pursuant to Civil Code section 52, public injunctive relief is necessary and appropriate to prevent Amazon from continuing and repeating its discriminatory actions as alleged above. Plaintiff is entitled to public injunctive relief on behalf of himself and the Class.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief:

1.     Public injunctive relief in the form of a preliminary and permanent injunction against Amazon and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful policies, practices, customs, and usages set forth herein;

2.     Certification of the case as a class action on behalf of the proposed Nationwide Class and California Class;

3.     Designation of Plaintiff's counsel as Class Counsel, and appoint the named Plaintiff as the Class representative;

4.     For an order requiring Amazon's officers and employees to undergo diversity, inclusion, and equity training;

**FIRST AMENDED COMPLAINT - Case No. 3:21-cv-01833-BTM-MDD**

5.      A declaratory judgment that the practices complained of herein are unlawful and violate 42 U.S.C. § 1981 and California Civil Code §§ 51 and 51.5;

6.      For general and special damages according to proof for violating 42 U.S.C. § 1981;

7.      For exemplary and punitive damages according to proof for violating 42 U.S.C. § 1981;

8.      For statutory damages mandated by and pursuant to California Civil Code section 52 for each and every offense committed by Amazon against Plaintiff and each member of the Class for violating California Civil Code sections 51 and/or 51.5;

9.      Costs incurred herein, including but not limited to reasonable attorneys' fees to the extent allowable by California Civil Code section 52 and California Code of Civil Procedure section 1021.5; and

10.     For such other and further legal and equitable relief as this Court may deem proper, appropriate, justified, or equitable.


Dated: October 27, 2022          Respectfully Submitted

                                 */s/ Greg Adler*
                                 Greg Adler, California Bar No. 234142
                                 Greg Adler P.C.
                                 35111F Newark Blvd. Suite 500
                                 Newark, CA 94560
                                 Phone: (844) 504-6587
                                 Fax: (469) 807-8878
                                 Email: greg@adler.law
                                 *Attorney for Plaintiff Jonathan Correll and the*
                                 *Proposed Class*

**FIRST AMENDED COMPLAINT - Case No. 3:21-cv-01833-BTM-MDD**



**EXHIBIT 1**

35

---

**FIRST AMENDED COMPLAINT - Case No. 3:21-cv-01833-BTM-MDD**





**Featured Brand: Bolden Beauty**
*El Paso, TX*

**Chinelo Chidozie & Ndidi Obidoa, Co-Founders**

The idea of Bolden was born over a family vacation in Key West, that worked for our skin tone. We started brainstorming and had decided to take a leap of faith. We coined the name Bolden from Black women centric brand. We want women to own their indivi comfortable in their beauty.

Shop now ›

**EXHIBIT 2**

36

**FIRST AMENDED COMPLAINT - Case No. 3:21-cv-01833-BTM-MDD**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**EXHIBIT 3**

37

**FIRST AMENDED COMPLAINT - Case No. 3:21-cv-01833-BTM-MDD**



**EXHIBIT 4**

**FIRST AMENDED COMPLAINT - Case No. 3:21-cv-01833-BTM-MDD**



**EXHIBIT 5**

39

**FIRST AMENDED COMPLAINT - Case No. 3:21-cv-01833-BTM-MDD**





**EXHIBIT 6**

**FIRST AMENDED COMPLAINT - Case No. 3:21-cv-01833-BTM-MDD**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**EXHIBIT 7**

41

**EXHIBIT 8**

42

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



## Available benefits

### Business education & mentorship

Access a minimum of one year of strategic advisory services to get the coaching, training, and insights you need to take your business to the next level. Connect with a dedicated network of business mentors, including Amazon experts and small business thought leaders, to continue to accelerate your business growth.

### Marketing & promotional support

Access new opportunities to be featured in the Black-owned business storefronts for Amazon retail customers and Amazon Business customers and promotions featuring Black-owned businesses that will help customers find products from your business throughout the shopping experience.

**EXHIBIT 8 (continued)**

43

**FIRST AMENDED COMPLAINT - Case No. 3:21-cv-01833-BTM-MDD**





**EXHIBIT 9**

44



**EXHIBIT 9 (continued)**

45

**FIRST AMENDED COMPLAINT - Case No. 3:21-cv-01833-BTM-MDD**



**EXHIBIT 10**

46

**EXHIBIT 10 (continued)**

47

**EXHIBIT 10 (continued)**

48

**FIRST AMENDED COMPLAINT - Case No. 3:21-cv-01833-BTM-MDD**

**How Amazon Business Account Administrators create a "Prefer small and diverse sellers" policy (Diversity Certifications Policy)**

**Steps 5 & 6:**

Name your policy and personalize a message to buyers.

Select the certifications to include in your policy.



**How buyers discover preferred small and diverse sellers**

Buyers will see offers from preferred small and diverse sellers highlighted as "Organization preferred" within their shopping experience.



**EXHIBIT 10 (continued)**

49

**FIRST AMENDED COMPLAINT - Case No. 3:21-cv-01833-BTM-MDD**

1
2
3
4
5
6
7
8
9
10
11
12
13



14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT 11**

50

**FIRST AMENDED COMPLAINT - Case No. 3:21-cv-01833-BTM-MDD**

# EXHIBIT 3



**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ENTERTAINMENT STUDIOS NETWORK, INC., et al. | Case No. CV 21-4972 FMO (MAAx) |
| Plaintiffs, | |
| v. | **ORDER RE:  PENDING MOTION** |
| MCDONALD'S USA, LLC, | |
| Defendant. | |

Plaintiffs Entertainment Studios Networks, Inc. ("ESN" or "Entertainment Studios") and Weather Group, LLC ("Weather Group") (collectively, "plaintiffs") filed their Third Amended Complaint ("TAC") against defendant, asserting violations of: (1) 42 U.S.C. § 1981; and (2) California's Unruh Civil Rights Act ("Unruh Act"), Cal. Civ. Code §§ 51, et seq.  Pending before the court is the Motion to Dismiss the Third Amended Complaint (Dkt. 55, "Motion") filed by McDonald's USA, LLC's ("defendant" or "McDonald's").  Having reviewed and considered all the briefing with respect to the Motion,  the court finds that oral argument is not necessary to resolve the Motion, see Fed. R. Civ. P. 78(b); Local Rule 7-15; Willis v. Pac. Mar. Ass'n, 244 F.3d 675, 684 n. 2 (9th Cir. 2001), and concludes as follows.

**ALLEGATIONS IN THIRD AMENDED COMPLAINT**

Plaintiffs are solely owned by Byron Allen ("Allen"), an African American media entrepreneur.  (See Dkt. 45, TAC at ¶¶ 10, 36, 46).  ESN initially produced non-fiction television programs that were distributed via broadcast syndication.  (Id. at ¶ 39).  These programs "had general audience appeal, in that they did not specifically target any particular demographic group

as the core audience." (Id at ¶ 40). Between 2009 and 2012, ESN launched seven television networks featuring lifestyle programming ("Lifestyle Networks") that also had general audience appeal. (See id. at ¶¶ 42-43). The Lifestyle Networks "are widely distributed and have high viewer demand[,]" reaching more than 180 million subscribers through ESN's contracts with over 60 multi-channel video programming distributors. (Id. at ¶ 45). ESN continues to produce television programming that runs on its Lifestyle Networks and in broadcast syndication. (See id. at ¶ 10). In 2018, Allen acquired Weather Group, the parent company of The Weather Channel, which plaintiffs allege is "the most trusted brand in cable news for the past decade[.]" (Id. at ¶ 47).

McDonald's is the world's leading global food service retailer, generating over $100 billion in revenue annually. (See Dkt. 45, TAC at ¶ 48). According to plaintiffs, defendant "employs a 'tiered' structure for advertising spending that explicitly differentiates on the basis of race." (Id. at ¶ 54). For "white-owned media companies[,]" McDonald's "contracts with a general market advertising agency[,OMD Worldwide ("OMD"),] . . . to allocate McDonald's annual advertising budget." (Id.). But for "African American media[,]" defendant contracts with Burrell Communications ("Burrell") to spend an advertising budget that "is de minimis compared to the general market budget[.]" (Id. at ¶ 55). For example, in 2019, McDonald's spent approximately $1.6 billion in television advertising in the United States; less than $5 million of that amount was allocated to African American-owned media companies. (See id. at ¶ 49).

Plaintiffs allege that if they were a "white-owned" company, they "would have received tens of millions of dollars in advertising revenue from McDonald's on an annual basis[,]" (Dkt. 45, TAC at ¶ 117), and "avoided the costs and burdens they were forced to incur through the racially discriminatory contracting process that McDonald's created" through its "two-tiered system that gave Entertainment Studios no chance of success." (Id. at ¶ 118). According to plaintiffs, "[t]he African American tier is less favorable than the general market tier[,]" in part because defendant "pays lower prices for African American advertising." (Id. at ¶ 56). In addition, plaintiffs allege that ESN "was shut out of the general market tier and forced to bid for advertising in the less favorable African American tier[,]" because McDonald's "stereotyped the entire company as an African American media company." (Id. at ¶ 58).

2

Plaintiffs allege that ESN "repeatedly sought to contract with McDonald's through its general tier advertising agency," but defendant "blocked these efforts[.]"  (Dkt. 45, TAC at ¶ 68); (see id. at ¶¶ 70-87) (describing attempts to contract).  At the same time, McDonald's has advertised on "similarly situated, white-owned networks[,]" (id. at ¶ 90), while offering plaintiffs  "pretextual excuse[s]" for its refusal to contract for advertising on ESN's Lifestyle Networks and syndicated programs.  (Id. at ¶ 65).  According to plaintiffs, even though ESN's Lifestyle Networks and syndicated programming "have general audience appeal[,]" McDonald's "viewed Entertainment Studios as an African American media company because Entertainment Studios is owned by an African American." (Id. at ¶ 59).  Plaintiffs claim this discriminatory treatment reflects defendant's "long and troubled history with racial discrimination directed towards African Americans," (id. at ¶ 2), including racial discrimination lawsuits brought by African American former senior executives and franchisees, protests by civil rights groups, and a text message sent by McDonald's CEO to Chicago's mayor that appears to blame the parents of a young African American girl who was shot in a McDonald's parking lot.  (See id. at ¶¶ 2-8).

## LEGAL STANDARD

A motion to dismiss for failure to state a claim should be granted if the plaintiff fails to proffer "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly (Twombly), 550 U.S. 544, 570, 127 S.Ct. 1955, 1974 (2007); Ashcroft v. Iqbal (Iqbal), 556 U.S. 662, 678, 129 S.Ct. 1937, 1949 (2009); Cook v. Brewer, 637 F.3d 1002, 1004 (9th Cir. 2011).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678, 129 S.Ct. at 1949; Cook, 637 F.3d at 1004; Caviness v. Horizon Cmty. Learning Ctr., Inc., 590 F.3d 806, 812 (9th Cir. 2010).  Although the plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do," Twombly, 550 U.S. at 555, 127 S.Ct. at 1965; Iqbal, 556 U.S. at 678, 129 S.Ct. at 1949; see also Cholla Ready Mix, Inc. v. Civish, 382 F.3d 969, 973 (9th Cir. 2004) ("[T]he court is not required to accept legal conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged.  Nor is the court required to accept as true allegations

that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences.") (citations and internal quotation marks omitted), "[s]pecific facts are not necessary; the [complaint] need only give the defendant[s] fair notice of what the . . . claim is and the grounds upon which it rests." <u>Erickson v. Pardus</u>, 551 U.S. 89, 93, 127 S.Ct. 2197, 2200 (2007) (<u>per</u> <u>curiam</u>) (internal quotation marks omitted); <u>Twombly</u>, 550 U.S. at 555, 127 S.Ct. at 1964.

In considering whether to dismiss a complaint, the court must accept the allegations of the complaint as true, <u>Erickson</u>, 551 U.S. at 94, 127 S.Ct. at 2200; <u>Albright v. Oliver</u>, 510 U.S. 266, 268, 114 S.Ct. 807, 810 (1994), construe the pleading in the light most favorable to the pleading party, and resolve all doubts in the pleader's favor.  <u>Jenkins v. McKeithen</u>, 395 U.S. 411, 421, 89 S.Ct. 1843, 1849 (1969); <u>Berg v. Popham</u>, 412 F.3d 1122, 1125 (9th Cir. 2005).  Dismissal for failure to state a claim can be warranted based on either a lack of a cognizable legal theory or the absence of factual support for a cognizable legal theory.  <u>See</u> <u>Mendiondo v. Centinela Hosp. Med. Ctr.</u>, 521 F.3d 1097, 1104 (9th Cir. 2008).  A complaint may also be dismissed for failure to state a claim if it discloses some fact or complete defense that will necessarily defeat the claim.  <u>Franklin v. Murphy</u>, 745 F.2d 1221, 1228-29 (9th Cir. 1984), <u>abrogated on other grounds by</u> <u>Neitzke v. Williams</u>, 490 U.S. 319, 324 n. 3, 109 S.Ct. 1827, 1831 & n. 3 (1989).

## **DISCUSSION**

I.    SECTION 1981 CLAIM.

Title 42 U.S.C. § 1981[1] provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens[.]"  42 U.S.C. § 1981(a).  The statute defines "make and enforce contracts" as including "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  <u>Id.</u> at § 1981(b).

---

[1] All statutory references are to Title 42 of the United States Code.

"[S]ection 1981 offers relief when racial discrimination blocks the creation of a contractual relationship[.]"[2]  Domino's Pizza, Inc. v. McDonald, 546 U.S. 470, 476, 126 S.Ct. 1246, 1250 (2006); Saint Francis Coll. v. Al-Khazraji, 481 U.S. 604, 609, 107 S.Ct. 2022, 2026 (1987) ("Although § 1981 does not itself use the word 'race,' the [Supreme] Court has construed the section to forbid all 'racial' discrimination in the making of private as well as public contracts."). To state a § 1981 claim, a plaintiff must plausibly allege that it "attempted to contract for certain services[,]" Lindsey v. SLT Los Angeles, LLC, 447 F.3d 1138, 1145 (9th Cir. 2006), and that, but for racial animus, the defendant would have contracted with plaintiff.[3]  See Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media ("Comcast"), 140 S.Ct. 1009, 1013 (2020) (holding that a § 1981 plaintiff must "plausibly show[] that, but for racial animus, [defendant] would have contracted with [plaintiff]"); Yoshikawa v. Seguirant, 41 F.4th 1109, 1117 (9th Cir. 2022) (same); Knight v. Wells Fargo Bank NA, 459 F.Supp.3d 1288, 1291 (N.D. Cal. 2019) ("To state a claim under Section 1981, a plaintiff must identify an impaired contractual relation by showing that intentional racial discrimination prevented the creation of a contractual relationship or impaired an existing contractual relationship.") (internal quotation marks omitted).

A.   Intentional Discrimination.

Defendant contends that plaintiffs have failed to plead sufficient facts to support a plausible inference of intentional discrimination.  (See Dkt. 55-1, Memo. at 13-21).  In particular, McDonald's challenges the sufficiency of plaintiffs' alleged comparator television networks, which McDonald's

---

[2] In 1991, Congress amended § 1981 to make clear "that § 1981's prohibition against racial discrimination in the making and enforcement of contracts applies to all phases and incidents of the contractual relationship[.]"  Rivers v. Roadway Exp., Inc., 511 U.S. 298, 302, 114 S.Ct. 1510, 1514 (1994); see id. at 302 n. 2, 114 S.Ct. at 1514 n. 2 (language amending § 1981); Garrett v. Tandy Corp., 295 F.3d 94, 100 (1st Cir. 2002) ("The 1991 expansion of the definition of 'make and enforce contracts' in section 1981 . . . extends the reach of the statute to situations beyond the four corners of a particular contract[.]").

[3] Defendant does not dispute that the African American-owned companies are "member[s] of a protected class" for purposes of their § 1981 claim.  (See, generally, Dkt. 55-1, Memorandum of Points and Authorities in Support of Motion to Dismiss [] ("Memo.")); see Lindsey, 447 F.3d at 1145.

contends are not similar in material respects to plaintiffs' Lifestyle Networks or syndicated programming.  (See id. at 14-18).  Defendant's contentions are unpersuasive.

The Supreme Court has "often acknowledged the utility of circumstantial evidence in discrimination cases."  Desert Palace, Inc. v. Costa, 539 U.S. 90, 99-100, 123 S.Ct. 2148, 2154 (2003).  For example, a "plaintiff [may] raise an inference of discrimination by identifying a similarly situated entity who was treated more favorably."  Pac. Shores Properties, LLC v. City of Newport Beach, 730 F.3d 1142, 1159 (9th Cir. 2013); see Snoqualmie Indian Tribe v. City of Snoqualmie, 186 F.Supp.3d 1155, 1162 (W.D. Wash. 2016) ("Plaintiffs in discrimination cases may plausibly plead discriminatory intent . . . . [by] alleg[ing] that a similarly situated individual or entity outside of the plaintiff's protected group received more favorable treatment from the defendant.").  The alleged comparator "need not be identical, but must be similar in material respects.  Materiality depends on the context and is a question of fact that cannot be mechanically resolved."  Earl v. Nielsen Media Rsch., Inc., 658 F.3d 1108, 1114 (9th Cir. 2011) (cleaned up).

Plaintiffs allege that McDonald's "refused to advertise on Entertainment Studios' lifestyle networks since they were launched in 2009[,]" even though defendant "purchased significant advertising on similarly situated, white-owned networks."  (Dkt. 45, TAC at ¶ 13).  According to plaintiffs, the comparator networks identified in the operative complaint are similarly situated to ESN's Lifestyle Networks and The Weather Channel from an advertiser's perspective because they "are carried by the same [distributors] and therefore reach the same subscribers, [] feature similar content and [] target and reach the same demographic age groups."  (Id. at ¶ 91).  Further, plaintiffs allege that even if their programs and networks "have different ratings (i.e., viewership)[,]" (id. at ¶ 94), their networks and syndicated programming "have higher viewership than networks that McDonald's paid to advertise on."  (Id. at ¶ 95).  For example, according to MRI-Simmons data, which is "the most well-known and trusted survey data provider in the television industry[,]" ESN's Lifestyle Networks and The Weather Channel "are more popular with McDonald's and fast-food customers in general as compared to white-owned networks that [defendant] advertises on[.]"  (Id. at ¶¶ 99-100).

Despite plaintiffs' allegations that ESN's syndicated programming and The Weather Channel have higher ratings than the alleged comparators, (see Dkt. 45, TAC at ¶¶ 95-96), McDonald's asserts that the "[t]wo television channels are not similarly situated in all material respects, from an advertiser's perspective, if one attracts many times more viewers than the other." (Dkt. 55-1, Memo. at 16). Defendant cites cases in which courts found that ratings are relevant to "the amount advertisers will pay[.]" (See id. at 15). However, defendant cites no case in which a court has found, at the pleading stage or otherwise, that ratings determined whether an advertiser decided to enter into a contract, much less that any ratings difference rendered a comparator fatally deficient. (See, generally, id. at 14-15). As plaintiffs note, "[w]hile ratings are relevant as to the *terms* of a potential contract, such as revenue and price, ratings disparities do not justify flat out refusals to contract." (See Dkt. 56, Opposition to Defendant's Motion to Dismiss [] ("Opp.") at 18-19) (emphasis in original).

As for ESN's syndicated programming, defendant similarly contends that plaintiffs failed to identify appropriate comparators because syndicated programming "is an entirely different product from cable television networks, which are distributed via multi-channel video programming distributors[.]" (Dkt. 55-1, Memo. at 18). However, the Ninth Circuit rejected a similar argument in Nat'l Ass'n of Afr. Am.-Owned Media v. Charter Commc'ns, Inc. ("Charter"), 915 F.3d 617 (9th Cir. 2019), judgment vacated on other grounds by Comcast, 140 S.Ct. 1009. In Charter, the defendant argued that "the complaint fail[ed] to allege any facts whatsoever showing that Entertainment Studios' channels are 'similarly situated' to the channels [the defendant] added (or expanded) in respects such as content, quality, popularity, viewer demand, or any objective metric relevant to a carriage decision." Id. at 626 n. 8 (cleaned up). The Charter court agreed that "in order for us to infer discriminatory intent from these allegations of disparate treatment, we would need to conclude that the white-owned channels were similarly situated to Entertainment Studios'." Id. But because "television networks can vary widely" with respect to those metrics, the court concluded that "such a thorough comparison of channels would require a factual inquiry that is inappropriate in reviewing a 12(b)(6) motion[,]" and "accept[ed] as true Plaintiffs' assertions that

other, lesser-known, white-owned networks were selected for carriage at the same time that Charter refused to carry Entertainment Studios' offerings." Id.

Here, plaintiffs allege that ESN's syndicated programs are similarly situated to the comparator networks, including, among other things, in their general audience appeal and ratings. (See Dkt. 45, TAC at ¶¶ 91, 97-98). Construing the allegations in the light most favorable to plaintiffs, the court, at this stage, cannot conclude that plaintiffs have failed to allege or identify similarly situated products. In other words, to the extent the parties dispute whether the alleged comparators are similarly situated in all material respects, that "is a question of fact that cannot be mechanically resolved" at this stage. See Earl, 658 F.3d at 1114 (internal quotation marks omitted). In short, the court is persuaded that plaintiffs have sufficiently alleged that similarly situated products received more favorable treatment from defendant. See Snoqualmie Indian Tribe, 186 F.Supp.3d at 1162 (in pleading discriminatory intent, "plaintiffs commonly allege that a similarly situated individual or entity outside of the plaintiff's protected group received more favorable treatment from the defendant").

McDonald's also asserts that plaintiffs undermined their allegations that it "stereotyped" plaintiffs' products based on Allen's race by "admit[ting] that, since at least November 2019, they have consistently pitched their cable television networks" to OMD, defendant's general advertising representative. (Dkt. 55-1, Memo. at 26). As an initial matter, plaintiffs allege that McDonald's blocked ESN, not Weather Group's, access to OMD. (See, e.g., Dkt. 45, TAC at ¶¶ 14-19, 58, 67-69, 72, 79, 87). Plaintiffs allege that while Weather Group made "presentations [to] showcase the significant advertising opportunities that are available for McDonald's on The Weather Channel[,]" (id. ¶ 65); (see id. at ¶¶ 64-65, 77-82), defendant blocked ESN's efforts to pitch advertising opportunities to OMD. (See, e.g., id. at ¶¶ 68, 87).

As a result, plaintiffs joined Weather Group for two advertising presentations to OMD, (see Dkt. 45, TAC at ¶¶ 79, 82), in an effort "to circumvent McDonald's racial stereotyping so that OMD could finally consider Entertainment Studios' networks and other media properties." (Id. at ¶ 79). According to plaintiffs, ESN "wanted to pitch its syndicated programming to OMD so that it could potentially access McDonald's much larger general market advertising budget, but McDonald's

8

continued to force Entertainment Studios to pitch its syndicated programming to Burrell as a result of the same racial profiling and stereotyping that McDonald's engaged in for over a decade." (Id. at ¶ 87). Contrary to defendant's assertions, plaintiffs' allegations that they pitched their networks to OMD do not contradict plaintiffs' allegations that McDonald's stereotyped ESN's network and programming based on Allen's race. Indeed, plaintiffs allege that, because of defendant's racial stereotyping, ESN had to find a way to "circumvent" the two-tiered system – a system, the necessity of which, McDonald's makes no attempt to rationalize or explain in its papers. (See, generally, Dkt. 55-1, Memo.); (Dkt. 57, Reply Memorandum [] ("Reply")).

With respect to Weather Group, defendant contends that plaintiffs cannot show intentional discrimination because "there is no allegation that McDonald's advertising decisions changed after Allen acquired Weather Group in 2018." (Dkt. 55-1, Memo. at 19). According to McDonald's, "the obvious alternative explanation" for its decision not to contract with The Weather Channel is that it "continued to evaluate [the network] the same way it did before" Allen purchased the company. (Id.). Again, defendant's contentions are unpersuasive.

"If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6). A plaintiff's complaint may be dismissed only when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is implausible." Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011). Here, plaintiffs allege that Weather Group diligently pursued an advertising contract for The Weather Channel after Allen acquired the company, and that defendant did not offer, and otherwise refused, to buy advertising on The Weather Channel, even though McDonald's advertised on similarly situated white-owned networks. (See Dkt. 45, TAC at ¶¶ 77-82, 90-91). But whether defendant continued to evaluate the network the same way after Allen purchased Weather Group is a factual question that cannot be resolved at this stage. Further, McDonald's apparent refusal to even offer terms for advertising on the Weather Channel makes little business sense given that the Weather Channel has higher ratings and wider distribution than the two comparator networks. (See id. at ¶¶ 95-96). In short, the court declines to rule at this stage that "defendant's plausible alternative explanation is so convincing that

9

plaintiff's explanation is implausible." Starr, 652 F.3d at 1216; see, e.g., Charter, 915 F.3d at 628 ("Charter's race-neutral explanations for its conduct are not so convincing as to render Plaintiffs' theory implausible.").

Defendant also challenges plaintiffs' assertion that McDonald's "gave pretextual excuses for its refusal to contract." (Dkt. 56, Opp. at 13); (see Dkt. 55-1, Memo. at 20); (Dkt. 57, Reply at 18-20). Plaintiffs allege that OMD, McDonald's general market advertising agency, told Weather Group that defendant would not advertise on The Weather Channel because it "skews towards an older audience." (Dkt. 45, TAC at ¶ 110). In addition, McDonald's "African American ad agency" Burrell allegedly told plaintiffs that defendant "did not contract to advertise on the ESN Lifestyle Networks because were not widely distributed." (Id. ¶ 112). McDonald's contends that the statements identified by plaintiffs cannot be pretextual because "the TAC admits that both statements were true when made." (Dkt. 57, Reply at 18).

However, plaintiffs allege that defendant's explanations are questionable because McDonald's "contracts with older-skewing networks" that "have lower ratings than The Weather Channel and have less distribution[.]" (Dkt. 45, TAC at ¶ 110). Also, ESN presented Burrell with data showing its distribution had grown, but McDonald's "still refuse[d] to contract, while at the same time contracting with white-owned networks that have smaller distribution." (Id. at ¶ 112). Finally, regardless of whether the statements were accurate with respect to The Weather Channel's demographics or ESN's distribution, plaintiffs' contention is that the "nondiscriminatory explanation[s] for [defendant's] decision . . . were not its true reasons, but were a pretext for discrimination." Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 143, 120 S.Ct. 2097, 2106 (2000) (internal quotation marks omitted); see B&S Glass, Inc. v. Del Metro, 2021 WL 3268360, *8 (D.D.C. 2021) ("Race is not barred from being a 'but-for cause' of the contract's cancellation simply because Plaintiffs allege that Defendants provided them with illegitimate, pretextual explanations for the termination."). Drawing all reasonable inferences in favor of plaintiff, the court is persuaded that plaintiffs' allegations of pretext bolster an inference of racial discrimination. See, e.g. Armstrong v. Reynolds, 22 F.4th 1058, 1069 (9th Cir. 2022) ("On a motion to dismiss, taking Armstrong's factual allegations in her complaint as true, the presence

10

of allegedly pretextual reasons for firing do not defeat the plausibility of Armstrong's allegation that her termination was retaliatory."); Dickerson v. D.C., 315 F.Supp.3d 446, 455-56 (D.D.C. 2018) (noting that "[w]hile the ultimate fact-finder may determine" that the stated reasons for employment decision were "benign or unsupported by the evidence," the allegations of pretext supported an inference of racial discrimination for § 1981 claim at the motion-to-dismiss stage).

Finally, defendant contends that plaintiffs' allegations regarding its "corporate culture[,]" including an allegedly racist text message sent by McDonald's CEO to Chicago's mayor, are "irrelevant" to this action. (See Dkt. 55-1, Memo. at 20). However, the Ninth Circuit has held that remarks by a corporation's "senior management" that "suggest[] the existence of racial bias" can support a § 1981 claim, even when not directed at the plaintiff specifically. Metoyer v. Chassman, 504 F.3d 919, 937 (9th Cir. 2007), abrogated on other grounds by Charter, 915 F.3d 617; see id. ("We have held that bigoted remarks by a member of senior management may tend to show discrimination, even if directed at someone other than the plaintiff."); id. at 627 n. 9 (noting that "racially charged comments" made by senior decision-makers for the corporate defendant could serve as "circumstantial evidence of discriminatory animus" even though the statements did not occur in the context of the plaintiffs' specific claims).

Taken together, and construed in the light most favorable to plaintiffs, plaintiffs have alleged sufficient facts to support an inference of intentional discrimination. See, e.g., Charter, 915 F.3d at 626-27 (finding that plaintiffs had plausibly alleged intentional discrimination in refusing to contract based in part on allegations "that white-owned companies were not treated similarly"); Brown v. Sessoms, 774 F.3d 1016, 1023 (D.C. Cir. 2014) (concluding that plaintiff stated a § 1981 claim by alleging differential treatment of a similarly-situated employee in university tenure process).

B.    But-For Causation.

To prevail on a § 1981 claim, "a plaintiff must initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right." Comcast, 140 S.Ct. at 1019. The "'traditional' standard of but-for causation . . . is established whenever a particular outcome would not have happened 'but for' the purported cause." Bostock v. Clayton Cnty.,

Georgia, 140 S.Ct. 1731, 1739 (2020) (citation omitted).  The Supreme Court has noted that but-

for causation "can be a sweeping standard" because "[o]ften, events have multiple but-for causes."

Id.  In the context of a § 1981 claim, "if the defendant would have responded differently but for the

plaintiff's race, it follows that the plaintiff has not received the same right as a white person."

Comcast, 140 S.Ct. at 1015.

Here, defendant asserts that plaintiffs "provide[d] no well-pleaded facts to support an

inference that, but for Allen's race, McDonald's would have contracted with either Plaintiff." (Dkt.

55-1, Memo. at 21). Specifically, McDonald's contends that, with respect to ESN's Lifestyle

Networks, "the allegations in the TAC only demonstrate that McDonald's has chosen to do

business with its larger, better-known, and more popular competitors." (Id.).  But that is not what

the TAC alleges, and the court cannot accept defendant's version of the facts at this stage.[4]

Rather, the TAC alleges that "[i]f Plaintiffs were white-owned, McDonald's would not have (1)

forced Entertainment Studios to deal exclusively with McDonald's African American advertising

agency, (2) deprived Entertainment Studios access to McDonald's general market advertising

budget and general market advertising agency, or (3) refused to contract to advertise on The

Weather Channel, the ESN Lifestyle Networks and other non-print media owned by Allen." (Dkt.

45, TAC at ¶ 116).  As a result, plaintiffs allege that they were denied "tens of millions of dollars

---

[4] Defendant's reliance on Astre v. McQuaid, 804 F.Appx. 665 (9th Cir. 2020), (see Dkt. 55-1, Memo. at 21), is unavailing.  In Astre, a short unpublished decision, the plaintiff admitted that a race-neutral reason caused her employer to lose its contract with the county, which in turn "impaired" the plaintiff's contract with her employer.  See id. at 667 ("Astre expressly alleged that Judge Wood, at or with the request of Cal CASA, decided to decertify MAC due to a lack of community support.  These allegations do not give rise to a plausible inference that McQuaid's alleged racially discriminatory actions caused the alleged impairment to Astre's contractual relationship with MAC.").  Here, plaintiffs allege that McDonald's provided them with race-neutral explanations for its refusal to contract, but they do not allege or suggest that those were the actual reasons for defendant's decision.  See, e.g., B&S Glass, Inc., 2021 WL 3268360, at *8 (distinguishing Astre on the ground that "the plaintiff[] provided non-discriminatory reasons for the defendants' cancellation of a contract" in that case, whereas in B&S Glass, "Plaintiffs pleaded that Defendants gave them multiple non-discriminatory explanations for the cancellation" of a contract) (emphasis in original).  The court in Astre also identified other problems with the plaintiff's § 1981 claim that are not present here, including her "fail[ure] to plausibly allege that any conduct motivated by intentional discrimination impaired her contractual relationship with [her employer]." 804 F.Appx at 666 n. 2.

in advertising revenue from McDonald's on an annual basis[,]" (<u>id.</u> at ¶ 117), and that ESN

incurred costs "trying to get a contract through [defendant's] two-tiered process." (<u>Id.</u> at ¶ 119).

Plaintiffs also allege that but-for McDonald's stereotyping of ESN based on its owner's race, ESN

would have been able to compete in defendant's larger "general market" advertising tier, which

has significantly greater resources available than the separate "tier reserved for media companies

that produce content 'targeted' to an African American audience." (<u>Id.</u> at ¶ 14-15).

Defendant also contends that plaintiffs failed to adequately plead causation because, "even

if McDonald's had offered an advertising contract for these networks, nothing suggests that

Entertainment Studios would have accepted its terms." (Dkt. 55-1, Memo. at 22). But McDonald's

contention begs the question as to whether it engaged in discriminatory conduct in the formation

and/or negotiation of an advertising contract. In other words, based on a reasonable interpretation

of plaintiffs' allegations, it was because of McDonald's discriminatory conduct that plaintiffs were

never provided with an opportunity to consider McDonald's terms, let alone given an opportunity

to decide whether or not to "accept" defendant's terms. In any event, plaintiffs' TAC sets forth

allegations detailing plaintiffs' decade-long efforts to obtain an advertising contract, which included

"multiple offers each year to enter into a contract with McDonald's[.]"[5] (Dkt. 45, TAC at ¶ 67); (<u>see</u>

<u>id.</u> at ¶¶ 67-87) (alleging efforts to obtain an advertising contract with defendant).

Finally, defendant repeats its argument that plaintiffs cannot show that race was the but-for

cause of its decision not to advertise on The Weather Channel because there is no allegation

McDonald's advertised there before Allen bought Weather Group in 2018. (<u>See</u> Dkt. 50-1, Memo.

---

[5]  The court is not persuaded by defendant's contention – for which no authority was provided, (<u>see</u>, <u>generally</u>, Dkt. 55-1, Memo. at 22) – that because it advertised on ESN's syndicated programming years ago, plaintiffs cannot satisfy the causation standard. (<u>See</u> <u>id.</u>) ("[W]ith respect to Entertainment Studios' syndicated programming, Plaintiffs concede that McDonald's has advertised on that programming in the past."). Defendant's argument that plaintiffs cannot establish causation because they do not allege that McDonald's "generally refuses to advertise with African-American-targeted media companies[,]" (Dkt. 55-1, Memo. at 22), is similarly unavailing. Defendant cites no case law holding that a § 1981 plaintiff must show that the defendant discriminated against <u>all</u> members of a protected class. (<u>See</u>, <u>generally</u>, <u>id.</u>). In any event, defendant's argument misses the mark. Plaintiffs contend that defendant refused to contract with them because "they are owned by an African American[,]" (<u>see</u> Dkt. 45, TAC at ¶ 21), not because they may have certain "African-American-targeted" media content.

at 22).  However, it is unclear to what extent, if any, Weather Group pursued advertising with McDonald's prior to Allen's acquisition in 2018.  (See, generally, id.); (Dkt. 57, Reply at 22).  In any event, plaintiffs allege that defendant has refused to contract with Weather Group since Allen's acquisition because of his race.  (See Dkt. 45, TAC at ¶¶ 46-66).  And, as noted earlier, see supra at § I.A., despite Weather Group's diligent efforts to pursue an advertising contract for The Weather Channel, McDonald's has refused to do so while advertising on similarly situated white-owned networks with inferior ratings and distribution. (See Dkt. 45, TAC at ¶¶ 63-64, 77-82, 90-91, 95-96).

In short, the court is persuaded that plaintiffs have adequately alleged but-for causation in support of their § 1981 claim.  See, e.g., Circle City Broad. I, LLC v. AT&T Servs., Inc., 2021 WL 6134587, *4 (S.D. Ind. 2021) (concluding that plaintiff, "minority-owned, local television broadcasting company[,]" plausibly alleged but-for causation in support of § 1981 claim against television distributor who "refus[ed] to negotiate a fair deal").

C.    Contractual Right.

Defendant also contends that plaintiffs failed to state a § 1981 claim because "the TAC does not adequately identify a contractual right that was infringed" and the TAC "concedes that neither party ever offered any particular contract."  (Dkt. 55-1, Memo. at 23).  According to defendant, aside from an ESN proposal during a meeting in July 2019, plaintiffs failed to allege that they presented "any contractual terms" to McDonald's during meetings regarding potential advertising, "including price, quantity, or duration."  (Id. at 24).

"Any claim brought under § 1981 . . . must initially identify an impaired 'contractual relationship,' under which the plaintiff has rights."  Domino's Pizza, Inc., 546 U.S. at 476, 126 S.Ct. at 1249 (2006) (quoting 42 U.S.C. § 1981(b)).  However, "[s]uch a contractual relationship need not already exist, because § 1981 protects the would-be contractor along with those who already have made contracts."  Id. at 476, 126 S.Ct. at 1249-50.  Thus, "Section 1981 offers relief when racial discrimination blocks the creation of a contractual relationship . . . so long as the plaintiff has or would have rights under the . . . proposed contractual relationship."  Id. at 476, 126 S.Ct. at 1250.

14

Here, plaintiffs allege that they have "made multiple offers each year to enter into a contract with McDonald's whereby McDonald's purchases advertising time on the networks[,]" (Dkt. 45, TAC at ¶ 67), and identified several specific meetings between 2012 and 2021, where defendant refused to contract with them. (See, e.g., id. at ¶¶ 70, 72, 77-80); (see id. at ¶ 53) ("Plaintiffs repeatedly presented their advertising opportunities to McDonald's ad agencies, but McDonald's refused to offer advertising contracts on any terms for Plaintiffs' networks or broadcast syndicated programming."). Plaintiffs also allege that "media companies do not offer contracts" or "deal terms" to defendant or its advertising agencies. (Id. at ¶ 52). Rather, "[m]edia companies present opportunities and McDonald's will make an offer to spend a certain amount of money at certain prices on certain media properties." (Id.). Under the circumstances here, the court is persuaded that plaintiffs' allegations "create the plausible inference that [plaintiffs] attempted to enter a contractual relationship with [defendant]" to advertise on plaintiffs' networks. See Body by Cook, Inc. v. State Farm Mut. Auto. Ins., 869 F.3d 381, 388 (5th Cir. 2017). In other words, plaintiffs have sufficiently alleged that they are "would-be contractor[s]" within the meaning of § 1981.[6] See Domino's Pizza, Inc., 546 U.S. at 476, 126 S.Ct. at 1250.

Defendant also contends that the Second Amended Complaint ("SAC") "added a new claim that McDonald's discriminated against Entertainment Studios by failing to advertise on its syndicated programming after a meeting held in July 2019." (Dkt. 55-1, Memo. at 28) (citing Dkt. 40, SAC ¶ 83; Dkt. 45, TAC ¶ 84). Because the SAC was filed in December 2021, defendant argues that a "claim related to the July 2019 meeting is timely only if it relates back to the [First Amended Complaint ("FAC")] or original complaint filed in July and May 2021, respectively." (Id.).

As an initial matter, the court is skeptical that this is a new claim. For example, the FAC alleged that ESN "was shut out of the general market tier and forced to bid for advertising in the less favorable African American tier" because at one time ESN had some "African American

---

[6] The court is unpersuaded by McDonald's contentions that because plaintiffs' claims are based in part on statements or decisions that occurred before May 20, 2019, plaintiffs' claims are barred by the two-year statute of limitations. (See Dkt. 55-1, Memo. at 27). As plaintiffs point out, (see Dkt. 56, Opp. at 29-30), they allege that defendant continued refusing to contract with them based on unlawful discrimination within the limitations period. (See Dkt. 45, TAC at ¶¶ 76-87).

1  shows that ran in broadcast syndication." (Dkt. 20, FAC at ¶ 49). Rather than attempting to add

2  a new claim, it appears that plaintiffs included additional allegations in their SAC regarding ESN's

3  efforts to obtain an advertising contract for its syndicated programming in response to the court's

4  order dismissing their earlier complaint. (See Dkt. 38, Court's Order of November 30, 2021, at 2)

5  (stating that plaintiffs' general allegations regarding their attempts to contract appeared to be

6  insufficient).

7       In any event, even if plaintiffs' additional allegations regarding ESN's syndicated

8  programming constitute a new claim, the court finds that it relates back to the FAC and the original

9  complaint. Rule 15 of the Federal Rules of Civil Procedure provides that "[a]n amendment to a

10  pleading relates back to the date of the original pleading when . . . the amendment asserts a claim

11  or defense that arose out of the conduct, transaction, or occurrence set out – or attempted to be

12  set out – in the original pleading[.]" Fed. R. Civ. P. 15(c)(1)(B). "An amended claim arises out of

13  the same conduct, transaction, or occurrence if it will likely be proved by the same kind of

14  evidence offered in support of the original pleading." ASARCO, LLC v. Union Pac. R. Co., 765

15  F.3d 999, 1004 (9th Cir. 2014) (internal quotation marks omitted). Rule 15(c)'s relation back

16  doctrine is "liberally applied." Id. (internal quotation marks omitted).

17       Assuming plaintiffs assert a new claim regarding McDonald's refusal to contract for

18  advertising on ESN's syndicated programming, that claim would be "proved by the same kind of

19  evidence" offered in support of plaintiffs' original claims regarding ESN's Lifestyle Networks. For

20  example, the FAC alleged that defendant "stereotyped" ESN "as an African American media

21  company because Entertainment Studios is owned by an African American[,]" which has impacted

22  both ESN's syndicated programming and its Lifestyle Networks. (See Dkt. 20, FAC at ¶¶ 49-50).

23  Thus, whether McDonald's stereotyped plaintiffs "as an African American media company" with

24  respect to ESN's syndicated programming is likely to be proved with the same kind of evidence

25  offered in support of plaintiffs' claim with respect to ESN's Lifestyle Networks.

26  II.   UNRUH ACT CLAIM.

27       Defendant generally argues that plaintiffs' Unruh Act claim, which is based on the same

28  allegations regarding defendant's refusal to contract on the basis of race, (see Dkt. 45, TAC at ¶¶

128-134), fails for the same reasons as their § 1981 claim.  (See Dkt. 55-1, Memo. at 6-8).

The Unruh Act provides that "[a]ll persons within the jurisdiction of [California] are free and equal, and no matter what their . . . race . . . are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever."  Cal. Civ. Code § 51(b).   The purpose of the Unruh "Act is to create and preserve a nondiscriminatory environment in California business establishments by banishing or eradicating arbitrary, invidious discrimination by such establishments." White v. Square, Inc., 7 Cal.5th 1019, 1025 (2019) (internal quotation marks omitted).   "In enforcing the [Unruh] Act, courts must consider its broad remedial purpose and overarching goal of deterring discriminatory practices by businesses" and construe it "liberally in order to carry out its purpose." Id. (citations and internal quotation marks omitted).

As with a § 1981 claim, a plaintiff must plead intentional discrimination to state an Unruh Act claim.  See Harris v. Capital Growth Investors XIV, 52 Cal.3d 1142, 1175 (1991) (plaintiff must "plead and prove intentional discrimination" under the Unruh Act), superseded by statute on other grounds as noted in Munson v. Del Taco, Inc., 46 Cal.4th 661, 624 (2009); Mackey v. Bd. of Trustees of California State Univ., 31 Cal.App.5th 640, 660 (2019) ("The Unruh Act requires proof of intentional acts of race discrimination and does not cover disparate impact.") (emphasis omitted).  However, the but-for causation standard does not apply to plaintiffs' Unruh Act claim. As defendant acknowledges, (see Dkt. 55-1, Memo. at 21), plaintiffs need only show "that a substantial reason for [defendant's conduct] was because of Plaintiff's race[.]" Grant v. Starbucks Corp., 2019 WL 8112465, *6 (C.D. Cal. 2019) (citing Judicial Council Of California Civil Jury Instruction 3060) (emphasis added); see also Harris v. City of Santa Monica, 56 Cal.4th 203, 226 (2013) (distinguishing between the "substantial motivating factor" and more stringent "but-for" standards in discrimination cases).

For the reasons stated above, see supra at § I.,  the court finds that plaintiffs plausibly allege that defendant intentionally discriminated against them in refusing to contract, and that race was a but-for cause – a more demanding requirement than the Unruh Act's "substantial reason" standard, see Harris, 56 Cal.4th at 226 – of defendant's refusal to contract.

With respect to defendant's argument that plaintiffs' Unruh Act claim fails because they "have not alleged that their 'relationship with [McDonald's] was similar to that of the customer in the customer-proprietor relationship,'" (Dkt. 55-1, Memo. at 29) (quoting <u>Bongiovanni v. State Farm Mut. Auto. Ins. Co.</u>, 2020 WL 7861973, *2 (C.D. Cal. 2020), the court is unpersuaded. The court cannot conclude at this stage that plaintiffs were not "in a relationship with the offending business establishment [<u>i.e.</u>, defendant] 'similar to that of the customer in the customer-proprietor relationship which the [Unruh] Act and its predecessors have most commonly covered.'" <u>Johnson v. Riverside Healthcare Sys., LP</u>, 534 F.3d 1116, 1124 (9th Cir. 2008) (quoting <u>Strother v. S. California Permanente Med. Grp.</u>, 79 F.3d 859, 874 (9th Cir. 1996)). The Ninth Circuit has "acknowledged that California courts have allowed parties who were 'not clients, patrons, or customers, in the traditional sense' to bring claims under" the Unruh Act, including, for example, condominium owners against their condominium owners' association and female children excluded from membership in the Boys' Club. <u>Id.</u> at 1124 n. 5 (quoting <u>Strother</u>, 79 F.3d at 873).

## CONCLUSION

Based on the foregoing, IT IS ORDERED THAT:

1. Defendant's Motion to Dismiss the Third Amended Complaint (**Document No. 55**) is **denied**.

2. Defendant shall file its Answer no later than **September 26, 2022**.

Dated this 16th day of September, 2022.

/s/
Fernando M. Olguin
United States District Judge

EXHIBIT 4

**FILED**
Superior Court of California
County of Los Angeles

APR 01 2022

Sherri R. Carter, Executive Officer/Clerk
By _____ M. Ventura _____ Deputy
Marisa Ventura

# COURT ORDER

*Crest, et al. v. Padilla*
20 STCV 37513

| | |
|---|---|
| TYPE OF MOTION: | (1)-(2): Motion for Summary Judgment, or in the alternative, Summary Adjudication. |
| MOVING PARTY: | (1): Plaintiffs, Robin Crest, Earl De Vries, and Judy De Vries; (2): Defendant, Shirley N. Weber, in her official capacity as Secretary of State of the State of California. |
| RESPONDING PARTY: | (1): Defendant, Shirley N. Weber, in her official capacity as Secretary of State of the State of California; (2): Plaintiffs, Robin Crest, Earl De Vries, and Judy De Vries. |
| HEARING DATE: | Monday, March 14, 2022 |

When faced with a problem, the immediate temptation is to employ the most obvious and direct solution. In most cases, it isn't even fair to call this impulse a "temptation." It's just a normal and sound approach to life. But sometimes there are constraints which call for additional care. This is one of those times.

This litigation was born because the Legislature spotted an issue: corporate board seats by and large belong to members of one race, sexual orientation, and gender identity. After further investigation, they concluded that this disparity was the result, conscious or unconscious, of a process that leads board members to select replacements who look and feel like them. This meant that qualified members of other groups were, intentionally or unintentionally, being excluded.

In a society based as ours is on inclusion and equal opportunity, these observations were concerning on their own terms. However, the Legislature had also been informed by various experts, businesses, and shareholders that the composition of a corporate board has various knock-on effects. A homogenous board is vulnerable to stagnant thinking and common assumptions; it is also less flexible in responding to challenges. This results in poorer business practices, less innovation, and ultimately less profit. A heterogenous board avoids these pitfalls and generally leads to a healthier business that makes more money.

The Legislature's observations are intuitively sensical. There is nothing outlandish or incredible about the idea that people generally tend to socialize with, and select, other people like themselves. The natural result of this tendency is the exclusion of people who look and act differently. And the natural result of that exclusion is the loss of the acumen that those different people would bring to a conversation, business, or any other group. The underlying premise here is that demographic diversity is a reasonable proxy for differing perspectives and life experiences. That premise is not seriously challenged by anyone involved in this case.

If demographically homogenous boards are a problem, then heterogenous boards are the immediate and obvious solution. But that doesn't mean the Legislature can skip directly to mandating heterogenous boards. The difficulty is that the Legislature is thinking in group terms. But the California Constitution protects the right of *individuals* to equal treatment. Before the Legislature may require that members of one group be given certain board seats, it must first try to create neutral conditions under which qualified individuals from *any* group may succeed. That attempt was not made in this case.

Procedural Posture

On September 30, 2020, Plaintiffs filed their Complaint for Declaratory and Injunctive Relief against Defendant Alex Padilla in his official capacity as Secretary of State of the State of California ("Secretary"). On November 4, 2020, Defendant Secretary filed their Answer.

Bench trial is currently set for May 2, 2022.

Plaintiff now moves this court, per Code of Civil Procedure § 437c, for summary judgment, or in the alternative, summary adjudication on the sole cause of action in the Complaint.

Plaintiffs' initial Request for Judicial Notice is GRANTED as to Exhibits A and D. It is DENIED as to Exhibit E. Plaintiffs' reply Request for Judicial Notice is GRANTED – it consists solely of the report which was discussed in the initial papers and was completed during the briefing period. The parties have had ample opportunity to discuss it and inclusion of the final version changes nothing.

Plaintiff's reply Objections to Evidence are OVERRULED. They are identical copies of the Objections filed in opposition to Defendant Secretary's motion, which are discussed below.

Defendant Secretary's Objections to Evidence are OVERRULED as to No. 1 and SUSTAINED as to No. 2.

Defendant Secretary also moves this court for summary judgment, or in the alternative, summary adjudication of the following issues:

ISSUE NO. 1: Corporations Code § 301.4[1] does not violate California Constitution article 1, section 31 because it does not discriminate against or grant preferential treatment to any individual or group in the operation of public employment, public education, or public contracting.

ISSUE NO. 2: Plaintiffs cannot challenge the Secretary's compliance with the mandatory reporting obligations in Corporations Code § 301.4, because a taxpayer action cannot be

---

[1] In their papers, the parties refer to the law at issue by its legislative designation: "AB 979." While there is nothing wrong with that designation, once a bill has proceeded out of the legislature and into the courts as a duly enacted statute, the proper citation is by code and section. Therefore, this discussion will refer to "AB 979" as "Corporations Code § 301.4."

used to attack lawful reporting activity.

ISSUE NO. 3: Plaintiffs' challenge to the Secretary's enforcement of Corporations Code § 301.4 is not ripe for adjudication.

ISSUE NO. 4: Corporations Code § 301.4 does not violate California Constitution article 1, section 7 because the statute satisfies strict scrutiny review.

Defendant Secretary's Request for Judicial Notice is GRANTED.

Plaintiff's Evidentiary Objections is OVERRULED, as discussed more fully in the section on the state of the record.

Ruling

Plaintiff's motion for summary judgment is GRANTED. Defendant Secretary's motion for summary judgment is DENIED. Defendant Secretary's motion for summary adjudication is DENIED as MOOT as to Issue No. 1 and otherwise DENIED. Plaintiff is instructed to serve a proposed form of judgment within 10 days.

The State of the Record

These are cross-motions for summary judgment on a single complaint with only one cause of action, so the evidence presented by both parties is virtually identical. As counsel know, on a motion for summary judgment the court is looking for triable issues of fact. Do the parties disagree about any given fact, and is that fact material to the outcome of the case? What would the trial look like? What would the parties be asking the court to decide?

To answer those questions, the court looks primarily at the opposition separate statement. That document tells the court straight out whether a fact listed by the moving party is disputed by the opposing party. Review of both Plaintiffs' and the Secretary's Opposition Separate Statements reveals no material dispute sufficient to require a trial.

*Plaintiffs' Motion*

Plaintiffs' motion offers the court 15 alleged material facts which can be summarized as follows. Plaintiffs have paid income taxes. Corporations Code § 301.4 is the law and says what it says. The Secretary will spend taxpayer money gathering and reporting data on whether the corporations subject to Section 301.4 have complied with its provisions. The Secretary retains the ability at any time to impose a fine for non-compliance. Some of the corporations subject to Section 301.4 also have contracts to perform work for the State of California. And finally, the conclusory statement that Section 301.4 "treats differently persons who are similarly situated for the purposes of the statute." (Defendant's Separate Statement in Opposition ["DOSS"] No. 15).

That last point is not a "fact" so much as a legal conclusion – it is the thing that Plaintiff must prove. Naturally, the Secretary disputes it. But the interpretation of a law is not a matter of

fact that requires a trial, it is a legal question – the very thing motions like these were created to resolve.

Some of the other facts are disputed, but the disputes are not material. The Secretary suggests that Plaintiff Robin Crest has not paid income taxes in the relevant time frame but admits that the other two Plaintiffs have. (DOSS No. 1). The Secretary complains about Plaintiffs' evidentiary citations and descriptions but in the same breath admits the basic points asserted. (DOSS Nos. 8-12). Finally, the Secretary disputes both the precise number of companies covered by Section 301.4 and the precise number of those companies that hold state contracts. (DOSS Nos. 13-14). But the numbers themselves are not important. It need only be clear that some companies are subject to Section 301.4, and some subset of those companies hold state contracts. The Secretary does not contest that.

*Defendant Secretary's Motion*

The Secretary's motion offers the court some 228 material facts.[2] An exhaustive summary of those facts is not particularly feasible here. But neither is it necessary, as Plaintiffs only disputed 17 of those facts. What Plaintiffs have done with many of the remaining facts is concede that each fact is undisputed, and then follow that concession with a reference to a specific evidentiary objection. In almost every instance[3] the objection is "hearsay." All these statements are admissible for non-hearsay purposes, so the objections are OVERRULED. The court can only conclude that they were filed in an effort to clarify the purpose for which the evidence is admitted.

The 17 facts which Plaintiffs chose to dispute were Nos. 3, 11-16, 20-22, 97-98, 124, 186, 217-218 and 220. (See generally Plaintiffs' Opposition Separate Statement ["POSS"]). Of these, Nos. 3 and 186 involved a disagreement over how to construe the Complaint, while Nos. 11-16 and 20-22, involved a disagreement over how to describe the actions taken by the Secretary.[4] None of these things presents a factual question. Plaintiffs' response to Nos. 217-218 and 220 cites no evidence, it simply reads "Disputed; argumentative; not a fact." Only Plaintiffs' responses to Nos. 97-98 and 124 produce even the hint of a triable issue. But these responses mainly refer the court to the Secretary's own evidence; where they add anything more, they point only to the piece of evidence cited in Plaintiff's Additional Fact No. 247. (POSS No. 247).

That final "fact," No. 247, brings the parties as close as they ever come to a real, material dispute. It reads: "Plaintiffs' expert, Dr. Jonathan Klick, demonstrates that the studies and expert opinions on which Defendant relies are not reliable." (POSS No. 247). The evidence cited in support is, of course, the Declaration of Dr. Jonathan Klick, Ph.D., J.D.

---

[2] Plaintiff adds 19 "Additional Facts," of which 18 were culled directly from the Secretary's evidence and thus cannot represent true disputes. The 19th is Fact No. 247, addressed later in this section.

[3] For Objection Nos. 60, 64, and 65, the objection was relevance. That objection too is OVERRULED. An independent discussion of these three exceptions is not required.

[4] Plaintiffs' responses to Nos. 11-16 simply refer the court to the Secretary's own statement in No. 10. Plaintiffs introduce no evidence of their own.

Dr. Klick is an eminently qualified statistician with an impressive academic and practical pedigree. He provides a robust academic critique of certain studies and opinions produced by the Secretary's experts. But there are several reasons why this does not create a triable issue of fact sufficient to defeat summary judgment. First, as discussed below, there are limits on the extent to which the court can substitute its own evidentiary judgment for that of the legislature. Second (also discussed below) the existence of an evidentiary basis for the legislature's conclusions is merely the beginning of the inquiry. Third, by Plaintiffs' own admission, the Declaration of Dr. Klick was only introduced to challenge the Secretary's data regarding the state's interest in the *economic* benefits of diversity; it does not challenge the state's interest in remediating discrimination.[5] (Reporter's Transcript of Proceedings, March 14, 2022 ["RT"] p. 50:27-51:9).

Neither party believes that there is a triable issue here. Neither party has asked for more time to produce more evidence. The Secretary is convinced that they should win based on the current record. (RT p. 39:18-28). So are the Plaintiffs. (RT p. 57:14-59:8). Plaintiffs concede in their Reply that there is no dispute of fact. (Plaintiff's Reply p. 1:14-18). The disputes are "really" only "about characterizations of evidence." (Id. p. 1:11). The information presented by Dr. Klick was produced purely as insurance – to be used if the court decided that general economic benefits were a compelling state interest. (Id. p. 1:16-18; RT p. 50:27-51:11). For the reasons explained below, that contingency has not come to pass.

The Challenged Law

Corporations Code § 301.4 says, in full:

(a) No later than the close of the 2021 calendar year, a publicly held domestic or foreign corporation whose principal executive offices, according to the corporation's SEC 10-K form, are located in California shall have a minimum of one director from an underrepresented community on its board. A corporation may increase the number of directors on its board to comply with this section.

(b) No later than the close of the 2022 calendar year, a publicly held domestic or foreign corporation whose principal executive offices, according to the corporation's SEC 10-K form, are located in California shall comply with the following:

(1) If its number of directors is nine or more, the corporation shall have a minimum of three directors from underrepresented communities.
(2) If its number of directors is more than four but fewer than nine, the corporation shall have a minimum of two directors from underrepresented communities.
(3) If its number of directors is four or fewer, the corporation shall have a minimum of one director from an underrepresented community.

(c) No later than March 1, 2022, and annually thereafter, the Secretary of State shall include in its report required by subdivision (d) of Section 301.3, at a minimum, all of the

---

[5] The Declaration of Dr. Klick specifically addresses only the testimony of Drs. Alison Konrad, J. Yo-Jud Cheng, and M.V. Lee Badgett. It does not attack the testimony of Dr. Jessica N. Grounds, or any other witness.

following:

> (1) The number of corporations subject to this section that were in compliance with the requirements of this section during at least one point during the preceding calendar year.
> (2) The number of publicly held corporations that moved their United States headquarters to California from another state or out of California into another state during the preceding calendar year.
> (3) The number of publicly held corporations that were subject to this section during the preceding year, but are no longer publicly traded.

(d)(1) The Secretary of State may adopt regulations to implement this section. The Secretary of State may impose fines for violations of this section as follows:

> (A) For failure to timely file board member information with the Secretary of State pursuant to a regulation adopted pursuant to this paragraph, the amount of one hundred thousand dollars ($100,000).
> (B) For a first violation, as described in paragraph (2), the amount of one hundred thousand dollars ($100,000).
> (C) For a second or subsequent violation, as described in paragraph (2), the amount of three hundred thousand dollars ($300,000).

(2) For the purposes of this subdivision, both of the following apply:

> (A) Each director seat required by this section to be held by a director from an underrepresented community, which is not held by a director from an underrepresented community during at least a portion of a calendar year, shall count as a violation.
> (B) A director from an underrepresented community having held a seat for at least a portion of the year shall not be a violation.
> (3) Fines collected pursuant to this section shall be available, upon appropriation by the Legislature, for use by the Secretary of State to offset the cost of administering this section.

(e) For purposes of this section, the following definitions apply:

> (1) "Director from an underrepresented community" means an individual who self-identifies as Black, African American, Hispanic, Latino, Asian, Pacific Islander, Native American, Native Hawaiian, or Alaska Native, or who self-identifies as gay, lesbian, bisexual, or transgender.
> (2) "Publicly held corporation" means a corporation with outstanding shares listed on a major United States stock exchange.

The Nature of This Case

"California's Constitution, unlike its federal counterpart, does not contain a "case or

6

controversy" limitation on the judicial power." <u>Connerly v. State Personnel Bd.</u> (2001) 92 Cal.App.4th 16, 29. In the ordinary course of litigation, that difference between the two constitutions doesn't matter much. Almost all the cases this court handles involve persons who have suffered a real, individual injury (or who seek to prevent such an injury) which was caused by some other named person. But here there is neither an injured plaintiff, nor a named defendant who has caused harm. There is no corporation seeking to avoid compliance. There is no prospective board member seeking an order awarding them a vacant seat. Instead there are three taxpayers seeking a (necessarily abstract) determination that a law is facially unconstitutional.

Such actions are expressly allowed by Code of Civil Procedure § 526a, which says in relevant part as follows:

> "(a) An action to obtain a judgment, restraining and preventing any illegal expenditure of, waste of, or injury to, the estate, funds, or other property of a local agency, may be maintained against any officer thereof, or any agent, or other person, acting in its behalf, either by a resident therein, or by a corporation, who is assessed for and is liable to pay, or, within one year before the commencement of the action, has paid, a tax that funds the defendant local agency, including, but not limited to, the following:
> (1) An income tax.
> …
> (d) For purposes of this section, the following definitions apply:
> (1) "Local agency" means a city, town, county, or city and county, or a district, public authority, or any other political subdivision in the state."

The Secretary argues that *statewide* elected officials running *statewide* departments are not a "*local* agency" under section 526a(d)(1). Therefore, they say, the Secretary of State cannot be a defendant in a taxpayer action.

The trouble with this argument is that a long line of cases has "expanded the right to bring a taxpayer action to include suit against state government."[6] <u>Cornelius v. Los Angeles County Metropolitan Transportation Authority</u> (1996) 49 Cal.App.4th 1761, 1776 (collecting cases). The primary procedural question in taxpayer actions, until very recently, wasn't whether a suit could properly be brought against this or that particular defendant. It was whether the plaintiff needed to pay property taxes to have standing, or whether some other form of tax payment would suffice. See e.g. <u>Weatherford v. City of San Rafael</u> (2017) 2 Cal.5th 1241, 1251.

It is true that in 2018, the Legislature amended Section 526a to answer that question. The amendment enumerated specific types of tax payments that would confer standing. It also added subdivision (d)(1), which provides the specific definition of "local agency" on which the Secretary now relies. However, the Legislative Digest for the amendment indicates that the intent of the Legislature was to "expand" the scope of taxpayer actions. 2018 Cal. Legis. Serv. Ch. 319 (A.B. 2376). And when the Legislature passes a bill, it is presumed to know the current state of the law. <u>Estate of McDill</u> (1975) 14 Cal.3d 831, 837-838. This court can hardly conclude that the Legislature meant to "expand" taxpayer actions by shrinking the number of possible defendants and overturning a large body of case law in the process.

---

[6] The Secretary has acknowledged this case law, though they question whether it should be followed.

In the absence of some appellate authority suggesting that the 2018 amendments to section 526a created a new limitation, this trial court must follow the existing rules.

*The Nature of the Expense*

It is undisputed that the Secretary has spent some taxpayer money[7] on gathering and disseminating information related to corporate compliance with Corporations Code § 301.4. Reporting forms have been updated, informational letters have been mailed out, a new page has been added to the Secretary's web site, and an annual report is being prepared. The Secretary argues that these expenditures are not "illegal" under Section 526a because they merely report or disclose information.

The law is a little subtler than that. The issue isn't the Secretary's collection of information. The issue is the purpose for collection. Where the purpose for disclosure and reporting requirements is simply for the interest value of the information itself, there is no constitutional violation. Connerly, *supra*, 92 Cal.App.4[th] at 56. But where the purpose of disclosure and reporting requirements is to secure or measure compliance with some specific stated goal, there may well be a constitutional violation even if there is no monetary penalty for failure to comply. Id. at 52.

Plaintiffs' complaint is that Section 301.4 imposes an improper duty on corporations to have a certain number of directors from certain demographic groups. The Secretary is enforcing that duty by collecting and preparing to publish compliance information. If Plaintiffs are right that this statute imposes an unconstitutional duty, then the Secretary's efforts to discover and publicize non-compliance are enforcement efforts. The presence or absence of "real teeth," in the form of a monetary or other penalty, does not matter.

*Ripeness*

The foregoing discussion also resolves the parties' ripeness arguments. The Secretary contends the controversy here is not ripe because (a) Section 301.4(d)(1) makes the imposition of a monetary penalty discretionary and (b) the Secretary has not yet exercised its discretion to impose such a penalty. Leaving aside the cold nature of that comfort, monetary penalties are not the only means of enforcing an unconstitutional duty. The Secretary is already engaged in such enforcement by instructing corporations to comply and preparing public reports on their compliance. The controversy is indeed ripe.

Public Contracting

Plaintiffs argue that Section 301.4 violates Article 1, Section 31 of the California Constitution. It does not.

---

[7] The Secretary does contend that the money spent wasn't *all* taxpayer money, but this is immaterial. There is no requirement that the challenged conduct be exclusively tax-funded. It is enough that the defendant entity be partially funded by tax dollars.

The relevant portions of Article 1, Section 31 of the California Constitution read as follows:

> "(a) The State shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting."

Plaintiffs' motion flatly asserts that Section 301.4 falls afoul of Article 1, Section 31 because some of the corporations subject to Section 301.4 currently hold public contracts. That argument is suspect in the extreme. In none of their papers do Plaintiffs cite any authority to support it. Section 301.4 does not condition the award of public contracts on compliance with its provisions. It doesn't mention public contracting at all. There is no reason that a constitutional provision governing the award of public contracts should affect laws in other subject areas simply because those laws regulate the behavior of some companies that also happen to have a public contract. By its plain terms, Article 1, Section 31 applies to the hiring of public employees, the operation public schools, and the award of public contracts. Section 301.4 affects none of those things. There is no violation of Article 1, Section 31.

However, given the following discussion, the court's answer to this question is MOOT. Judgment cannot be awarded in favor of the Secretary because, as explained in the next section, Section 301.4 *does* violate Article 1, Section 7 of the California Constitution. Therefore, the Secretary's motion for summary adjudication on Issue No. One is DENIED as MOOT.

Equal Protection

Article 1, Section 7 of the California Constitution says that

> "(a) A person may not be deprived of life, liberty, or property without due process of law or denied equal protection of the laws...
> (b) A citizen or class of citizens may not be granted privileges or immunities not granted on the same terms to all citizens. Privileges or immunities granted by the Legislature may be altered or revoked."[8]

"A legislative classification satisfies equal protection of law so long as persons similarly situated with respect to the legitimate purpose of the law receive like treatment." Connerly, *supra*, 92 Cal.App.4[th] at 32. "Legislative classifications generally are entitled to judicial deference... However, judicial deference does not extend to laws that employ suspect classifications, such as race. Because suspect classifications are pernicious and are so rarely relevant to a legitimate governmental purpose [citation], they are subjected to strict judicial scrutiny; i.e., they may be upheld only if they are shown to be necessary for furtherance of a compelling state interest and they address that interest through the least restrictive means available." Id. at 33.

---

[8] Section 7(a) contains a rather lengthy amendment, dating from the 1970s, discussing school busing programs. Those provisions are not relevant to this case.

*Facial Challenge*

Plaintiffs argue that Corporations Code § 301.4 is, on its face and without regard to any individual application, in violation of Article 1, Section 7. To succeed on this type of challenge, Plaintiffs must show that Section 301.4 "inevitably pose[s] a present total and fatal conflict" with Article 1, Section 7. Arcadia Unified School Dist. v. State Dept. of Education (1992) 2 Cal.4th 251, 267. That is exactly the sort of conflict present here.

Section 301.4 clearly applies suspect categories: it imposes a duty on corporations to use such categories in the selection of their board members. It requires corporations to have a specific number of directors who are members of certain listed races, or else have certain listed sexual orientations or gender identities.[9] People of other races, orientations, and identities are necessarily excluded from those board seats.

In an effort to avoid this plain and obvious issue, the Secretary suggests ever more complex possible scenarios, searching for a situation where compliance with Section 301.4 would *not* conflict with Equal Protection. They search in vain.

The Secretary suggests that a corporation could use an anonymized selection process that "should" produce a compliant board. But the Secretary has no way of knowing what an anonymized selection process would produce. What if the anonymized process does not produce a compliant board? Well, says the Secretary, repeat the process until it *does* produce a compliant board. (Defendant's Opposition p. 17:1-2). This gives the game away. The object is to use an apparently neutral method to achieve a non-neutral, pre-determined outcome.

Another idea is to expand the size of the board, so no current director need be displaced. But that does not cure the problem: each new board seat would necessarily belong only to one of the groups on the list and to no one else. On the flip side, the Secretary suggests that some boards would be compliant if they were smaller – corporations in that situation might simply refuse to fill seats as members from the excluded groups leave. But again, that strategy only works if the person leaving is *not* a member of one of the groups on the list. Even then, the corporation would be failing to choose a replacement for one of two reasons: either because it did not want to hire someone from the listed groups, or because it was afraid it might select someone from an unlisted group.

Finally, the Secretary observes that corporations are, and have always been, free to act themselves to increase their own diversity. Of course. But so what? Voluntary action, by definition, is not compliance with a statutory mandate. In that scenario, both Section 301.4 and the Equal Protection clause would simply be out of the picture. The fact that the constitution and laws *permit* an action does not mean that the government is free to *command* it.

Plaintiffs have properly brought a facial challenge to this law.

---

[9] It is not disputed that these are all suspect classes for the purposes of the Equal Protection clause of the California Constitution.

*Similarly Situated*

The Secretary argues that the classification contained in Section 301.4 is justified because the listed groups and the unlisted groups are not "similarly situated." As noted above, an Equal Protection challenge can only succeed if "similarly situated" people are treated differently. Conversely, if the people treated differently are *not* similarly situated, there is no Equal Protection claim.

The Secretary claims that the listed groups are not "similarly situated" to anyone else because they are "underrepresented" and have been subjected to discrimination. But Equal Protection rights are individual rights, not group rights. Taking Offense v. State (2021) 66 Cal.App.5th 696, 725 (quoting Woods v. Horton (2008) 167 Cal.App.4th 658, 671). Thus, the statement that a certain *group* is (or has been) the subject of discrimination is not conclusive about a given set of *individuals*. Accepting the Secretary's contention would short-circuit the Constitutional analysis; a legislative finding of fact regarding group discrimination could prevent the court from ever applying strict scrutiny in the first place. Arguments regarding discrimination against certain groups belong in the analysis of compelling government interests, which comes later.

The relevant set of individuals here is those who are qualified to sit on corporate boards. There are many people of all identities who are ready, able, and willing to serve in that capacity. No party to this case disputes the existence of large pools of qualified talent, no matter what group one looks at. Therefore, individual members of both the listed groups and unlisted groups are similarly situated when it comes to board seats. The only difference between them is that members of certain groups will look around the boardroom and see far fewer faces that look like theirs. Why that is, and what can be done about it, come in at the next step.

But before moving on to that topic, it is worth noting that the groups selected for preference by the statute are not inclusive of all numeric minorities. In a written inquiry, the court asked specifically why these groups were chosen. The court also asked why two different types of minorities (ethnic and sexual orientation/identity) were included while other types of minorities (such as religious minorities) were excluded. In their Reply (at footnote 7), the Secretary stated that these were the groups that had statistical discrepancies and no other group asked to be included. In effect, the included groups were included simply because they asked to be. Excluded groups were excluded because they didn't show up.[10]

At oral argument, the court and counsel had a focused discussion on the decision to include Asians, who were *not* originally one of the groups selected for preference. (Reply p. 11 fn.7). The Secretary argued that Asians should be a preferred group because Asians are highly represented in "managerial" positions but are not highly represented on boards.[11] (RT 23:25-

---

[10] Counsel for the Secretary also suggested that any confusion about the categories was an additional reason that the controversy is unripe; they offered that the Secretary might issue future regulations regarding how to read the categories. (RT p. 30:8-25). It is hard to see what the Secretary could change by regulation. The language of the statute is straightforward – a board member must self-identify with one of the listed labels. That's it. There is no room there for the Secretary to tinker with the definitions of any given category.

[11] The findings made by the Legislature at the time of passage also include a reference to a report by the Ascend

25:4). There are at least two problems with that argument. First, it relies on a significant ambiguity in the term "managerial." It is true that, nationwide, 54% of Asians work in what the Bureau of Labor Statistics calls "management, professional, and related occupations." (Defendant's RJN Exhibit 1, Section 1(a)). But that might include anything from running a big box store to civil engineering to the practice of medicine. It doesn't mean that 54% of Asians are presently qualified to sit on a major corporate board.

Second, the Secretary's comparison relies on nationwide statistics, rather than focusing on California. As explained below, the information relevant to a California law is the state of play in California. Legislators in the Golden State cannot use discrimination beyond our borders to justify the use of racial categories within our borders. And the California numbers included in the Legislature's own findings show that 42% of corporations subject to this law already have at least one Asian member. (Defendant's RJN Exhibit 1, Section 1(e)). The next closest listed minority was African-Americans, who are represented on 16% of covered corporate boards. (Id.).

The foregoing two paragraphs illustrate the hazards of deciding to lump every preferred minority group (other than women) into a single, exclusive list. A justification must be produced for every group.[12] And it leaves pregnant the question of what to do if a minority group that was excluded from the initial list wants to be added later. Does the Equal Protection clause compel the addition of any subsequently-identified group? Can the boundaries of these groups be policed in any rational way, given that the statute determines membership solely by self-identification? Finally, there is the practical fact that every group added to the list waters down the benefits for the other groups. If a corporation need fill only a certain small number of seats with members of these communities, then it may do so by hiring only from one of the minorities on the list.[13] None of these things are direct reasons to find Section 301.4 unconstitutional, but they do suggest several of the more serious problems discussed above and below, chief among them the lack of focus on a specific, definable target issue.

*Compelling Interest*

When the state uses a suspect classification, its action is not entitled to the presumption of constitutionality that courts would ordinarily apply. Connerly, *supra*, 92 Cal.App.4th at 36. In

---

Foundation, to the effect that Asian Americans "were the least likely to be promoted to manager or executive positions in California." (Defendant's RJN Exhibit 1, Section 1(l)). That seems to contradict the Secretary's statement that Asians are overrepresented in managerial positions. But in any event, the study referred to was not submitted to the court and is not itself part of the present record, so it cannot be evaluated.

[12] See Connerly, *supra*, 92 Cal.App.4th at 38-39: "[T]he remedy must be designed as nearly as possible to restore the victims of specific discriminatory conduct to the position they would have occupied in the absence of such conduct. Random inclusion of racial groups without individualized consideration whether the particular groups suffered from discrimination will belie a claim of remedial motivation. The lack of any effort to limit the benefits of a remedial scheme to those who actually suffered from specific discrimination will be fatal to the scheme." (Internal citations omitted).

[13] For example, a corporation that wished to avoid hiring members of a different ethnicity might hire members of the LGBT community instead.

fact, the reverse is true – the burden is on the state to demonstrate a justification. Id. The state must identify a compelling interest "with some degree of specificity." Id. at 36-37. This specificity requirement is meant to ensure that the state's reasons are clear and concrete – an abstract desire to remedy some general social problem is not a compelling interest.[14] See Id. at 36; see also Shaw v. Hunt (1996) 517 U.S. 899, 909-910; City of Richmond v. J.A. Croson Co. (1989) 488 U.S. 469, 505-506; Wygant v. Jackson Bd. of Educ. (1986) 476 U.S. 267, 276. The state has to say precisely what it means to fix so that it can properly craft (and others can properly evaluate) the remedy. Shaw, *supra*, 517 U.S. at 909; Croson, *supra*, 488 U.S. at 507.

The Secretary offers two possible compelling interests here. First, they say that the state has a compelling interest in remedying discrimination in corporate board selection. Second, they say that the state has a compelling interest in obtaining various public benefits that would come from diverse boards: more profitable corporations that lead to better investment returns for public pension plans and more tax revenue for the state, better corporate integrity and oversight, more inclusive workplaces, and so forth. Each of these proffered interests is discussed, in turn, in the following two subsections.

**Remediation**

It is true that remediating discrimination may be a compelling interest. See Taking Offense, *supra* 66 Cal.App.5th at 717; Connerly, *supra*, 92 Cal.App.4th at 37. However, as previously noted, it is not enough for the state to broadly offer an intent to address general discrimination. The state must identify a specific arena in which discrimination has occurred. "A generalized assertion that there has been discrimination in a particular industry or region is insufficient." Connerly, *supra*, 92 Cal.App.4th at 38.

*Specific Arena*

What is a properly focused arena, and where exactly is the line which divides a proper target from an improper target? As with so many things in the law, it is easier to identify the cases at the extremes than to articulate a rule that provides guidance moving forward.[15] But the phrasing of Connerly and a survey of the cases it cites (such as Wygant and Croson) suggest an answer. As quoted in the previous paragraph, Connerly forbids general assertions of discrimination "in a particular industry *or* region." (Emphasis added). In other words, it is not enough to say, 'there has been discrimination in the construction trade' or 'there has been discrimination in California.' But where discrimination can be pegged to a particular industry *and* region, then the issue has sufficient definition to be addressed – the hiring of teachers in a given district (as in Wygant) or the construction business in a given city (as in Croson).

---

[14] There is another aspect to this, not relevant here – the proffered interest must have been the 'actual purpose' behind the action. The state cannot use a facially innocuous purpose to serve as a stalking horse for their real motives. There is no dispute in this case as to the motives of the Legislature in passing Section 301.4.

[15] On the one hand, per the cases quoted above, general societal discrimination is not a sufficiently specific, definable target. On the other, a particular unit of municipal government (Wygant, *supra*, 476 U.S. at 274-275) or a single industry within a given city (Croson, *supra*, 488 U.S. at 504-505) *is* a sufficiently definable target.

Here, the arena in which discrimination has occurred is "in corporate board selection." That is neither confined nor specific. It covers the entire nation and all industries.[16] True, Section 301.4 is limited to California companies, but that limitation is born of jurisdictional concerns, not any evidence that Californian boards are particularly bad. The evidence considered by the Legislature and presented by the Secretary ranges across all sorts of categories, from the Fortune 100, Fortune 500, and Russell 3000 indexes to the various insurance companies that fall under the regulation of California's Insurance Commissioner. This is not the sort of concrete area in which the state interest in fixing discrimination can become compelling.

At oral argument, the Secretary emphasized that by confining Section 301.4 to corporations listed on a major stock exchange and headquartered in California, the Legislature would only be regulating .7% (or .07%) of the stock companies in California. (RT p. 24:5-11). The raw number of companies is over 600, give or take a few. As a number, that may not seem like much. But an arena doesn't become focused simply because numbers feel small. Taking a thin slice off the top of an economy as large and dynamic as California is a bit like taking a thin slice off the top of a fruitcake. What you're likely to get is a wide variety of quite different ingredients.

No one has presented evidence to tell this court who the regulated companies are. They almost certainly include some of the tech companies of Silicon Valley, perhaps entertainment companies from Hollywood, pharmaceutical companies from San Diego, maybe agriculture and/or lumber companies from the Central Valley and the North Coast. The list is surely *not* confined to any one industry or geographic region.

What's more, the persons qualified to be on the board of a tech company are probably not equally qualified to sit on the board of an agribusiness, or an entertainment venture. The lack of focus on a given industry probably has a meaningful impact on the pool of qualified candidates. Of course, the court has no way of knowing that for sure because, as discussed more fully below, no attempt has been made to define that pool. Which leads back to the specificity requirement: if the Legislature cannot define the pool of qualified candidates, how can it say that it has properly focused its efforts on a specific arena of discrimination?

### "Convincing Evidence" Required

Even if the state could meet the specificity requirement, there is also an evidentiary requirement. As Connerly, *supra*, 92 Cal.App.4th at 37 describes it, the state must "have convincing evidence" that their remedial action is necessary. That rule poses interesting questions for the interaction of the judicial system with the other branches of government.

It is not immediately clear how the courts are supposed to determine if the Legislature has "convincing evidence" that their action was necessary. Are they merely checking to make sure that the Legislature's findings were not a sham? Or are they supposed to substitute their own

---

[16] When this court questioned the Secretary on its use of certain national statistics instead of California statistics, counsel replied that national statistics were appropriate because the corporations subject to Section 301.4 "draw from a national pool." (RT p. 29:1-15). It is hard to see how the measure is confined to a specific arena when it is being justified by national statistics and is intended to have a national effect.

judgment for that of the Legislature and hold a trial to see if there really is discrimination that needs to be remediated? The prospect of an *un*elected branch of government simply telling an *elected* branch that they were wrong about certain social facts…is not particularly palatable. Courts are not well-situated to make broad-based investigations of societal issues, as they are confined to the evidence and arguments presented by counsel and cannot make their own independent inquiries into the facts.

Neither party presented written argument on this issue. When questioned at oral argument, both parties agreed that the court should not re-weigh the evidence and substitute its own judgment for that of the Legislature. The Secretary suggested, relying in part on Hiatt v. City of Berkely (1982) 130 Cal.App.3d 298, that the court would just look to see if there was some basis to support the Legislature's conclusions.[17] (RT p. 42:1-43:5). The Plaintiffs suggested that the court should establish a cut-off point in time – the date the bill was passed – and only consider facts that were put in the legislative record prior to that date. (RT p. 43:14-44:17). Those facts would either be in line with Connerly or they wouldn't.

The Secretary's citation to Hiatt is not terribly helpful; the phrase "convincing evidence" is nowhere to be found in the opinion, which simply relied on a trial court finding that the City of Berkeley had no evidence at all to support its conclusions. And the Plaintiff's suggestion that the Secretary cannot use post-passage evidence to bolster the Legislature's position is untenable. If this court refused to consider evidence generated after passage, it would risk invalidating Section 301.4 based on an inadequate record even the facts to make an *adequate* record were already before it. See Coral Const. Co. v. King County (9th Cir. 1991) 941 F.2d 910, 920-921.[18] Put a little more plainly, the court would only be sending the matter back to the Legislature so that the Legislature could put the Secretary's evidence packet into the record and send the matter back to the court. That sort of interbranch ping-pong should be avoided.

Further reading of Connerly suggests a solution to the court's quandary. During its consideration of individual programs, the panel made the following observations:

> "Under equal protection principles, the use of statistical underutilization to establish hiring goals suffers from a fatal flaw. The scheme can be viewed in only two ways. It may represent a decision to assure participation of some specified percentage of a particular group merely because of race or gender, which would be impermissible discrimination. Or the use of statistical underutilization to establish hiring goals may be viewed as the establishment of a conclusive presumption of prior discrimination based upon statistical disparity. The problem with this is that, while statistical underutilization may serve as significant evidence of prior discriminatory hiring practices, it is not conclusive and is not, in itself, proof of discrimination. There may be explanations other than discrimination for statistical variations, and detailed consideration of past hiring

---

[17] The Secretary also suggested that this court should conduct an unbounded "totality of the circumstances" evaluation, citing Washington v. Davis (1976) 426 U.S. 229, 242. (Reply p. 10:7-8; RT P. 25:5-11). But that case was talking about how to determine whether the government was using a facially neutral test to serve the ulterior motive of a desired racial outcome. That is not a mystery the court faces here.

[18] Overruled on unrelated grounds by Board of Trustees of Glazing Heath and Welfare Trust v. Chambers (9th Cir. 2019) 941 F.3d 1195.

practices may rebut the inference suggested by statistical evidence. Constitutional rights cannot be foreclosed through the use of presumptions rather than proof. Accordingly, statistical anomalies, without more, do not give a governmental entity the legal authority to employ racial and gender classifications." Connerly, *supra*, 92 Cal.App.4[th] at 55-56.

Based on this discussion, when the court is looking for "convincing evidence" it is checking to see what kind of investigation has been done, either before passage of the bill or since. It is looking for a "detailed consideration" of past practices in the affected arena. Statistical evidence is "significant" but by itself insufficient to support a finding of discrimination. Likewise, anecdotal evidence in the form of testimony from individuals who have observed discrimination in the defined arena is not by itself sufficient to prove discrimination. See Coral Const., *supra*, 941 F.2d at 919. However, when combined, anecdotal evidence may 'bring statistical numbers to life'; conversely, statistics may show that anecdotes are more than just a few unfortunate anomalies. See Id.

### The Evidence Offered

So, what evidence has been produced? On the anecdotal front, the Secretary has presented the declarations of Guy Primus, Sukhinder Singh Cassidy, Virgil Roberts, Oswaldo Gromada Meza, Fabrice Houdart, Lawrence Low, Coco Brown, and Catherine A. Halligan. The court has reviewed these declarations and found that they are of the type which could, when combined with proper statistics, support a finding of discrimination.

On the statistical front, the ground is shakier. The sort of numeric anomaly which will support a finding of discrimination has been carefully defined by both Connerly and the Supreme Court cases it cites. There must be a disparity between the demographic make-up of *the qualified talent pool* and those who hold positions in the targeted arena. See Connerly, *supra*, 92 Cal.App.4[th] at 55-56 and Wygant, *supra*, 476 U.S. at 274-275 (both citing Hazelwood School Dist. v. U.S. (1977) 433 U.S. 299, 311-313).

There was a study[19] done by the Latino Corporate Directors Association ("LCDA"), prior to passage of Section 301.4, which used 10-K filings to identify the directors of publicly held California corporations and then used other publicly-available information to determine the racial and ethnic identification of each director. (Declaration of Jessica N. Grounds ¶¶ 16-18). This supplies a reasonably accurate comparison point: the demographics of those holding directorial positions in publicly held California corporations, prior to the law's passage. But that data point means little without something to compare it to. And that is where both the Legislature and the Secretary have come up short.

No one in the record appears to have made any effort to identify, define, or survey the qualified talent pool for director positions.[20] Instead, the numbers produced by the LCDA study

---

[19] The Secretary has presented other studies, of course. But these studies miss the required level of precision on both sides. They are either national in scope (and thus too broad to justify a state-level measure) or local to places like Silicon Valley (and thus too narrow to justify a statewide measure).

[20] Some of the experts have identified common feeder positions (such as "C-Suite" executive roles) and academic

are compared to the general population. (Declaration of Jessica N. Grounds ¶¶ 22-26; Declaration of Alison Konrad ¶ 10). But the general population is manifestly not the qualified talent pool for corporate board seats. While anyone off the street might someday *become* the sort of person who sits on boards, it is absurd to suggest that any member of society, selected at random, would *presently* fit that bill. Therefore, the evidence currently presented to the court fails to show the required statistical disparity between actual directors and the set of people qualified to be directors.

At oral argument, prompted by this court, the Secretary offered two other types of evidence for consideration. First, they offered evidence to show that there is an issue in the pipeline – that the "C-Suite" executive jobs which are the most common "feeders" for board positions belong disproportionately to straight, cisgender white males. (See e.g. Declaration of Jessica Grounds ¶¶ 27, 36). This is not evidence of discrimination in *board* selection. It may well be evidence of discrimination in the selection of C-Suite executives. That is not before this court – perhaps it should be. But a person is not necessarily engaging in discrimination when they look at a talent pool full of white people and pick a white person.[21]

Second, the Secretary offered evidence to show that the board selection process is secretive, exclusive, and dependent on the personal networks of those already holding board positions. This is indeed proof of a structural problem which could viably be traced to past discrimination. (RT p. 25:24). If overt discrimination in years gone by placed a certain segment of the population on boards, and new board members are selected by old board members, and old board members make their choices from their own social networks – then it is easy to see how people who are not from the entrenched segment of society would be excluded. People tend (though it is far from a categorical rule) to build social networks that resemble themselves.

The trouble with that argument is the assumption it requires. For the logic to hold, the court must assume that at some unspecified point in the past California corporations overtly discriminated against every group listed in Section 301.4. That assumption is probably safe. It would certainly be unsurprising. But it is still an *assumption*, based on our knowledge of general

---

qualifications (such as an MBA), but there appears to be no one single "gatekeeping" qualification that could be used to define the pool in the way that a license might for lawyers and medical professionals, or a credential might for teachers.

[21] There is a definitional issue to flag here. As overt, conscious, and express discrimination recedes, it may leave behind structural distortions in society and unconscious biases. Both the tide of discrimination and the jetsam it leaves behind may have the same practical effects and get called by the same name, but that does not make them quite the same thing. At oral argument, Plaintiffs pushed to define only conscious, deliberate action as "discrimination." It is not clear that the law shares their semantic rigidity. As the Secretary pointed out in response, and as explained above, the law will conclude that discrimination exists without necessarily identifying and proving a case with a specific perpetrator or victim.

It is also worth pointing out that any robust notion of cultural pluralism requires a factfinder to at least consider the possibility that the presence or absence of a given group in a given industry is the product of benign cultural preferences. Of course, that may not be the case. But this is the question posed by the existence of statistical disparities: are we seeing a result of invidious discrimination, or benign cultural differences? The same evidence which raises the question cannot also conclusively answer it.

societal discrimination. And as explained above, general societal discrimination is not something that will justify the use of a suspect category in a particular context. The bill that enacted Section 301.4 contained no findings of historical discrimination on California corporate boards. (Defendant's RJN Exhibit 1). Nor has the Secretary produced any such evidence.

### *Summation*

In short, the law has not properly defined a sufficiently specific arena in which discrimination is to be remediated. And even if it had, the Secretary has not produced evidence of discrimination which this court could find "convincing" under Connerly. Their statistics do not have a proper comparison group – they have no measurement of the qualified talent pool, and thus they cannot show a proper statistical disparity. The Secretary's anecdotal evidence is all right as far as it goes, but it cannot be convincing *by itself*. It needs the support of either (1) a properly established statistical disparity or (2) a properly traced statistical history showing that, from a time of formal discrimination until now, the composition of boards has remained unchanged. Because the law does not define a sufficiently specific arena, and is not supported by convincing evidence of discrimination, the state's interest in remediating discrimination cannot be used to justify this measure.

## Public Benefits

The Secretary conducts their discussion of this alleged interest by spelling out all the benefits that a business gets from having a diverse board. Diverse boards lead to better decision-making and higher profits, says the Secretary, because people from different backgrounds are likely to see problems in different ways. Returning to the premise that minority status is a reasonable proxy for differing perspectives and experiences, the Secretary posits that people with different backgrounds are probably going to question each other's assumptions rather than share them. A diverse board is more likely to generate unique approaches, and to handle their diverse employees in an appropriate way.

All of this makes intuitive sense.[22] Two heads are better than one. And a pairing of one head from San Francisco and one from Fresno may well be better than a pairing of two heads from San Diego. Plaintiffs do not dispute the internal validity of the reasoning. What they dispute is whether this sort of generic interest in healthy business can constitute a compelling state interest. It cannot.

Healthy businesses are obviously a good thing. But the state's generic interest in healthy businesses is not sufficiently specific or immediate to permit the use of suspect classifications. It is not difficult to accept the proposition that diverse boards may be "good for business." Nor is it hard to believe that the knock-on effects of strong businesses include more tax revenue, better performance for pension funds, and better workplaces with happier employees. But if these downstream, indirect effects were to be compelling interests, there is no limit to what might be allowed, provided the economic data were properly massaged.

---

[22] It is akin to the rationale that justifies the jury system, in which 12 laypersons representing a broad cross-section of the community are called on to decide the facts of a case.

The Secretary's cited cases do not support their position. <u>McGlynn v. State of California</u> (2018) 21 Cal.App.5[th] 548, 564-565 involved the technical administration of a judicial pension fund; the plaintiffs' claims to certain vested pension rights had direct effects upon the balance sheets of that pension fund. <u>West Corp. v. Superior Court</u> (2004) 116 Cal.App.4[th] 1167, 1180 didn't involve Equal Protection at all; it involved the court's ability to assert personal jurisdiction over a given defendant. On the federal side, <u>Grutter v. Bollinger</u> (2003) 539 U.S. 306, 328 found a compelling interest in the diversity of the student body on a college campus. And <u>Larsen v. U.S. Navy</u> (D.D.C. 2007) 486 F.Supp.2d 11, 29-30 deferred to the national Navy in its assertion that a diverse officer and chaplain corps was essential to its national security goals.

None of these cases stands for the proposition that general economic health or good business practices are a compelling state interest in this context. They address very specific and narrow situations: the size and extent of pension benefits,[23] the administration of a public university, and the composition of a particular subsection of the armed forces. The state's interest in farming taxes is not compelling for constitutional purposes.

During the hearing, the Secretary essentially conceded this point. Counsel said that "it's critically important that [the economic interest] is not by itself…the very fundamental and well-recognized interest is in remedying discrimination." (RT p. 35:10-15). If the economic interest is not compelling by itself but becomes compelling by joining with another interest that *is already* compelling by itself…then the economic interest is simply not compelling. Defendant Secretary has failed to establish any compelling interest which would justify Section 301.4.

*Narrow Tailoring*

However, even if this court were to find that the Secretary had shown a compelling interest, they would still have to establish that the remedy chosen is narrowly tailored to suit that interest. "Only the most exact connection between justification and classification will suffice." <u>Connerly</u>, *supra*, 92 Cal.App.4[th] at 37. "The classification must appear necessary rather than convenient, and the availability of nonracial alternatives—or the failure of the legislative body to consider such alternatives—will be fatal to the classification." <u>Id.</u> Narrow tailoring does not require the state to try *every* alternative which may occur (after the fact) to the active imaginations of hostile parties or musing judges. See <u>Grutter</u>, *supra*, 539 U.S. at 339; <u>Coral Const.</u>, *supra*, 941 F.2d at 923. But it does require serious consideration of race-neutral steps which are plainly available and not obviously impractical. See <u>Grutter</u>, *supra*, 539 U.S. at 339; <u>Coral Const.</u>, *supra*, 941 F.2d at 923.

Despite the relatively short discussion of narrow tailoring in the Secretary's moving and opposition papers, this is where Section 301.4 rests on the thinnest ice. It is true that the minimum requirements are not a "quota" in the strictest sense of the term – there is no specific percentage of directors that must be met. A company with a board of nine complies when three directors are from the listed groups; a company with a board of ninety would likewise comply

---

[23] If Section 301.4 was truly intended to help state pension plans, it should have been targeted at companies whose stock the pension plans hold. It does the pension plans no good to improve the profitability and stock prices of businesses they *don't* hold.

with only three directors from the listed groups. Nevertheless, even a requirement like this (which the Secretary repeatedly calls a "flexible floor") reserves a certain number of seats for directors from the listed groups, necessarily excluding anyone else from those seats.

A numeric requirement is certainly the most direct path to the Legislature's desired result. But there is precious little indication that the Legislature seriously considered or attempted other intermediate and race-neutral measures. It is worth noting here that the Secretary has submitted many of the legislative materials for Corporations Code § 301.3, which deals solely with gender discrimination. That statute is not at issue in this case. While these materials are relevant for their discussion of network effects and how statistical disparities come to exist, they are less revealing on the issue of alternative methods for dealing with race, sexual orientation, or gender identity discrimination.

Counsel for the Secretary suggested that the approach of creating a numeric goal came from Wygant. (RT 39:6-9). The Court in that case said that firing people to achieve racial parity among employees in a school district would not be narrowly tailored – a "hiring goal" would be a better idea. Wygant, *supra*, 476 U.S. at 283-284. However, the Court did *not* order the school district to expand the number of positions available so that the new jobs could be filled by members of a certain group. That is the only option available to corporations who (1) were not already in compliance with Section 301.4, (2) wish to comply with Section 301.4, and (3) do not want to fire any current board members. Wygant does not support the position that this measure is narrowly tailored.

The Secretary's primary evidence that lesser measures would fail is the California Department of Insurance's attempt to get insurance companies to diversify their boards. The Declaration of Dave Jones details those efforts, which were composed of voluntary surveys, seminars, and other initiatives of a similar nature. But when the Insurance Commissioner wished to go farther than simple cajolery, when he wanted to publicly disclose the board composition of the companies under his jurisdiction, the Legislature *declined*. (Declaration of Dave Jones ¶ 19). The former Commissioner attributes that rejection to a strong lobbying effort from the companies involved. (Id. ¶ 18).

For some years, the state maintained a "Registry" of capable and qualified women and minorities who wanted to sit on boards. (Declaration of Dana Loewy). This Registry required that individuals pay $200 biennially to be listed, and it required that corporations pay $500 for access to the list. (Id.). Only 28 corporations joined, and it appears the Registry was ultimately abandoned. (Id.). The two largest state pension funds likewise created a database of diverse potential board candidates. (POSS Nos. 201-202). This got a somewhat larger buy-in – possibly due to the pension funds' shareholder status in certain companies. (Id.). And in 2013 the Legislature also passed a concurrent resolution calling on corporations to add diverse members to their boards. (POSS No. 197). The response to these various initiatives was not satisfactory to the Legislature.[24]

---

[24] There is also evidence that, prior to the passage of Section 301.4, individual Legislators went to have personal meetings with unidentified business leaders about the issue of diverse boards. (POSS No. 207-212). It is not clear that this can be counted as an initiative of the Legislature since it involved no official acts, but it is worth noting.

According to the Secretary, the Legislature had finally had enough of asking. Now it was time for telling. Their frustration is somewhat sympathetic. But by escalating from somewhat blasé and voluntary requests straight to a numeric mandate, they skipped over several possible intermediate and neutral steps, some of which were obvious even to their own experts, members, and counsel. The most prominent of these is a disclosure requirement that would compel corporations to reveal the demographic information of their board members.

One of the Secretary's experts, Ms. Jessica N. Grounds, put it thus at paragraph 35 of her declaration:

> "Another external barrier for underrepresented groups to appointments on California company boards is the lack of transparency in data collection, particularly in the case of demographic leadership data related to race, ethnicity, sexual orientation, and gender identity. For example, a recent report found that for the 2021 proxy season, only 26.9% of Russell 3000 companies included information on the racial/ethnic composition of their board. Like many things in business, you cannot measure or set goals for things that you do not track. When there is a lack of a baseline, it is hard to know where you stand, and oftentimes your assumptions are inaccurate without solid data. For example, a study conducted by McKinsey and LeanIn of 70,000 employees and eight-two companies in the United States found that over 50% of men surveyed thought that women were well-represented in their company's leadership positions, when, in fact, women held only in 1 out of 10 leadership positions. Based on my experience, this misperception is applie[d] in a similar manner to other underrepresented groups enumerated in AB 979. In my expert opinion, the lack of data collection itself, is a structural barrier to board service for underrepresented groups."

In a hearing conducted after Section 301.4 was enacted, several of the participants echoed the catchphrase "what gets measured gets done," emphasizing the necessity of getting corporations to disclose the demographics of their directors. (Declaration of Sonya Ledanski Hyde Exhibit 4, p. 31:22ff). This would allow Legislators to understand the terrain they may need to regulate, and it would allow shareholders likewise to understand the composition of boards and take whatever action they deem appropriate.

Not only has the Legislature not attempted this, but as noted above, they rebuffed the efforts of the former Insurance Commissioner to do so. The Secretary has gone through a few possible alternatives (such as the NFL's "Rooney Rule") and tried to explain why they wouldn't work. And perhaps the Secretary is right about those alternatives. But the Legislature did not take the simplest and most obvious next step: a disclosure requirement. That approach was not tried and found ineffective. It was found politically difficult and left untried.

The obscurity of the board selection process forms a central part of the rationale behind Section 301.4. On page 8 of their Reply, Plaintiffs have made a helpful collection of the evidence regarding how board members are selected: the existing board gets together in a confidential setting, comes up with candidates which are contacted at some point, and ultimately proposes a person to the shareholders, who then vote.[25] In a memorable sentence, the Secretary has

---

[25] What this means is that people who have been considered and rejected may never even know they've been

described that process as "a highly subjective, secretive, and insular decision making process that relies on social networks dominated by white, straight, cisgender men and...infected with in-group bias." (Defendant's Opening Memorandum p. 9:24-10:1). According to the Secretary's arguments and experts, it is this process which leads, even unintentionally and subconsciously, to the exclusion of minorities from board seats.

As already noted, the Secretary believes that a neutral process "should" produce a board which would comply with Section 301.4; they urge that companies could and should use such a process. If that is the state's position, then another obvious step (aside from disclosure requirements) would be to alter the board selection process. If the process is the problem, why not change it? Yet the state has made no attempt to do so.

When this court posed the possibility, the Secretary responded by citing two pieces of evidence: a footnote in the declaration of their expert stating that boards generally meet confidentially, and a line from a trial transcript in another case where an expert speculates that an open process might affect the stock price of the company or personally embarrass the people under consideration for the seat. (Defendant's Reply p. 12:15 [citing the Declaration of Darren Rosenblum at fn. 5 and the Declaration of Anthony V. Seferian, Exhibit 3]). But the fact that boards generally *do* meet confidentially doesn't mean that they always *should*. And the idea that stock prices might fluctuate based on new information about company leadership is hardly alarming; that is how the market is supposed to work. As for the speculation that a person might be embarrassed to have their candidacy known...suffice it to say that the personal modesty of the successful (where such modesty exists) is a true ornament to their personality, but not a reasonable basis on which to formulate public policy.

In sum, even if the Secretary had established a specific, compelling interest, Corporations Code § 301.4 is not narrowly tailored to serve that interest. It is not the least restrictive means available for accomplishing the goals the Legislature had in mind. There are other obvious and neutral measures suggested by the legislators themselves, their experts, their witnesses, and even the statements of their lawyers. These measures were not attempted. Worse, in at least one instance they were rejected. That is fatal to the mandate of Section 301.4.

Conclusion

Corporations Code § 301.4 violates the Equal Protection Clause of the California Constitution on its face. The statute treats similarly situated individuals – qualified potential corporate board members – differently based on their membership (or lack thereof) in certain listed racial, sexual orientation, and gender identity groups. It requires that a certain specific number of board seats be reserved for members of the groups on the list – and necessarily excludes members of other groups from those seats.

The Secretary has not identified a compelling interest to justify this classification. The broader public benefits produced by well-run businesses do not fit that bill. On the other hand, while remediation of discrimination *can* be a compelling interest, the state must define a specific

_____

considered. The only way to be aware of your consideration is to either (a) be contacted by an existing board member or (b) find out about a vacancy some other way and take affirmative steps to lobby for the spot.

arena in which the discrimination has occurred, such as a school district or a specific industry within a particular local jurisdiction. Corporate boards are not such an arena – they cover all industries and all parts of the country. The Legislature did not even attempt to limit its investigation or its findings to California corporations, though jurisdictional restrictions ensured that only California corporations would be covered by the law. And even supposing that corporate boards were a sufficiently specific arena, neither the Legislature nor the Secretary has produced the combination of (a) valid statistical comparisons and (b) anecdotal testimony which could serve as "convincing evidence" of discrimination in that arena.

Furthermore, Section 301.4 is not narrowly tailored to meet the compelling interest the Secretary offers. The Legislature made no attempt to conduct a demographic survey of the qualified talent pool of potential board members. It made no attempt to obtain disclosure from California corporations regarding the current demographics of their boards. In fact, when asked to do so by the Insurance Commissioner, the Legislature refused. The Legislature and the Secretary blame a "secretive, insular" selection process for the problem with current board compositions. Yet there has been no attempt to improve that process, nor has any good explanation been offered for that lack of effort.

Because Section 301.4 treats similarly-situated individuals differently based on race, sexual orientation, and gender identity, because that use of suspect categories is not justified by any compelling interest, and because the statute is not narrowly tailored to serve the interests offered, Section 301.4 violates the Equal Protection Clause of the California Constitution. Plaintiffs are entitled to a judgment declaring as much and an injunction preventing the expenditure of taxpayer funds on implementation of the measure.

A member of the public, whom all three branches of government serve, might wonder at this result, given some of the concessions made in the record. If the Legislature has identified a social problem, how can the court stand in the way of the obvious and direct approach to solving it? There are two complementary answers to the question.

The first comes from the differing functions accorded to the different branches. It is the function of the judicial branch to resolve disputes. Courts serve that function, in part, by maintaining the continuity of rules even against the will of a majority. Residents of all stripes can feel more at home and at peace with one another if they know the rules are stable, even when they don't like those rules.

The second is that fundamental values, whether personal or social, must be guarded. Equal treatment and opportunity, of and for all individuals regardless of how they look or identify, is one of this state's basic commitments. Sometimes and in some places the citizens of this state will not live up to that ideal. But the thing that caused the problem is not always the right tool to fix the problem. Only in very particular cases should discrimination be remedied by more discrimination. And that should only happen after obvious alternative measures have been tried. Sometimes the direct approach should be the last resort, not the first.

Plaintiffs' motion for summary judgment is GRANTED. Defendant's motion for summary judgment, and their alternative motion for summary adjudication, is DENIED. Plaintiff

is directed to submit a proposed form of judgment within 10 days.

Dated: _____ 4/1/22

_____
Judge of the Superior Court
Terry A. Green

# EXHIBIT 5

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FILED**

Superior Court of California
County of Los Angeles

**MAY 13 2022**

Sherri R. Carter, Executive Officer/Clerk
By_____ Deputy
E. Garcia

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

ROBIN CREST, EARL DE VRIES, and
JUDY DE VRIES,

      Plaintiffs,

vs.

ALEX PADILLA, in his official capacity as
Secretary of State of the State of California.

      Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 19STCV27561

VERDICT

   This case presents two facial challenges to Senate Bill (S.B.) 826. The

Plaintiffs allege that S.B. 826 violates Equal Protection under Article I, Section 7

(aka Equal Protection Clause) and violates Equal Protection under Article I, Section

31 (the prohibition on discrimination based on sex in public employment, education

or contracting) of the California Constitution.

   Both claims are brought under Code of Civil Procedure Section 526a which

states, "An action to obtain a judgment, restraining and preventing any illegal

expenditure of, waste of, or injury to, the estate, funds, or other property of a local

agency, may be maintained against any officer thereof, or any agent, or other

person, acting in its behalf, either by a resident therein, or by a corporation, who is

assessed for and is liable to pay, or, within one year before the commencement of

- 1 -

1   the action, has paid, a tax that funds the defendant local agency, including, but not

2   limited to, the following: (1) An income tax.  (2) A sale and use tax or transaction

3   and use tax initially paid by a consumer to a retailer.  (3) A property tax, including a

4   property tax paid by a tenant or lessee to a landlord lessor pursuant to the terms

5   of a written lease.  (4) A business license tax." This section allows a taxpayer to

6   enjoin an actual or threatened expenditure of taxpayer funds by a state official

7   where the expenditure is illegal.

8       The above provision has been held to apply to both state and local officials

9   for more than 50 years. (Serrano v. Priest (1971) 5 Cal. 3d 584, 619 n.38 ["[I]]t has

10   been held that state officers too may be sued under section 526a."]; Blair v.

11   Pitchess (1971) 5 Cal. 3d 258, 268, ["[I]]t has been held that taxpayers may sue

12   state officials to enjoin such officials from illegally expending state funds."].),

13   Stanson v. Mott (1976) 17 Cal.3d 206, 222-23; Vasquez v. State (2003) 105

14   Cal.App.4th 849, 854; Farley v. Cory (1978) 78 Cal.App.3d 583,589; Los Altos

15   Property Owners Ass'n v. Hutcheson (1977) 69 Cal.App.3d 22, 26-30; Ahlgren v.

16   Carr (1962) 209 Cal.App.3d 248, 254 ["[T]]he great weight of authority supports the

17   right of a taxpayer to bring an action to enjoin the alleged illegal expenditure of

18   public moneys by a state official."].)  In addition, Connerly v. State Personnel Bd.

19   (2001) 92 Cal.App.4th 16, a taxpayer action brought against the state under Section

20   526, held that state officers may be sued.

21       The Court considered but was not persuaded by Defendant's argument that

22   Serrano v. Priest (supra) was the result of a ruling "without any real analysis". The

23   Defendant cited Rutgard v. City of Los Angeles (2020) 52 Cal App. 5th P. 815, 830,

24   (among others).

25       The Court finds that **PLAINTIFFS ARE TAXPAYERS** and have standing for

26   purpose of challenging a statutory scheme enacted by Legislature for application

27   throughout the state. The Court finds that Plaintiff's Judy De Vries, Earl De Vries,

28   and Robin Crest paid taxes to the State in the year prior to filing this lawsuit or were

1 | assessed and liable for such taxes.

2 |       The Court finds the Plaintiffs cause of action as a Taxpayer was Ripe. The

3 | Plaintiff's evidence is compelling. The Court relied on the following Plaintiff's

4 | testimony and all the admitted evidence to support this finding including:  Exhibits

5 | 44, 45, and 47; Judy DeVries (Dec. 1), Pg. 62, line 25 through Pg. 70, line 1; Pg.

6 | 89, line 14 through Pg. 80, line 7 Earl De Vries (Dec. 1), Pg. 81, line 7 through Pg.

7 | 85, line 6. (Dec. 2), Pg. 5, line 28 through Pg. 6, line 14 Exhibit 46; Robin Crest

8 | (Dec. 1), Pg. 86, line 17 through Pg. 88, line 17. The Defendant argued that the

9 | claim is not ripe or justiciable because "the Government has not promulgated

10 | regulations implementing penalties and or there is no evidence to indicate future,

11 | threatened prosecution". Defense offered citations to Mahler v. Judicial Council of

12 | California (2021) 67 Cal. App. 5th, P. 111, Ohio Forestry Assn, Inc. v. Sierra Club

13 | (1998) 523 U. S. P. 726, 733-34.  On this issue the Court finds for the Plaintiff.

14 |       The Court was most persuaded by Plaintiff's evidence including the following

15 | exhibits and testimony to show the **ILLEGALITY OF ACTIVITY** as challenged

16 | including; Exhibits 43, 213, 216, and 220; Senator Hannah-Beth Jackson (Jan. 27),

17 | Pg. 37, line 15 through Pg. 39, line23; Pg. 40, line 10 through Pg. 41, line 13; Pg.

18 | 60, line 21 through Pg. 62, line 16. Exhibits 2, 3, 8, and 9; Betsy Bogart (Dec. 2),

19 | Pg. 22, line 11 through Pg. 24, line 21; Pg. 52, line 25 through Pg. 53, line 15,

20 | Exhibits 4 and 5; Bogart (Dec. 2), Pg. 20, line 2 through Pg. 23, line 10; Pg. 25, line

21 | 22 through pg. 29, line 12, Exhibits 6 and 7; Bogart (Dec. 2), Pg. 29, line 20 through

22 | Pg. 32, line 24, Exhibits 10 and 11; Bogart (Dec. 2), Pg. 38, line 4 through Pg. 39,

23 | line 9, Bogart (Dec. 2), Pg. 8, line 27 through Pg. 1, line 19; Pg. 12, lines 3-15,

24 | Bogart (Dec. 2) Pg. 29, line 26 through Pg. 30, line 23; Pg. 33, lines 26 through Pg.

25 | 34, line 27, Bogart (Dec. 2), Pg. 88, lines 15 through Pg. 89, line 11, Bogart (Dec.

26 | 2), Pg. 2, lines 3-23, Bogart (Dec. 2), Pg. 40, line 2 through Pg. 41, line 17.

27 |       Defendant argued unpersuasively that the governmental conduct is legal and

28 | a "taxpayer suit will not lie where the challenged governmental conduct is legal".

05/16/2022

1    Defendants cited to Coshow v. City of Escondido (2005) 132 Cal. App. 4 P. 687,

2    714-15, Humane Society of the United States v. State Board of Equalization (2007)

3    152 Cal App. 4th, 349, 355. Lyons v. Santa Barbara County Sheriff's Office (2014)

4    231 Cal. App. 4th p. 1499, 1503.

5          The Court notes that a claim under CCP§526a requires an **EXPENDITURE**

6    **OF PUBLIC FUNDS.** The use of taxpayer funds to implement or carry out an

7    allegedly unconstitutional law is illegal and satisfies the requirement. The

8    expenditure can be actual or even threatened, and the size of the expenditure is

9    immaterial. (Blair v. Pitchess, (1971) 5 Cal. 3d at 258; Wirin v. Parker, (1957) 48

10   Cal. 2d 890, 894.) Employees of a public entity implementing or carrying out an

11   allegedly unconstitutional law likely satisfies the requirement. (Blair v. Pitchess, 5

12   Cal. 3d at 258; Wirin v. Harrell, (1948) 85 Cal. App. 2d 497, 504-05; Citizens for

13   Uniform Laws v. County of Contra Costa, (1991) 233 Cal. App. 3d 1468, 1472-76.)

14         The Court finds Plaintiffs proved Defendant Secretary of State was an officer

15   of the State via Judicial Notice of that fact. Further, the Plaintiffs carried their burden

16   to prove an actual or threatened substantial expenditure of taxpayer funds or

17   taxpayer-financed resources by Defendant by promulgating regulations and

18   implementation of fines for enforcement of S.B. 826.

19         The Court considered all Plaintiffs and Defendant testimony and admitted

20   evidence. The Court was not persuaded by Defendant's argument that the "Plaintiff

21   failed tc show a threatened or actual illegal expenditure..." Defendants argued

22   vigorously that the implementation of and regulating the issue of monetary fines in

23   the cha lenged S.B. 826, was discretionary. Further, it was testified that the

24   Secretary had no plans to and has not taken any steps to issue the regulations

25   necessary to impose fines. Susan Lapsley offered testimony on 12-13-21 at p. 14,

26   line 12-26 that no regulations were planned. Lapsley is the Deputy Secretary of

27   State. She reviews, advises and makes recommendations on every regulatory

28   package and she was not aware of any efforts or discussions regarding

05/16/2022

1   implementation of or imposing monetary fines for a violation of S.B. 826. On 12-2-

2   21 Betsy Bogart, whose division implements S.B. 826, testified and averred she is

3   similarly not aware of any plans to implement regulations or monetary fines. It was

4   apparent to the court through defense testimony that the collection of information

5   and analysis of S.B. 826, by the State of California, and its importance to the

6   anticipated increase in tax revenues, once S.B. 826 was implemented, was

7   purposeful and significant. Ongoing and or anticipated expenditures indicated

8   implementation planning was occurring and in its beginning state. Fines to compel

9   compliance was anticipated and expected by S.B. 826.

10   The Court then analyzed the **COUNT 1 VIOLATION OF EQUAL**

11   **PROTECTION CLAUSE OF Cal. Const. art, I, § 7** "A person may not be… denied

12   equal protection of the laws." (*Cal. Const., art I, § 7(a).*) Under California law,

13   classifications based on gender have long been considered "suspect" for purposes

14   of an equal protection analysis. *(Woods v. Horton (2008) 167 Cal. App. 4th 658,*

15   *674 (citing Sail'er Inn, Inc. v. Kirby (1971) 5 Cal.3d 17-20).)*

16   The first prerequisite to a meritorious claim under the equal protection clause

17   is a showing that the state has adopted a classification that affects two or more

18   "similarly situated" groups in an unequal manner. (Woods, 167 Cal.App.4th a 670.)

19   The Court does not ask whether persons in the groups are similarly situated

20   for all purposes, but only whether they are similarly situated for purposes of the

21   laws in question such that some level of scrutiny is required to determine whether

22   the distinction is justified. (Taking Offense v. State of California (2021) 66

23   Cal.App.5th 696, 724; Woods, supra, at 670.) In addition, a Court does not ask

24   whether a group is" historically more likely to experience discrimination" than

25   another group when determining whether the two groups are similarly situated.

26   (Taking Offense, 66 Cal.App.5th at 725.)

27   When a statute makes express use of a suspect classification, a plaintiff

28   challenging the statute meets their initial and ultimate burden simply by

05/16/2022

1   pointing out the classification. (Woods, 167 Cal. App. 4th at 674.) The statute is

2   presumed to be unconstitutional, and the government bears the burden of

3   demonstrating otherwise. (D'Amico v. Board of Medical Examiners (1974) 11 Cal.

4   3d 1, 17; Woods, 167 Cal. App. 4th at 674; Connerly v. State Personnel Bd. (2001)

5   92 Cal. App. 4th 16, 36 & 43.)

6       The Court considered all Plaintiffs' and Defendants' evidence including:

7   Exhibit 236 (Section 2(b) of S.B. 826 which requires that, by December 31, 2021,

8   publicly held corporations in California have at least 1 female director if the number

9   of directors is 4 or fewer, at least 2 female directors if the number of directors is 5,

10  and at least 3 female directors if the number of directors is 6 or more.

11  The court found instructive the depositions and or testimony of: Sen. Hanna

12  Beth Jackson (Feb. 1), Pg. 65, line 28 through Pg. 66, line 13, (S.B. 826 requires a

13  specific number of female directors be added to corporate boards depending on

14  board size), Pg. 74, line 28 through Pg. 75, line 5, (corporations must now consider

15  women to comply with S.B. 826). Susanne Meline (Jan. 28), Pg. 111, lines 10-15

16  (Corporations must take gender into account to comply with S.B. 826); Alison

17  Konrad (Dec. 12), Pg. 103, line 28 through 104, line 28, (Defendant's expert admits

18  describing S.B. 826's gender-based classifications a quota) Exhibit 16/217, Pg. 4,

19  (Assembly Floor analysis reports, "the use of quota-like system, as proposed by this

20  bill, remedy past discrimination and differences in opportunity may be difficult to

21  defend.") Exhibit 17/219, Pg. 7, (Assembly Judiciary Committee analysis describes

22  S.B. 826 as "essentially a quota system for private corporate boards. Should this bill

23  be challenged, the State would confront a difficult challenge in showing a

24  compelling government interest in requiring a gender-based quota system for a

25  private corporation.")

26      In support of the Court finding, the Court considered all relevant admitted

27  evidence including: Meline, Jan. 28, Pg. 54, line 12 through Pg. 56, line 8 (board

28  selection process is the same for men and women); Betsy Berkhemer-Credaire,

1    Dec. 13, Pg. 43, lines 16-22 (describing board selection process generally, which

2    does not differentiate between men and women), Dec. 10, Pg. 95, line 23 through

3    Pg. 96 line 1 (same), Dec. 10, Pg. 81, lines 18-22 (being appointed to a board is a

4    difficult process for men and women), Dec. 14, Pg. 67, lines 9-19 (men and women

5    vie for the same, few open board seats each year); Schipani, Dec. 9, Pg. 3, line 7

6    through Pg. 7, line 9 (describing how boards come into existence and the general

7    board selection process, which does not differentiate between men and women),

8    Jan. 11, Pg. 112, lines 15-22 (both highly qualified men and women have not been

9    selected and do not serve on boards)

10          The Court finds Plaintiffs carried their burden to prove that men and women

11   are similarly situated for purposes of S.B. 826's gender-based quota. As Plaintiffs

12   have demonstrated that S.B. 826 is presumptively unconstitutional, the **BURDEN**

13   **SHIFTS TO DEFENDANT** to prove that S.B. 826 satisfies strict scrutiny.

14          To meet the **STRICT SCRUTINY TEST**, Defendant must show (1) a

15   compelling state interest, (2) that S.B. 826 is necessary and (3) that S.B. 826 is

16   narrowly tailored. The strict scrutiny standard applies even if a law is claimed to be

17   remedial. (Connerly, 92 Cal.App.4th at 35, 37-38.)

18          It is without question that the government must demonstrate a **(1)**

19   **COMPELLING STATE INTEREST** and show that was in fact the Legislature's

20   actual purpose, not a post hoc re-imagining of that purpose. (Connerly, 92

21   Cal.App.4th at 38-39.)

22   Defendant claimed three compelling state interests:

23          (1) S.B. 826 was passed to eliminate and remedy discrimination in the

24              director selection process for publicly held corporate boards in California.

25          (2) S.B. 826 was passed to increase gender diversity on the boards of

26              publicly held corporations to benefit the public and the state economy.

27          (3) S.B. 826 was passed to increase gender diversity on publicly held

28              corporations headquartered in California to benefit and protect California

05/16/2022

taxpayers, public employees and retirees.

The law informs the Court that there is no compelling governmental interest in remedying societal discrimination. (Hiatt v. City of Berkeley (1982), 130 Cal.App.3d at 311-14.) There also is no compelling governmental interest in remedying generalized, non-specific allegations of discrimination. (Connerly, 92 Cal.App.4th at 38.)

The State must have a strong basis in evidence to conclude that remedial action is necessary before it embarks on a program to remedy discrimination, and the discrimination cannot merely be conceded. Generalized assertions of discrimination in a particular region or industry are insufficient to give rise to a compelling governmental interest, as are mere statistical anomalies, and the discrimination must be identified with specificity. (Ibid.) The state also must show purposeful or intentional, unlawful discrimination by the entity employing the suspect classification to assert a compelling governmental interest in remedying discrimination. (Hiatt, 130 Cal.App.3d at 311; Coral Constr. v. City of San Jose (2000) 24 Cal.4th 537, 568).

The use of a suspect classification to remedy purported discrimination has not been upheld absent judicial, legislative, or administrative findings of constitutional or statutory violations. (Hiatt, 130 Cal.App.3d at 311 [citing Bakke, 438 U.S. at 307 (Powell, J., concurring).]) "Without such findings of constitutional or statutory violations, it cannot be said that the government has any greater interest in helping one individual than in refraining from harming another." (Ibid. citing Bakke, 438 U.S. at 308-09.)

The State also must show that when using a suspect classification to redress specific discrimination the use of the classification is remedial. (Connerly, 92 Cal.App.4th at 38.) Connerly instructs that the remedy must be designed as nearly as possible to restore the victims of specific, purposeful, or intentional, unlawful

1  discrimination to the position they would have occupied in the absence of the

2  discrimination. (Id. At 39.) The lack of any effort to limit the remedial scheme to

3  those who suffered such discrimination is fatal to the scheme.

4          S.B. 826's goal was to achieve gender equity or parity; its goal was not to

5  boost California's economy, not to improve opportunities for women in the

6  workplace nor not to protect California's taxpayers, public employees, pensions and

7  retirees. In determining that fact, the Court was persuaded by the following

8  evidence: Exhibit 236 (text of S.B. 826 reference parity) Exhibit 351, Pg. 2, line 5

9  through Pg. 3, line 8 (Assembly Member Gonzalez Fletcher stating on the Assembly

10  Floor that the bill would "provide greater gender diversity" and "take a big step

11  towards closing this gender gap"); Jackson (Jan. 18), Pg. 78, lines 23-25 ("pretty

12  solidly clear that we were seeking gender parity"), Jackson (Feb. 1), Pg. 66, line 17

13  through Pg. 68, line 1 (S.B. 826 seeks to create gender equity within the board),

14  Jackson (Feb. 1), Pg. 124, lines 5-6 (:the goal of the legislation was to achieve

15  gender equality'), Jackson (Feb. 2), Pg. 18, line 14 through Pg. 19, line 12

16  (referencing achieving gender parity); Berkhemer-Credaire (Dec. 14), Pg. 74, lines

17  3-25 (goal is to reach parity).

18          A related goal of S.B. 826 was to get more women on boards; Jackson

19  (Jan. 18), Pg. 102, lines 21-28 (ultimate goal is "getting more women onto boards");

20  Pg. 37, lines 11-14 (proactive approach requiring more women on boards) Jackson,

21  (Feb. 1), Pg. 76, lines 7-12 ("This is a bill that addresses the need to add women on

22  boards"), Jackson (Feb. 15), Pg. 39, line 24 ("The issue is getting more women on

23  boards")

24          The Court considered all evidence but concluded a Compelling State Interest

25  is lacking. Specifically, the Court noted: Exhibit 236 (nothing in the text of S.B. 826

26  quantifies the expected boost to California's economy, the improvement in work

27  opportunities for women, or the protection of California taxpayers, public

28  employees, and retirees); Jay Chamberlain (Dec. 16), Pg. 82, lines 1-27 (there was

1   testimony that generally 10% of California's general fund revenues derive from all

2   corporate income tax proceeds, of which S.B. 826 corporations contribute an

3   unspecified portion of those proceeds); Chamberlain (Dec. 16), Pg. 84, lines 5-18

4   (California Department of Finance was not contacted during S.B. 826's legislative

5   process; the Department did not forecast a percentage increase expected in

6   general fund revenues because of S.B. 826; and the Department did not testify

7   before the legislature concerning S.B. 826), Chamberlain (Dec. 16), Pg. 83, line 21

8   through Pg. 84, line 4 (could not quantify how much a corporation's net income or

9   its profitability increases with female board members), Nzima (Dec. 15), Pg. 41, line

10  3 through Pg. 42, line 2 (S.B. 826 corporations only make up 5.7% of CalPERS's

11  portfolio), ($22.4 billion out of $392.5 billion)); Jackson (Feb. 1), Pg. 48, lines 21-26

12  ("there are so many items that can go into whether we pay more or less in taxes");

13  Jackson (Feb. 1), Pg. 63, lines 21-28 (did not know the percentage of California tax

14  revenue that derives from publicly held companies headquartered in the state and

15  does not believe that this information was provided to the legislature during S.B.

16  826's legislative process).

17        Defendant failed to sufficiently prove that S.B. 826's use of a gender-based

18  classification **(2) WAS NECESSARY** to boost California's economy, improve

19  opportunities for women in the workplace, and protect California taxpayers, public

20  employees, pensions, and retirees.

21        Neither Plaintiffs nor Defendant have identified any case in which boosting

22  the economy, improving work opportunities for women, protecting taxpayers, public

23  employees and retirees, or even improving corporate performance or corporate

24  governance, was found to be a Compelling Governmental Interest that justified the

25  use of a suspect classification.

26        The Court found the following evidence persuasive: Testimony of Jackson

27  (Feb. 1), Pg. 52, lines 26-27 ("There are always a number of ways to boost an

28  economy"), Jackson (Feb. 1), Pg. 53, lines 6-15 (witness acknowledged "a number

1    of different approaches" to protect taxpayers, shareholders, and retirees), Jackson

2    (Feb. 1) Pg. 54, line 25 through Pg. 55, line 4; Chamberlain acknowledged that

3    there were any number of ways to improve corporate profitability and boost the

4    economy without using a gender-based classification, Chamberlain (Dec. 16), Pg.

5    86, line 25 through Pg. 87, line 4 (acknowledging alternative ways to improve

6    corporate profitability).

7        Further, the studies cited in S.B. 826 failed to sufficiently show a causal

8    connection between women on corporate boards and corporate governance and did

9    not otherwise provide reliable conclusions, negating claims that S.B. 826's use of a

10   gender-based classification is necessary to boost California's economy, improve

11   opportunities for women in the workplace, or protect California taxpayers, public

12   employees, pensions, and retirees.

13       The Court considered: Exhibit 236 (text of S.B. 826 citing studies), Exhibit

14   244, Pgs. 3,6, and 15 ("As with the previous study, a causal link was not

15   established."); Jonathan Klick, Ph.D., J.D. (Jan. 13), Pg. 18, line 28 through Pg. 30,

16   line 6, Pg. 84, line 20 through Pg. 85, line 17; Jackson (Feb. 1), Pg. 31, lines 9-18,

17   Exhibit 245, Pgs. 4, 16, 18, and 21 ("While our statistical findings suggest that

18   diversity does coincide with better corporate financial performance and higher stock

19   market valuations, we acknowledge that we are not able to answer the causality

20   question, and this is an important caveat to the observations below in the report.");

21   Klick (Jan. 13), Pg. 30, line 8 through Pg. 40, line 16, Pg. 84, line 20 through Pg. 85,

22   line 17, Exhibit 246, Pg. 4("Given limited data access and sources, we were unable

23   to conduct regressions to determine causality. Furthermore, there are many

24   additional variables that must be controlled for in a regression, which we were

25   unable to collect for the entire sample."); Klick (Jan. 13), Pg. 40, line 18 through Pg.

26   48, line 11, Pg. 84, line 20 through Pg. 85, line 17; Jackson (Feb. 1), Pg. 32, line 17

27   through Pg. 33, line 3-5 through Pg. 34, line 1. Exhibit 47, Pgs. 6, 15, and 17 Klick

28   (Jan. 13), Pg. 48, line 12 through Pg. 54, line10; Pg. 56, line 7 through Pg. 60, line

1    9, Pg. 84, line 20 through Pg. 85, line 17; see also, Jackson (Feb. 1) Pg. 34, line 2

2    through Pg. 36, line 3, Exhibit 248; Klick (Jan.13), Pg. 60, line 10 through Pg. 62,

3    line 11, Pg. 84, line 20 through Pg. 85, line 17, Exhibit 249, Pg. 9 ("Some research

4    has found that gender diverse boards may have a positive impact on a company's

5    financial performance, but other research has not. These mixed results depend in

6    part on difference in how financial performance was defined and what

7    methodologies were used."); Klick (Jan. 13), Pg. 62, line 12 through Pg. 70, line 9,

8    Pg. 84, line 20 through Pg. 85, line 17; see also Jackson (Feb. 1) Pg. 36, line 4

9    through Pg. 37, line 2, Exhibit 250; Klick (Jan. 13), Pg. 70, line 10 through Pg. 71,

10    line 11, Pg. 73, lines 15-23, Pg. 84, line 20 through Pg. 85,line 17, Exhibit 227; Klick

11    (Jan. 13), Pg. 71, line 12 through Pg. 73, line 14, Pg. 84, line 20 through Pg. 85, line

12    17, Exhibit 251; Klick (Jan. 13), Pg. 76, line 8 through Pg. 78, line 6, Page 79, line

13    26 through Pg. 82, line 23, Pg. 84, line 20 through Pg.85, line 17, Exhibit 252; Klick

14    (Jan. 13), Pg. 78, line 12 through Pg. 79, line 25, Pg.84, line 20 through pg. 85, line

15    17, Exhibit 29, Pg. 4 ("While correlation does not prove causality, we have also

16    found that a diversity of leadership styles can contribute to more effective decision

17    making and that the leadership behaviors women typically display can have a

18    positive impact on many dimensions of an organization's performance and health.");

19    Klick (Jan. 13), Pg. 82, line 24 through Pg. 84, line 12, Pg. 84, line 20 through pg.

20    85, line 17; see also Jackson (Feb. 1) Pg. 38, lines 11-28.

21        Legislative analysis of S.B. 826 found that connections between women on

22    corporate boards and improved corporate performance and corporate governance

23    are inconclusive.

24        The court was persuaded by the following evidence: Exhibit 217, Pg. 3

25    ("[T]he Economist article, though not empirical suggests that quotas have not been

26    successful in generating additional benefits beyond more diverse boards. Empirical

27    research has been inconclusive in showing positive benefits related to company

28    performance, corporate decision-making, or beneficial effects on the representation

05/16/2022

1 | of women in senior management."); Jackson (Jan. 27), Pg. 47, lines 18-28, Exhibit

2 | 218, Pg. 4, Exhibit 229, Pg. 29 ("The value of such data on business performance

3 | has been questioned by many. The researchers themselves openly state that these

4 | statistically significant correlations do not prove causality. Others have noted that

5 | while there are many well-established benefits to gender-diverse boards, "the

6 | overall impact...of diversity on corporate performance has yet to be established.'

7 | Some are simply skeptical or unconvinced.'); Jackson (Jan. 27) Pg. 21, lines 2-25.

8 |     The Court noted from testimony that high quality academic studies that use

9 | sophisticated econometric methodologies and the most current statistical analyses

10 | were unavailable to the Legislature when it enacted S.B. 826. It was noted that

11 | when the above methodologies and statistical information were utilized, they do not

12 | support the existence of a causal relationship between women on boards and

13 | improved corporate performance and corporate governance. The Court considered

14 | all testimony and evidence, but was persuaded on this issue by the following

15 | admitted evidence/testimony: Klick (Jan. 13), Pg. 85, lines 2-25, Pg. 91, line 23

16 | through Pg. 92, line 3, Pg. 100, line 27 through Pg. 101, line 20, Pg. 102, line 11

17 | through Pg. 103, line 18, Pg. 107, line 22 through Pg. 109, line 22, Pg. 127, line 23

18 | through Pg. 130, line 24.

19 |     A Norwegian academic study for gender-based quota, which S.B. 826

20 | specifically references, do not show positive outcomes for the Norwegian

21 | businesses subject to the law and were ignored by the Legislatures and

22 | Defendant's experts. The Court considered the testimony of Dr. Klick, (Jan. 13), Pg.

23 | 104, line 1 through Pg. 109, line 2, Pg. 109, line 26 through Pg. 111, line 10.

24 |     The studies relied on by Defendant's experts who did not employ persuasive

25 | econometric methodologies and current statistical analyses mechanisms available.

26 | The admitted evidence in this regard include: Exhibit 257; Klick (Jan. 13) Page 85,

27 | line 26 through Pg. 89, line 24 Exhibit 259; Klick (Jan. 13), Page 89, line 25 through

28 | Pg. 96, line 23, Exhibit 260; Klick (Jan. 13), Pg. 97, line 1 through 98, line 18, Pg.

99, line 11 through Pg. 100, line 10, Klick (Jan. 13), Pg. 100, line 15 through Pg. 101, line 16, Pg. 127, line 23 through Pg. 130, line 24, Klick (Jan. 12) Pg. 92, line 8 through Pg. 93, line 8 (panel data in and of itself is insufficient to make any causal inference); Klick (Jan. 13) Pg. 3, line 19 through Pg. 5, line 28 (panel data makes the assumption that unobservable variables are constant over time, and therefore cannot reliably demonstrate causality), Klick (Jan. 13), Pg. 101, line 21 through Pg. 104, line 15, Pg. 106, line 8 through Pg. 109, line 22, Pg. 127, line 23 through Pg. 130, line 24, Klick (Jan. 13), Pg. 109, lines 8 through 22, Pg. 119, line 28 through 120, line 25, Pg. 129, line 4 through Pg. 130, line 17

The Court finds that studies cited in S.B. 826 do not sufficiently address discrimination and or causality nor utilize the most sophisticated, econometric methodologies and current statistical analysis available and thus were in this Courts view, unreliable. The Court found persuasive the following: Konrad (Dec. 7), Pg. 132, line 18 through Pg. 135, line 8.  Further the Court considered the admitted evidence including: Exhibit 257; Klick (Jan. 13) Page 85, line 26 through Pg. 89, line 24 Exhibit 259; Klick (Jan. 13), Page 89, line 25 through Pg. 96, line 23, Exhibit 260; Klick (Jan. 13), Pg. 97, line 1 through 98, line 18, Pg.99, line 11 through Pg. 100, line 10, Klick (Jan. 13), Pg. 100, line 15 through Pg.101, line 16, Pg. 127, line 23 through Pg. 130, line 24, Klick (Jan. 12) Pg. 92, line 8 through Pg. 93, line 8 (panel data in and of itself is insufficient to make any causal inference); Klick (Jan. 13) Pg. 3, line 19 through Pg. 5, line 28 (panel data makes the assumption that unobservable variables are constant over time, and therefore cannot reliably demonstrate causality), Klick (Jan. 13), Pg. 101, line 21 through Pg.104, line 15, Pg. 106, line 8 through Pg. 109, line 22, Pg. 127, line 23 through Pg.130, line 24, Klick (Jan. 13), Pg. 109, lines 8 through 22, Pg. 119, line 28 through 120, line 25, Pg. 129, line 4 through Pg. 130, line 17.

The Court found persuasive the following: Konrad (Dec. 7), Pg. 132, line 18 through Pg. 135, line 8 none of the studies cited in S.B. 826 identify specific

instances of discrimination in the board selection process, Jackson (Feb. 1), Pg. 45, lines 15-24.

The Court found the evidence offered by defense tended to support gender parity and proactively putting more women on boards demonstrated that the Legislature's actual purpose was gender-balancing, not remedying discrimination.

The Court noted the following evidence: Exhibit 236 (noting in section 1(A) "it will take 40 or 50 years to achieve gender parity, if something is not done proactively." Also noting in section 1(F) "if measures are not taken to proactively increase the number of women serving on corporate boards, studies have shown that it will take decades, as many as 40 or 50 years, to achieve gender parity amount directors"), Jackson (Jan. 18), Pg. 37, lines 11-14 Jackson (Jan. 18), Pg. 78, lines 23-25 ("pretty solidly clear that we were seeking gender parity"), Jackson (Jan. 18), Pg. 79, lines 22-28 (S.B. 826 is a "proactive step []" to "achieve gender parity"), Jackson (Jan. 18), Pg. 80, lines 25-28 ("the primary purpose of the bill is to promote equitable and diverse gender representation on California's publicly traded corporate boards headquartered in the state"), Jackson (Jan. 18), Pg. 88, lines 18-25 (without S.B. 826, "we'd be waiting another 40 or 50 years to get to gender parity, and that taking proactive steps was necessary to achieve gender parity"), Jackson (Jan. 18), Pg. 102, lines 21-28, Jackson (Jan. 18) Pg. 103, lines 12-23, Jackson (Jan. 25), Pg. 101, lines 2-7, Jackson (Jan. 27), Pg. 11, line 10 through Pg. 14, line 27, (Jan. 27), Pg. 95, line 10 through Pg. 96, line 8, Jackson (Feb. 1), Pg. 76, lines 7-12, Jackson (Feb. 15), Pg. 39, line 24, Jackson (Feb. 1), Pg. 124, lines 5-20, Berkhemer-Credaire (Dec. 14), Pg. 74, lines 3-25 (indicating the hope is reach parity" in 10 years).

The Court considered all evidence and specifically that S.B. 826's text does not reference discrimination nor remedying discrimination. Of the evidence presented, the Court was persuaded by the following: Exhibit 236 (text of S.B. 826 does not reference discrimination or remedying discrimination), Exhibit 205 (does

1   not reference discrimination or remedying discrimination), Exhibit 209 (does not

2   reference discrimination or remedying discrimination), Exhibit 351 (does not

3   reference discrimination or remedying decimation), Exhibit 212 (the

4   bill does not reference discrimination or remedying discrimination, The bill's author

5   was advised to add specific instances of past or present discrimination to try to

6   satisfy strict scrutiny); see also Jackson (Jan. 27), Pg. 33, line 1 through Pg. 35, line

7   7, Exhibit 215, does not reference discrimination or remedying discrimination,

8   Exhibit 216, does not reference discrimination or remedying discrimination, Exhibit

9   217 (analysis contains only one reference to remedying discrimination: "The use of

10  quota-like system, as proposed by this bill, to remedy past discrimination and

11  difference in opportunities may be difficult to defend."), Exhibit 218 (stated purpose

12  of the bill does not reference discrimination or remedying discrimination;), Exhibit

13  220, Exhibit 229. Pgs. 389 to 390 (providing background information for S.B. 826

14  does not reference discrimination in response to the question "What is the problem

15  or deficiency in current law which this bill seeks to remedy?"); see also Jackson

16  (Jan. 27) Pg. 23, line 23 through Pg. 25, line 3.

17       Further the Court notes that the law's focus on "critical mass" refutes

18  Defendant's claim that the actual purpose of the law is remedying discrimination

19  because having a "critical mass" of women on boards is unrelated to remedying any

20  injury that an actual victim of discrimination may have suffered. The court relied on

21  Exhibit 236, wherein section 1(g) noted that "studies have concluded that having

22  three women on the board, rather than just one or none, increases the effectiveness

23  of boards".

24       The Court noted Senator Hannah Beth Jackson's own summary of S.B 826

25  in her letter to Governor Brown, requesting his signature on S.B. 826 legislation,

26  described the legislations intent, "the issue of S.B. 826 seeks to address is classic

27  gender discrimination…that happens at the highest ranks of corporate America."

28  (Ex. 231). It was further expressed by Jackson and others how gender bias and

1   stereotypes are barriers to women becoming board members.

2       In support of women in the board room, the Defense offered the testimony of

3   stereotypical virtues of women such as "consensus builders" and "less risky

4   behavior in investments".

5       Such argument was also offered through a 2012 University of California,

6   Berkeley Study which opined that companies with more women on their boards are

7   more likely to create a" sustainable future", including implementing a strong

8   governance structure with a high level of transparency. A 2012 Credit Suisse study

9   offered that with women on the board business performance for key metrics would

10  improve, including stock performance, carrying less debt and price to book

11  value would benefit along with better net income growth (Ex 236-002: 244-006; 245.

12  247). The Governor on signing S.B. 826 furthered offered "we need greater equity".

13  The Court is unpersuaded by this offer of stereotypes for a justification of

14  S.B. 826.

15      Neither Plaintiffs nor Defendant have identified any case holding that the

16  government has a compelling interest in remedying societal discrimination or even

17  specific, private-sector discrimination that justified the use of a suspect

18  classification.

19      There is no Compelling Governmental Interest in remedying discrimination in

20  the board selection process because neither the Legislature nor Defendant could

21  identify any specific, purposeful, intentional and unlawful discrimination to be

22  remedied. Jackson (Feb. 1), Pg. 46, lines 2-4, Jackson (Feb. 1), Pg. 68, lines 7-13,

23  Konrad (Dec. 7), Pg. 107, lines 8-16, Schipani (Dec. 9), Pg. 116, line 15 through Pg.

24  117, line 3; Cindy Schipani (Dec. 9), Pg. 40, line 17 through Pg. 41, line 17, Jones

25  (Jan. 24), Pg. 107, lines 12-22, Meline (Jan. 28) Pg. 111, line 21 through Pg. 112,

26  line 6.

27      As an alternative and or in addition to the "finding of a Compelling State

28  Interest" the Defense argues that where it benefits or protects the public retirees

1  and the public pension, one could find a compelling state interest. McGlynn v. State

2  of California (2018) 21 Cal App. 5th 548, 564-65.  The court does not find this

3  argument persuasive nor sufficiently based on the law.

4      During trial the Court found that Defendant was unable to present specific

5  evidence of actual, unlawful discrimination against any specific woman by any

6  specific corporation subject to S.B. 826.

7      Discrimination experts, Konrad, and Schipani, could not identify specific

8  instance of specific woman being discriminated against by a specific corporation in

9  the corporation's board process. Legislature cited only statistics about the number

10  of women on corporate boards as compared to men, not any specific discrimination.

11  Court once again referred to Exhibit 326 (citing statistics in section 1(e) ).

12      Defendant offered after-the-fact supplementation to the Legislature's

13  statistics with claims of societal and structural discrimination and general social

14  phenomena of "like stereotyping", "affinity bias," "like picking like" and "gender

15  matching". These are not unique to nor associated with any particular, publicly held

16  corporations headquartered in California.

17      The Court refers directly to the following testimony: Jackson (Dec. 15), Pg.

18  99, lines 26-27, Jackson (Jan. 27), Pg. 64, line 22 through Pg. 65, line 9, Jackson

19  (Jan. 27), Pg. 98, line 10 through Pg. 99, line 3, Berkhemer-Credaire (Dec. 13), Pg.

20  70, lines 10-1, Berkhemer-Credaire (Dec. 13), Pg. 91, lines 10-17, Berkhermer-

21  Credaire (Dec. 14), Pg. 70, line 13-16, Jones (Jan. 4), Pg. 61, line 21 through Pg.

22  62, line 12, asserted that "like picking like" is not unique to corporate boards and is

23  "probably true across a variety of different categories and enterprises". Konrad

24  (Dec. 6), Pg. 49, line 21 through Pg. 50, line 17, Konrad (Dec. 7), Pg. 29, lines

25  19-28. Schipani (Dec. 8), Pg. 38, line 22 through 39, line 1 (testified essentially that

26  Literature tells us that people tend to prefer people like themselves. And with

27  respect to boards, there are studies that say that there is gender matching, so when

28  there is an open position on the board, it tends to be filled by a person of the same

05/16/2022

1   gender as the person who has left.") see also Schipani (Dec. 8), Pg. 40, line 25
2   through Pg. 41, line 6, Schipani (Dec. 8), Pg. 43, line 10 through Pg. 44, line 3,
3   Schipani (Dec. 8), Pg. 66, line 17 through Pg. 67, line 2, Schipani (Dec. 9), Pg. 41,
4   line 21 through 44, line 12, where in, witness offered women, as well as men,
5   critique women leaders more harshly, such that women leaders who speak too
6   softly are perceived as "not being leaders" while women leaders who do give orders
7   face "backlash".

8       The Court finds that Defendant's witnesses, including Jackson, Berkhemer-
9   Credaire, and Grounds, attributed the differences in the numbers of men and
10  women on corporate boards to reasons other than actual discrimination, including
11  the lack of open board seats, women's networking issues, board propensity to
12  select persons that they already know, and boards preference for choosing CEOs to
13  fill open board positions. Supporting evidence for the courts' view is: Jackson (Dec.
14  15), Pg. 100, lines 4-7, Berkhemer-Credaire (Dec. 10), Pg. 114, line 22 through Pg.
15  115, line 5, Berkhemer-Credaire (Dec. 10), Pg. 108, lines 23-28, Berkhemer-
16  Credaire (Dec.13), Pg. 84, line 25 through Pg. 85, line 18, Berkhemer-Credaire
17  (Dec. 14), Pg 71, lines 15-17, Meline (Jan. 28), Pg. 38, line 26 through Pg. 39,
18  line1.

19      It was argued that Corporations prefer directors with CEO experience, and
20  CEO's have tended to be men. Jackson (Jan. 25), Pg. 35, line 19 through Pg. 36,
21  line 6. Grounds (Jan. 11), Pg. 76, lines 14-26, Schipani (Dec. 8), Pg. 43, lines 1—
22  17. Berkhemer-Credaire gave testimony on (Dec. 10), Pg. 80, lines 15-23, that
23  women need to "network like men do, in order to seek and win a corporate board
24  seat". Berkhemer-Credaire (Dec. 10), Pg. 82, lines 2-7, Berkhemer-Credaire (Dec.
25  10), Pg. 105, line 22 through Pg. 106, line 14, Jackson (Dec. 16), Pg. 44, lines 9-14,
26  Berkhemer-Credaire (Dec. 10), Pg. 95, lines 13-20, Berkhemer-Credaire (Dec. 13),
27  Pg. 70, lines 9-24 (in summary testimony offered that board members want to bring
28  on CEOs and others they know but those individuals " tend to be Anglo men"); see

1   also id. At Pg. 91, lines 3-9, Berkhemer-Credaire (Dec. 13), Pg. 79, lines 18-24,

2   Berkhemer-Credaire (Dec.14), Pg. 30, lines 16-26, Berkhemer-Credaire (Dec. 14),

3   Pg. 71, line 23 through Pg. 72, line 11, Jones (Dec. 10), Pg. 42, lines 19-28, Jones

4   (Jan. 24), Pg. 38, lines 8-14, offered that "boards tend to recruit and hire people

5   onto their boards within the same social and economic circles as existing

6   members." Meline (Jan. 28), Pg. 49, line 26 through Page 50, line 5, Meline (Jan

7   28), Pg. 81, lines 4-21, offered that boards rely on the traditional process of looking

8   to their personal networks to fill board seats, commonly say they don't know any

9   women, and do not utilize resources like registries. Konrad (Dec. 7), Pg. 54, line 26

10  through Page 55, line 5, Grounds (Dec. 17), Pg. 111, lines 22-27, noting that a

11  primary barrier to women on boards is that "a lot of corporations do not look outside

12  their own networks". Witness, Cindy Schipani further opined regarding networking

13  on (Dec. 9), Pg. 5, lines 22-25, that in general, boards tend to select men

14  based on who they think is available and who would be best for the company.

15  Schipani (Dec.9), Pg. 15, line 17 through Pg. 16, line 6. Schipani (Dec. 9), Pg. 28,

16  lines 11-28.

17      The Court noted that Defendant's experts and expert opinions on

18  discrimination, were not before the Legislature when it enacted S.B. 826. The court

19  relied upon and was persuaded (not exclusively) by the following: Konrad (Dec. 7),

20  Pg. 103, lines 18-27, Konrad (Dec. 7) Pg. 5, line 28 through Pg. 7, line 3, Konrad

21  (Dec. 7), Pg. 27, line 15 through Pg. 28, line 1.

22      The Court noted that there was an absence of testimony by the witness

23  Konrad and others to show that publicly held corporations headquartered in

24  California engage in purposeful and intentional, unlawful discrimination against

25  women in their board selection processes, but only offered more generally that the

26  "board selection process" in the United States, including in California, is

27  "significantly affected by anti-female gender discrimination."); Konrad (Dec. 7), Pg.

28  28, lines 19-26. Konrad (Dec. 7), Pg. 109, lines 16-24; Pg. 111, lines 9-11 (The

witness did not distinguish between the terms "bias" and "discrimination" and used the terms interchangeably); Konrad (Dec. 7), Pg. 18, lines 15-23 also used the words discrimination and bias interchangeably Konrad (Dec. 7), Pg. 19, line 18 through Pg. 20, line 14 testified discrimination studies on which she for her opinion are "different" from panel studies relied on by Konrad (Dec. 7), Pg. 56, lines 7-12 testimony that no factor other than discrimination can explain the lack of women on corporate boards were contradicted by testimony of Berkhemer-Credaire, who testified that "lack of open seats" is the problem. Berkhemer-Credaire (Dec. 14) Pg. 71, lines 15-17.

The Court notes the witness Alison Konrad Ph.D. (Dec. 7), Pg. 112, lines 7-20 and Pg. 114, lines 15-27 based her opinion about discrimination in the board selection process on five studies, two of the five do not concern board selection itself but instead concern mentoring new board members (McDonald and Westphal); Konrad (Dec. 7), Pg. 21, lines 21 through Pg. 22, line 6, Pg. 118, line 10 through Pg. 119, line 19, Pg. 120, lines 2-21, Pg. 135, line 9 through Pg. 136, line 1.

The witness Schipani (Dec. 9), Pg. 40, line 17 through Pg. 31, line 17 testified clearly, offering her opinion regarding discrimination, which appears to arise from statistics about the numbers of women on boards and vague assertions about social phenomena, like gender-incongruent behaviors. The witness failed to specifically offer convincing testimony that publicly held corporations headquartered in California engaged in purposeful and intentional, unlawful discrimination against women in their board selection processes.

The singular study Schipani specifically identifies as having relied on for her opinion on discrimination is a 2020 article which was published in the MIT Sloan Management Review, well after S.B. 826's enactment.  The Court relied on Exhibit 257; Klick (Jan. 13), Pg. 86, line 2 through Pg. 89, line 24. It is noted that Exhibit 257 is a version of research for non-specialists and is not an actual academic study; it provides basic descriptive statistics and findings from survey responses and there

1   was insufficient testimony regarding statistically significant reliable research.

2       The Court noted all parties agreed that confidentiality is a necessary feature

3   of the board selection process and is not evidence that remedial action is

4   necessary. Testimony by Berkhemer-Credaire supported this view (Dec. 10), Pg.

5   80, lines 25-26, Berkhemer-Credaire (Dec. 13), Pg. 50, lines 5-27, Berkhemer-

6   Credaire (Dec. 13), Pg. 29, lines 12-23.

7       The evidence shows a natural progression towards adding more women to

8   the boards of private sector corporation over time: Berkhemer-Credaire (Dec. 14),

9   Pg. 52, line 26 through Pg. 54, line 4; Exhibit 279, Pg. 6, Berkhemer-Credaire (Dec.

10  14), Pg. 78, line 6 through Pg. 81, line 6; Exhibit 48, Pg. 7 , Berkhemer-Credaire

11  (Dec. 14), Pg. 101, line 13 through Pg. 102, line 8, Exhibit 280, Pg. 6, Berkhemer-

12  Credaire (Dec. 14), Pg. 102, lines 10-22, Exhibit 48, Pg. 7.

13      The Defendant did not carry the burden to show that the legislation was **(3)**

14  **NARROWLY TAILORED.**  Defendant failed to show the Legislature considered

15  gender-neutral alternatives to remedy specific purposeful or intentional, unlawful

16  discrimination against women by private-sector corporations in the selection of

17  board members or that gender-neutral alternatives were not available.

18      The Legislature did not consider amending existing anti-discrimination laws

19  or enacting a new anti-discrimination law focusing on the board selection process

20  before enacting S.B. 826: Jackson (Feb. 1), Pg. 68, line 23 through Pg. 71, line 3,

21  Jackson (Feb. 15), Pg. 67, line 21 through Pg. 71, line 14.

22      Defendant did not sufficiently prove that S.B. 826's use of a gender-based

23  classification was limited in scope and duration to that which is necessary to

24  remedy specific, unlawful discrimination against women in the selection of board

25  members.

26      Further, Defendant did not sufficiently prove that S.B. 826's use of a gender-

27  based classification was actually remedial. There is insufficient showing that S.B.

28  826 was designed as nearly as possible to restore the victims of specific, purposeful

1  or intentional, unlawful discrimination to the positions the victims would have

2  occupied in the absence of discrimination.

3  　　Exhibit 236, which is the text of S.B. 826, does not identify any purposeful or

4  intentional, unlawful discrimination it sought to remedy. The court further noted the

5  following testimony: Konrad (Dec. 7), Pg. 132, line 18 through Pg. 135, line 8,

6  wherein S.B. 826 does not identify specific instances of discrimination in the board

7  selection process. Jackson (Feb. 1), Pg. 45, line 15-19 Jackson (Feb. 1), Pg. 45,

8  line 20 through Pg. 46, line 9 (Legislature was not provided evidence of any specific

9  instances of discrimination in the board selection process), Jackson (Feb. 1), Pg.

10  66, line 17 through Pg. 68, line 1, averred that adding a woman board member

11  "doesn't necessarily cure" discrimination.

12  　　As to the claimed interest that S.B. 826 was passed to remedy

13  discrimination, defendant has not met its burden to show that this is necessary nor

14  narrowly tailored.  Therefore, for all the above stated reasons and analysis the

15  Court determines that S.B. 826 violates the Equal Protection Clause of the

16  California Constitution and is thus enjoined. [1]

18  Dated: 5 -13 - 22

19  　　　　　　　　　　　　MAUREEN DUFFY-LEWIS

20  　　　　　　　　　　　　JUDGE OF THE SUPERIOR COURT

---

[1] As the Court has found that S.B. 826 is unconstitutional under the Article I, Section 7, it need not make any determination as to plaintiffs' second count under Article I, Section 31.

- 23 -