Greg Adler, SBN 234142
GREG ADLER P.C.
35111F Newark Blvd., Ste 500
Newark, CA 94560
Phone: 844-504-6587
Email: greg@adler.law

Alfred G. Rava, SBN 188318
RAVA LAW FIRM
3667 Voltaire Street
San Diego, CA 92106
Phone: 619-238-1993
Email: alrava@cox.net

Attorneys for Plaintiffs and the Putative Class

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUCIANO ALEXANDRE, CHRISTINE LOUISE JOHNSON, and ERIC NELSON, on behalf of themselves, and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>AMAZON.COM, INC., and DOES 1-10,<br><br>Defendants. | Case No. 22-cv-01459-MMA (WVG)<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR:**<br><br>**1. Violation of 42 U.S.C. § 1981;**<br>**2. Violation of California Civil Code § 51 (The Unruh Civil Rights Act); and**<br>**3. Violation of California Civil Code § 51.5.**<br><br>CLASS ACTION |

All animals are equal, but some animals are more equal than others.

– George Orwell, *Animal Farm*

Amazon.com enters into contracts with "delivery service partners" to deliver packages to its customers. It also engages in unlawful and divisive racial discrimination by providing a $10,000 bonus exclusively to Amazon-preferred "Black, Latinx, and Native American entrepreneurs" who act as its delivery service partners, while denying this benefit to its Asian-American and White delivery service partners based on race or skin color. Plaintiffs Luciano Alexandre, Christine Louise Johnson, and Eric Nelson, all acting as sole proprietorship businesses, on behalf of themselves and all other similarly situated individuals and businesses, bring the following race discrimination allegations against Defendant Amazon.com, Inc. ("Amazon") to enjoin Amazon.com from continuing Amazon's racially discriminatory policies practices, and to recover class-wide damages on behalf of everyone who has suffered racial discrimination as a result of Amazon's program.

## JURISDICTION AND VENUE

1.    Jurisdiction is proper under 28 U.S.C. § 1332 because Plaintiffs are citizens of the State of California, Defendant is a citizen of the State of Washington, and the amount in controversy exceeds $5,000,000 exclusive of interest and costs, and therefore, both diversity jurisdiction and the damages threshold under the Class Action Fairness Act of 2005 ("CAFA") are present, giving this Court jurisdiction.

2.    Venue is proper pursuant to 28 U.S.C. § 1391 for the following reasons: (i) the conduct complained of herein occurred within this judicial district; and (ii) Amazon conducted business within this judicial district at all times relevant.

3.    Because Amazon has targeted California and otherwise expressly aimed its commercial activities at California, and Amazon has done substantial and continuous business in California, personal jurisdiction is established.

## PARTIES

4.    At all times relevant hereto, Plaintiff Luciano Alexandre has been a White

man

residing in San Diego, California where and when he visited Defendant Amazon's logistics website (https://logistics.amazon.com) in August of 2022 with the direct and specific intent to complete the online application to become an Amazon DSP when he encountered Amazon's above-referenced programs, policies, practices, promotions, and webpages with their respective terms or conditions, that (1) impaired his right to make and enforce contracts, (2) denied him and other White, Asian, and Native Hawaiian or Other Pacific Islander people and businesses owned by Whites, Asians, and Native Hawaiians or Other Pacific Islanders full and equal access to the DSP program based on their race or skin color, (3) caused or enabled Amazon to discriminate against, boycott, blacklist, and refuse to contract or trade with Mr. Alexandre and other White, Asian, and Native Hawaiian or Other Pacific Islander people and businesses owned by Whites, Asians, and Native Hawaiians or Other Pacific Islanders based on their race or skin color, and (4) marginalized and underserved Mr. Alexandre and other White, Asian, and Native Hawaiian or Other Pacific Islander people and businesses owned by Whites, Asians, and Native Hawaiians or Other Pacific Islanders based on their race or skin color. Mr. Alexandre did not finish the online application because he learned he would not be eligible for the $10,000 stipend Amazon was providing exclusively to Black, Latinx, and Native American entrepreneurs to offset these people of only certain preferred skin colors' startup costs. Mr. Alexandre has desired and continues to desire to become an Amazon DSP and was previously, and currently is, able and ready to apply. Mr. Alexandre satisfies each and every requirement to apply for Amazon's DSP program, including work experience, leadership, financial health, community involvement, and geographic preference.

5.     Specifically, Mr. Alexandre has access to well over $30,000 in liquid assets. His credit score is excellent. He has no debt, for example, he has no home mortgage or automobile loans. He is extremely skilled at handling his money and finances.

6.   Mr. Alexandre would easily pass any background check of his character or driving record. He has never been in any trouble with the law, and his driving record is excellent.

7.   Mr. Alexandre is an exceptionally strong candidate to be an Amazon delivery service partner, who would be accepted into the program if he were to complete the application and the interview process, and a reasonable opportunity for further investigation is likely to confirm that.

8.   Mr. Alexandre is an experienced and successful entrepreneur who has had his own painting contracting company for approximately fifteen years for which he drove and maintained a commercial van, similar to what Amazon delivery service partners drive, and for which he recruited and hired workers for his painting projects. His customer service credentials are par excellence and are some of the many reasons why he operated in successfully painting contracting business for so many years.

9.   Mr. Alexandre has experience managing profit-and-loss statements, and he has excellent budgeting and financial skills.

10.   Mr. Alexandre interviews very well and has never interviewed for a job for which he had not received an offer.  He has excellent people skills, is resourceful, and is an incredibly hard worker, who has never quit at anything, including a job as a tuna fisherman that required him to jump into the ocean and lift dolphins out of the purse seine nets used to catch tuna.

11.   Mr. Alexandre is capable of performing all of the tasks required of a delivery service partner, such as recruiting, hiring, and coaching a team of hourly employees, managing and maintaining a fleet of delivery vehicles, and adapting to demand throughout the year. He is active in his community, having painted City of San Diego properties *pro bono*, such as City lift guard stations and covering graffiti on City and private properties, cleaning up City and private properties, and in helping elderly people in the community.

12.    Mr. Alexandre is open to having his business serve as an Amazon delivery service partner in almost any location, and he is not tied down to any one area because of family obligations.

13.    At all times relevant hereto, Plaintiff Christina Louise Johnson has been a White woman residing in Hemet, California where and when she visited Defendant Amazon's logistics website (https://logistics.amazon.com) in August of 2022 with the direct and specific intent to complete the online application to become an Amazon DSP and encountered Amazon's above-referenced programs, policies, practices, promotions, and webpages with their respective terms or conditions, that (1) impaired her right to make and enforce contracts, (2) denied her and other White, Asian, and Native Hawaiian or Other Pacific Islander people and businesses owned by Whites, Asians, and Native Hawaiians or Other Pacific Islanders full and equal access to the DSP program based on their race or skin color, (3) caused or enabled Amazon to discriminate against, boycott, blacklist, and refuse to contract with Ms. Johnson and other White, Asian, and Native Hawaiian or Other Pacific Islander people and businesses owned by Whites, Asians, and Native Hawaiians or Other Pacific Islanders based on their race or skin color, and (4) marginalized and underserved Ms. Johnson and other White, Asian, and Native Hawaiian or Other Pacific Islander people and businesses owned by Whites, Asians, and Native Hawaiians or Other Pacific Islanders based on their race or skin color. Ms. Johnson did not finish the online application because she learned she would not be eligible for the $10,000 stipend Amazon was providing exclusively to Black, Latinx, and Native American entrepreneurs to offset these people of only certain, preferred skin colors' startup costs. Ms. Johnson has desired and continues to desire to become an Amazon DSP and was previously, and currently is, able and ready to apply. Ms. Johnson satisfies each and every requirement to apply for Amazon's DSP program, including work experience, leadership, financial health, community involvement, and geographic preference.

14.   Specifically, Ms. Johnson has access to well over $30,000 in liquid assets. She has no debt, she is extremely skilled at handling her money and finances, and has performed all types of office work.

15.   Ms. Johnson would easily pass any background check of her character or driving record. She has never been in any trouble with the law, and her driving record is excellent.

16.   Ms. Johnson is an exceptionally strong candidate to be an Amazon delivery service partner, who would be accepted into the program if she were to complete the application and the interview process, and a reasonable opportunity for further investigation is likely to confirm that.

17.   Ms. Johnson is an experienced and successful entrepreneur who in her career has driven a commercial van, similar to what Amazon delivery service partners drive. She has recruited and hired workers. Her customer service credentials are par excellence and are some of the many reasons why she has had a successful career.

18.   Ms. Johnson has experience managing profit-and-loss statements, and she has excellent budgeting and financial skills.

19.   Ms. Johnson interviews very well and has never interviewed for a job for which she had not received an offer.  She has excellent people skills, is resourceful, and is an incredibly hard worker, who has never quit at anything.

20.   She has been an independent contractor, as well as an owner of an assisted living facility in Tucson, Arizona, and throughout her career has been responsible for recruiting and hiring workers and has driven and maintained commercial vans.

21.   Ms. Johnson is capable of performing all of the tasks required of a delivery service partner, such as recruiting, hiring, and coaching a team of hourly employees, managing and maintaining a fleet of delivery vehicles, and adapting to demand throughout the year. She is active in her community.

22.   Ms. Johnson has been extremely active in her communities. For example,

she has been on the Board of Directors for her housing development and is serving and has served on several committees for that development, including long-range planning, and has prepared and served meals at an drug rehabilitation facility.

23.  Ms. Johnson is open to having her business serve as an Amazon delivery service partner in most any location, and she is not tied down to any one area because of familial obligations.

24.  At all times relevant hereto, Plaintiff Eric Nelson has been a White man residing in California where and when he visited Defendant Amazon's logistics website (https://logistics.amazon.com) in August of 2022 with the direct and specific intent to complete the online application to become an Amazon DSP when he encountered Amazon's above-referenced programs, policies, practices, promotions, and webpages with their respective terms or conditions, that (1) impaired his right to make and enforce contracts, (2) denied him and other White, Asian, and Native Hawaiian or Other Pacific Islander people and businesses owned by Whites, Asians, and Native Hawaiians or Other Pacific Islanders full and equal access to the DSP program based on their race or skin color, (3) caused or enabled Amazon to discriminate against, boycott, blacklist, and refuse to contract or trade with Mr. Nelson and other White, Asian, and Native Hawaiian or Other Pacific Islander people and businesses owned by Whites, Asians, and Native Hawaiians or Other Pacific Islanders based on their race or skin color, and (4) marginalized and underserved Mr. Nelson and other White, Asian, and Native Hawaiian or Other Pacific Islander people and businesses owned by Whites, Asians, and Native Hawaiians or Other Pacific Islanders based on their race or skin color. Mr. Nelson did not finish the online application because he learned he would not be eligible for the $10,000 stipend Amazon was providing exclusively to Black, Latinx, and Native American entrepreneurs to offset these people of only certain, preferred skin colors' startup costs. Mr. Nelson has desired and continues to desire to become an Amazon DSP and was previously, and currently is, able and ready to apply.  Mr.

Nelson satisfies each and every requirement to apply for Amazon's DSP program, including work experience, leadership, financial health, community involvement, and geographic preference.

25.   Specifically, Mr. Nelson has access to well over $30,000 in liquid assets. His credit score is excellent. He is extremely skilled at handling his money and finances.

26.   Mr. Nelson would easily pass any background check of his character or driving record. In fact, he has passed three background checks for obtaining concealed weapons permits in three states – California, Nevada, and Utah. He has never been in any trouble with the law, and his driving record is excellent.

27.   Mr. Nelson is an exceptionally strong candidate to be an Amazon delivery service partner, who would be accepted into the program if he were to complete the application and the interview process, and a reasonable opportunity for further investigation is likely to confirm that.

28.   Mr. Nelson is a thirteen-year veteran of the U.S. Marine Corps. While in the Marines, was recruited into counterintelligence, was a leader of men and women, a recruiter of personnel, and had extensive experience in driving and maintaining vans, trucks, and other heavy equipment and armored vehicles. He achieved the rank of Gunnery Sergeant.

29.   Mr. Nelson is an experienced and successful entrepreneur and independent contractor who currently employs four people for his home health care business. His customer service credentials are par excellence and are some of the many reasons why he has had a successful career.

30.   Mr. Nelson has experience managing profit-and-loss statements, and he has excellent budgeting and financial skills.

31.   Mr. Nelson interviews very well and has never interviewed for a job for which he had not received an offer.  He has excellent people skills, is resourceful, and is an incredibly hard worker, who has never quit at anything, including all that

the Marines demanded of him.

32.    Mr. Nelson is capable of performing all of the tasks required of a delivery service partner, such as recruiting, hiring, leading, and coaching a team of hourly employees, managing and maintaining a fleet of delivery vehicles, and adapting to demand throughout the year. He is active in his community, especially in securing equal treatment for everyone, no matter their protected personal characteristics.

33.    At the time he became aware of Amazon's DSP program, he had pre-selected for hiring for his newfound business a highly-rated, long-term Amazon employee at a nearby Amazon warehouse to be his first hire as a driver.

34.    Mr. Nelson is open to having his business serve as an Amazon delivery service partner in most any location, and he is not tied down to any one area because of familial obligations.

35.    *Former* Plaintiff Nam Be, after witnessing Amazon's insistence in Amazon's Motion to Dismiss in preferring people based on their race or skin color to be delivery service partners, has decided to not become an Amazon delivery service provider and therefore to not continue as a plaintiff in this case.

36.    All of the Plaintiffs' injuries are traceable to Amazon and Amazon's racially discriminatory practices and policies, and those injuries will be redressed by the damages and prospective relief sought in this lawsuit.

37.    All of the injuries giving rise to lead Plaintiff Luciano Alexandre's claims occurred in the Southern District of California, which gives this Court venue under 28 U.S.C. § 1391(b)(2).

38.    At all times relevant hereto, Defendant Amazon.com, Inc. has been a Delaware-registered domestic corporation with its headquarters in the State of Washington and with operations in San Diego, California.

39.    The above-named Defendant, and its subsidiaries and agents, are collectively referred to as "Amazon.com, Inc.," "Amazon," or "Defendant." The true names and capacities of the Defendants sued herein as DOE DEFENDANTS

1 through 10, inclusive, are currently unknown to Plaintiffs, who therefore sue such Defendants by fictitious names. Each of the Defendants designated herein as a DOE is legally responsible for the unlawful acts alleged herein. Plaintiffs will seek leave of Court to amend the Complaint to reflect the true names and capacities of the DOE Defendants when such identities become known.

40.     Plaintiffs are informed and believe, and thereon allege, that at all relevant times, each and every defendant was acting as an agent and/or employee of each of the other Defendants, and was the owner, agent, servant, joint venturer and employee, each of the other and each was acting within the course and scope of its ownership, agency, service, joint venture and employment with the full knowledge and consent of each of the other Defendants. Plaintiffs are informed and believe, and thereon allege, that each of the acts and/or omissions complained of herein was made known to, and ratified by, each of the other Defendants.

## STATEMENT OF FACTS

41.     Amazon discriminates against individual Asians, Whites, and Native Hawaiians or Other Pacific Islanders and against any businesses owned by Asians, Whites, Native Hawaiians or other Pacific Islanders through a so-called "Diversity Grant" program whereby only Amazon's preferred or favored Black, Latino, and Native American entrepreneurs (hereinafter "Amazon-favored entrepreneurs") who wish to contract with Amazon as delivery service partners (hereinafter "DSPs") are provided $10,000 in additional consideration as part of their contracts with Amazon to be a DSP. Amazon has blocked Asian, White, and Native Hawaiian or Other Pacific Islander entrepreneurs and their businesses (hereinafter "Amazon-disfavored entrepreneurs") from even applying for the $10,000 stipend Amazon is providing in its DSP contracts to only Amazon-favored entrepreneurs. As further explained below, Amazon prohibits Asians, Whites, and Native Hawaiians or Other Pacific Islanders, as well as businesses owned by Asians, Whites, and Native Hawaiians or Other Pacific Islanders such as the sole proprietorship businesses of

Plaintiffs, from applying for the same types of DSP contracts that Amazon allows only Blacks, Latinos, and Native Americans to enter into with Amazon. See https://logistics.amazon.com (last visited September 28, 2022), a printout of which is attached to this complaint as Exhibit 1.

42.    As seen in Exhibit 1 and also excerpted below, Amazon uses the coined, superficially gender-neutral, and woke term "Latinx" in its solicitations for Amazon-favored entrepreneurs. But recent national surveys of Latinos show that "Latinx" is highly unpopular among Latinos. Many Latinos find the term Latinx to be offensive, odd, and off-putting because it does not follow the traditional structure of Spanish, making it awkward because Spanish plurals do not end in "x" and it is difficult to pronounce because so few Spanish words end with two consonants. See, e.g.,        www.nbcnews.com/think/opinion/many-latinos-say-latinx-offends-or-bothers-them-here-s-ncna1285916. Therefore, the term "Latinos" will be primarily used in this Second Amended Complaint.

43.    As seen in Exhibit 1, on the website https://logistics.amazon.com, under the heading "Commitment to Diversity," Amazon expresses its preference for only "Black, Latinx, and Native American entrepreneurs" to the exclusion of other underserved and disfavored races (e.g. Asians or Pacific Islanders) as follows:

> We're proud to announce a Diversity Grant to help reduce the barriers to entry for Black, Latinx, and Native American entrepreneurs — a $1 million commitment toward funding startup costs, offering $10,000 for each qualified candidate to build their own businesses in the U.S. With the launch of this grant program, we're investing in building a future for diverse business owners to serve their communities. If interested, please complete the diversity questions in the Financial Details section of the Application.

44.    Regarding the above "diversity questions in the Financial Details section of the Application," during the application process to become an Amazon DSP on https://logistics.amazon.com, prospective applicants are asked if they would be interested in receiving a $10,000 "diversity grant" toward becoming a DSP. If

prospective applicants are so interested, they are required to select and provide their race from a drop-down box. However, "White," "Caucasian," "Asian," "Asian-American," "Native Hawaiian," "Pacific Islander" or any variation of these non-Black, non-Latino, or non-Native American terms is not even an option as seen below:



45. Thus, in applying with Amazon for a DSP contract, Asian, White, Native Hawaiian or Other Pacific Islander people and their businesses are completely blocked from even applying for the $10,000 stipend Amazon provides to only Amazon's preferred Black, Latino, and Native American people in violation of 42 U.S.C. § 1981 and California Civil Code sections 51 and 51.5.

46. Amazon's self-titled "Commitment to Diversity" is anything but. Instead, it is a commitment to discrimination, divisiveness, inequity, and an anti-Asian, anti-

White, and anti-Pacific Islander policy and practice by the world's largest online retailer. Furthermore, Amazon's so-called "Diversity Grant" is actually a form of consideration in the contracts Amazon enters into only with Amazon's preferred Black, Latino, and Native American entrepreneurs. If Amazon held a sincere "Commitment to Diversity" it would commit to providing the same DSP contracts with the same consideration to *all* entrepreneurs, no matter their race or skin color.

47.    Amazon's impairment of Plaintiffs' rights to make and enforce contracts and racially discriminatory contracting and denial of full and equal accommodations, advantages, facilities, privileges, or services to Plaintiffs and other Asian, White, Native Hawaiian or Other Pacific Islander people, as well as businesses owned by Asians, Whites, and Native Hawaiians or Other Pacific Islanders such as the sole proprietorship businesses of Plaintiffs, violates 42 U.S.C. § 1981 and California's Unruh Civil Rights Act, which is codified as California Civil Code section 51. Amazon's (1) discrimination against Plaintiffs and other Asian, White, and Native Hawaiian or Other Pacific Islander people and against businesses owned by Asians, Whites, and Native Hawaiians or Other Pacific Islanders, (2) boycotting or blacklisting of Plaintiffs and other Asian, White, and Native Hawaiian or Other Pacific Islander people, as well as businesses owned by Asians, Whites, and Native Hawaiians or Other Pacific Islanders, and (3) refusal to contract or trade with Plaintiffs and other Asian, White, and Native Hawaiian or Other Pacific Islander people, as well as businesses owned by Asians, Whites, and Native Hawaiians or Other Pacific Islanders, violates California Civil Code section 51.5. The remedies for violations of Civil Code sections 51 and 51.5 are provided by California Civil Code section 52 and include injunctive relief, a minimum of $4,000 for each and every offense, and attorneys' fees for prevailing plaintiffs.

48.    Amazon's disparate treatment of applicants to be DSP contractors has caused discontent, animosity, harm, resentment, division, and envy among the races, constituted intentional, arbitrary, unreasonable, and/or invidious

discrimination, and contravened America and California's historical effort and compelling public policy to put an end to race discrimination. Amazon willfully and maliciously injured Plaintiffs and other Asian, White, and Native Hawaiian or Other Pacific Islander people, as well as businesses owned by Asians, Whites, and Native Hawaiians or Other Pacific Islanders, by intentionally discriminating against them based on their race or the color of their skin.

49.    Amazon's racially discriminatory DSP contracting terms not only undermine our nation's historical effort to eradicate race discrimination, it also violates Amazon's very own supposed commitment to diversity and inclusion, found at https://www.aboutamazon.com/workplace/diversity-inclusion, which reads as follows:

> We are a company of builders who bring varying backgrounds, ideas, and points of view to inventing on behalf of our customers. Our diverse perspectives come from many sources including gender, race, age, national origin, sexual orientation, culture, education, and professional and life experience. We are committed to diversity and inclusion and always look for ways to scale our impact as we grow.

50.    Amazon's race-based DSP contracts are antithetical to Amazon's above expressed and highly self-touted commitment to diversity and inclusion. Contrary to being committed to diversity and inclusion, Amazon has employed its race-based DSP contracts because Amazon is committed to increased profits and increased virtue signaling. If Amazon was sincerely committed to diversity and inclusion, Amazon would have provided the $10,000 in consideration to *all* DSP contract applicants, no matter their race or the color of their skin.

51.    Amazon's race-based DSP contracts are yet another example of Amazon's systemic and institutional discrimination against and marginalization of people based on their race or skin color, such as Amazon's ongoing Black Business Accelerator    program.    See    https://sell.amazon.com/programs/black-business-

accelerator, last visited September 22, 2022. The race-based program offers valuable business benefits to only Black vendors – regardless of their wealth or success in business – and includes, among other perks, the following benefits available only to Black vendors:

- $500 credit to assist with start-up and operational costs.
- FREE imaging services for up to 50 products to help showcase your products.
- Up to $3,000 in advertising credits to increase exposure for your brand.
- All Black Business Accelerator sellers will be offered up to one year of strategic advisory services. An account manager will support your launch and growth in our stores with personalized insights and recommendations, operational support, and issue assistance.
- Free training and educational resources on how to start and build a successful business selling online are available through Amazon Small Business Academy, Amazon Seller University, and the Minority Business and Technology Initiative.

52. Similar to Amazon's race-based DSP contracting practices, Amazon's Black Business Accelerator overtly prohibits sellers of other racial groups, such as Latinos, Native Americans, Asians, Whites, and Native Hawaiians or Other Pacific Islanders from even applying for Amazon's Black Business Accelerator. Amazon's race-based Black Business Accelerator and DSP contracts are evidence of the systemic and institutional discrimination by Amazon, as Amazon provides both programs to only those with the right skin color no matter their wealth or business acumen and success, while Amazon denies these two programs to those with the wrong skin color no matter their financial condition or business inexperience.

53. For both of these Amazon race-based programs, Black American businessman David Stewart, majority owner of Worldwide Technology, worth an estimated $6.1 billion, basketball legend and Black entrepreneur Michael Jordan,

worth an estimated $1.7 billion, and media and business mogul Oprah Winfrey, worth an estimated $2.5 billion, could all apply for Amazon's DSP contracts with the $10,000 in additional consideration and apply for Amazon's Black Business Accelerator with all of its above Black-only benefits. But Amazon arbitrarily prohibits poor or middle class Asian, White, and Native Hawaiian or Other Pacific Islander entrepreneurs from applying for the additional $10,000 DSP consideration, and Amazon will not permit poor or middle class Asians, Whites, Latinos, Native Americans, and Native Hawaiians or Other Pacific Islanders to apply for Amazon's Black Business Accelerator program.

54.    Amazon's Black Business Accelerator program is currently being challenged in the U.S. District Court for the Southern District of California Case No. 3:21-cv-01833-BTM-MDD, *Jonathan Correll v. Amazon.com, Inc.*

55.    Amazon's relentless endeavors to normalize racial discrimination and Amazon's own version of racial apartheid or segregation were hopefully dealt a severe blow by the U.S. Supreme Court in the recent landmark case of *Students For Fair Admissions, Inc. v. President And Fellows Of Harvard College* 600 U.S. ----, 143 S.Ct. 2141, 216 L.Ed.2d 857 (2023). The Court in *Students For Fair Admissions* held that race-based affirmative action programs in college admissions processes violate the Equal Protection Clause of the Fourteenth Amendment – specifically, the race-based admissions practices at Harvard and University of North Carolina that favored Black, Latinos, and Native Americans over Asian-Americans and Whites. *Students For Fair Admissions*, 143 S.Ct. at 2213. ("It is a plus that is 'sometimes' awarded to 'underrepresented minority' or 'URM' candidates—a group UNC defines to include "'those students identifying themselves as African American or [B]lack; American Indian or Alaska Native; or Hispanic, Latino, or Latina,'" but not Asian or white students"). Fortunately, the U.S. Supreme Court has banned racism in at least college admissions and similar affirmative action programs. *Students for Fair Admissions* restates and reinforces

America's public policy against race discrimination.

**FACTS RELATED TO STANDING**

56.  *White v. Square, Inc.* 891 F.3d 1174 (9th Cir. 2018) ("*White I*") was an Unruh Act class action. "The district court dismissed White's first amended complaint without prejudice on the ground that White lacked statutory standing to sue Square pursuant to the Unruh Act, and then dismissed White's second amended complaint with prejudice on the same ground. The district court reasoned that White had not attempted to obtain services from Square, and under *Surrey v. TrueBeginnings*, 168 Cal. App. 4th 414, 418 (2008), mere awareness of Square's discriminatory policies was insufficient to confer standing."

57.  On appeal, the Ninth Circuit reversed and held that a person who visits and reviews a business's website, encounters a discriminatory policy, *and does not proceed to enter into a contractual relationship with the business, has standing under Article III of the U.S. Constitution*. "We conclude that White meets the constitutional standing requirements. White alleged that he sought to use Square's services, but was unable to do so because of its discriminatory policy…  Because 'discrimination itself ... can cause serious non-economic injuries to those persons who are denied equal treatment solely because of their membership in a disfavored group,' *Heckler v. Mathews* , 465 U.S. 728, 739–40, 104 S.Ct. 1387, 79 L.Ed.2d 646 (1984), and 'state law can create interests that support standing in federal courts,' *Cantrell v. City of Long Beach* , 241 F.3d 674, 684 (9th Cir. 2001), White's allegations satisfy Article III's requirements for a concrete and particularized injury." *White I* at 1176-1177. Notably, the Ninth Circuit did not narrowly limit its conclusion on standing to Unruh Act cases only, but to a broader universe of scenarios involving facially discriminatory policies on business' websites.

58.  The Ninth Circuit then certified questions to the California Supreme Court about the standing requirement under the Unruh Act under the same circumstances. *White v. Square, Inc.* 7 Cal. 5th 1019 (2019) ("*White II*").  The California Supreme

Court in *White II* agreed with *White I* and answered the Ninth Circuit's questions with the following concise holding: "We conclude that a person who visits a business's website with intent to use its services and encounters terms or conditions that exclude the person from full and equal access to its services has standing under the Unruh Civil Rights Act, with no further requirement that the person enter into an agreement or transaction with the business." *White II* at 1032 – 1033.

59.  Thus, under prevailing Ninth Circuit precedent, a person who has the intent to enter into a contract with a business, but encounters a facially discriminatory policy that denies the person equal contract terms, has standing under Article III of the U.S. Constitution with no further requirement that the contract be consummated.

60.  To illustrate this principle, consider the following example, borrowed from the hypothetical example used by the California Supreme Court in *White II*. Suppose an online seller of luxury vehicles required all Black people to pay cash, whereas members of all other races could finance their purchases. If a Black person who intended to purchase such a vehicle filed suit alleging violations of 42 U.S.C. § 1981 and the Unruh Civil Rights Act, per *White I*, he would have Article III standing even if he refused to enter into the sales contract and refused to pay the purchase price in cash because of the car dealer's racial discrimination. Otherwise, businesses could effectively blacklist entire classes of people based on race by ensuring standing was so financially difficult as to render standing virtually impossible, i.e., the defendant car dealer in such a hypothetical situation would win a dismissal every time unless the plaintiff was willing to suffer the additional indignity of paying tens of thousands of dollars to a business that has already indicated it discriminates and disfavors on the basis of the plaintiff's race. It would undermine civil rights laws to hold that such a plaintiff lacked standing to sue because he refused to enter into a contract under racially discriminatory terms, or that the plaintiff lacked standing because he was not completely blocked from entering into the contract for the purchase of the vehicle. Citizens are not required

to forfeit standing to sue because they walk away from contracts with racially discriminatory terms.

61.   This is why the Supreme Court has repeatedly instructed that the injury establishing standing is simply "the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *N.E. Fla. Ch. of the Assoc. Gen. Contractors of Am. v. City of Jacksonville, Fla*., 508 U.S. 656, 666 (1993). Additionally, as a separate type of non-economic injury, "[t]he badge of inequality and stigmatization conferred by racial discrimination is a cognizable harm in and of itself providing grounds for standing." *Moore v. U.S. Dep't of Agric. on Behalf of Farmers Home Admin.*, 993 F.2d 1222, 1224 (5th Cir. 1993); *Heckler v. Mathews*, 465 U.S. 728, 739–40 (1984) (stressing the Court's "repeated[] emphasi[s]" that discrimination perpetuates "archaic and stereotypic notions" and "stigmatiz[es] members of the disfavored group as innately inferior and therefore as less worthy participants in the political community[,]" causing "serious non-economic injuries" to those denied equal treatment) (citation omitted). An injury resulting from a racial stigma can also be categorized as a harm to one's dignity. *E.g., Georgia v. McCollum,* 505 U.S. 42, 48 (1992) (discrimination is harm to the "dignity of persons").

62.   In the present case, Plaintiffs have suffered both types of injuries: denial of equal treatment and stigma. Plaintiffs are either Whites suing on behalf of other Whites and Asian-Americans, and solely on the basis or their race or skin color they are ineligible for the $10,000 stipend Amazon exclusively provides exclusively only Blacks, Latinos, and Native Americans to offset their startup costs. Moreover, such policies and practices send a clear message that all Whites and Asian-Americans, regardless of their individual situations, are inherently unworthy of equal treatment.

63.   Plaintiffs and the putative class are suffering present-day injury in fact because: (1) Plaintiffs must pay $10,000 more to start a delivery-service-partner

business because they are White or Asian-American rather than a member of the Amazon-preferred racial or skin color categories of being Black, Latino, or Native American; (2) Plaintiffs' ineligibility to recoup the $10,000 in startup costs on account of their race or skin color makes them unwilling to apply to Amazon's DSP program; (3) The $10,000 stipend Amazon provides to companies owned only by Blacks, Latinos, and Native Americans puts Plaintiffs at a competitive disadvantage in the application process by drawing in minority applicants who would otherwise sit out or pursue other career opportunities without $10,000 in free money; (4) The Black, Latino, and Native American applicants who will compete against Plaintiffs for acceptance into the DSP program have more credible applications because they will automatically have an extra $10,000 in startup capital if their companies become delivery service partners; (5) Plaintiffs cannot apply to the DSP program or have their companies become an Amazon delivery service partner without subjecting themselves to discrimination based on their race or skin color; and (6) Plaintiffs are being stigmatized and collectively punished based solely on how they were born.

64. It is of no consequence that Plaintiffs did not actually apply for the discriminatory benefit for which they were not eligible. *Gratz v. Bollinger*, 539 U.S. 244, 245, 260–61 (2003). The Supreme Court has found standing where plaintiffs "would have" sought a benefit, but for the discriminatory qualification. *Clements v. Fashing*, 457 U.S. 957, 962 (1982) (plaintiffs who would have announced their candidacy but for the challenged "automatic resignation" provision had standing since a provision creating an obstacle to plaintiffs' candidacy "cannot be said … [to] present[] only a speculative or hypothetical" harm). Moreover, the Supreme Court does not require a "futile gesture" to establish standing. *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 366 (1977). A plaintiff with a simple "desire" for a benefit, yet stymied by a discriminatory barrier, "is as much a victim of discrimination as is he who goes through the motions." *Id.* Futility doctrine is necessary, especially in civil rights cases, otherwise only plaintiffs "who ignored

the [Whites Only] sign and subjected themselves to personal rebuffs" would have standing. *Id.* at 365. *See also Moore*, 993 F.2d 1222 (recognizing futility when the government told plaintiffs that the program was closed to whites); *Hailes v. United Air Lines*, 464 F.2d 1006, 1007–09 (5th Cir. 1972) ("futile gesture" for man to apply to "stewardess" job); *White II* at 1030 ("Such a requirement would limit a business's liability only to individuals who inquire and would potentially enable a business to make exceptions to its stated policies in order to avoid suit, even as its stated policies deter the lion's share of customers belonging to a protected group.") Likewise, it would have been a futile gesture for Plaintiffs in this case to apply to become DSPs when they already knew they were ineligible for equal treatment but for their race.

65.  All of the Plaintiffs and their respective sole proprietorship businesses have standing based on *White I* and at least on the facts asserted herein regarding all of the Plaintiffs meeting and exceeding each and every requirement to apply for Amazon's DSP program, including work experience, leadership, financial health, community involvement, and geographic preference, except for not meeting Amazon's preferred race or skin color to qualify for Amazon's $10,000 stipend that Amazon provides exclusively to only Blacks, Latinos, and Native Americans.

66.  Plaintiffs will not apply to the Amazon delivery-service-partner program until Amazon eliminates this racially discriminatory policy, either by extending its $10,000 benefit to Whites and Asians or curtailing or eliminating this exclusive and racist benefit entirely. That is, allow everyone to be eligible for the $10,000, no matter their race or skin color, or don't offer it all. Plaintiffs, however, are prepared to apply immediately to the Amazon DSP program and will apply if and when Amazon permanently revokes its discriminatory policies based on race or skin color.

*67.*  Plaintiffs need a judicial declaration of their rights under 42 U.S.C. § 1981 and federal and State of California civil-rights law before they invest additional time

and money into becoming a DSP business owner. *See* 28 U.S.C. § 2201(a);

*McGraw-Edison Co. v. Preformed Line Products Co.,* 362 F.2d 339, 342 (9th Cir. 1966), certiorari denied 87 S.Ct. 229, 385 U.S. 919 ("The purpose of the Declaratory Judgment Act is to afford an added remedy to one who is uncertain of his rights and who desires an early adjudication thereof without having to wait until his adversary should decide to bring suit, and to act at his peril in the interim.").  See, also, *Shell Oil Co. v. Frusetta,* 290 F.2d 689, 692 (9th Cir. 1961).

68.  All of the Plaintiffs' injuries are traceable to Amazon and its racially discriminatory policies, and the Plaintiffs' injuries will be redressed by the damages and prospective relief sought in this lawsuit.

## CLASS ALLEGATIONS

69.   Plaintiffs seek to represent a class that consists of: (1) all White and Asian individuals and their White and Asian owned businesses that stand "able and ready to apply" to Amazon's "delivery service partners" program; (2) all White and Asian individuals and their White and Asian owned businesses that will apply to or participate in Amazon's "delivery service partners" program in the future, and who will be subjected to racial discrimination from Amazon absent relief from this Court; and (3) all current White and Asian individuals and their White and Asian owned businesses that are participants in Amazon's "delivery service partners" program who are being subjected to racial discrimination by Amazon.

70.  Not included in the Class are the following individuals or entities: (1) Amazon and its parents, subsidiaries, affiliates, officers and directors, current or former employees, and any entity in which Amazon has a controlling interest; (2) all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; (3) all judges and their staff members assigned to hear any aspect of this litigation, as well as such persons' immediate family members; and (4) Plaintiffs' counsel and anyone employed by Plaintiffs'

counsel.

71.    Plaintiffs reserve the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

72.    This action has been brought and may properly be maintained pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2) and (b)(3) for the below reasons.

73.    The Class is so numerous that joinder of all members is impracticable. Upon information and belief, there are thousands of Class members.

74.    There are questions of law and fact common to the Class and these questions predominate over any questions affecting only individual members. Common questions include: (1) Whether Amazon's DSP contract with its race-based $10,000 consideration deprive Plaintiffs and the Class of their rights under 42 U.S.C. § 1981 and California Civil Code sections 51 and 51.5; (2) whether Plaintiffs and the Class were harmed by Amazon's unequal treatment of and discrimination against those who have intended to use or contract with Amazon to become DSPs, as well as those who became DSPs but were not provided the $10,000 consideration in their DSP contract because of their race; (3) whether Plaintiffs and the Class are entitled to statutory damages; (4) whether Plaintiffs and the Class are entitled to equitable and injunctive relief, and if so, what equitable and injunctive relief is warranted; and (5) the scope of permanent public injunctive relief that may result.

75.    Plaintiffs' claims are typical of the claims of the Class because Amazon's programs, policies, practices, and promotions described herein have denied both the Plaintiffs and the Class their rights under 42 U.S.C. § 1981 and the full and equal accommodations, advantages, facilities, privileges, and/or services to which they are entitled under California Civil Code sections 51 and 51.5, and have caused or enabled Amazon to discriminate against, boycott, blacklist, and/or refuse to contract or trade with both the Plaintiffs and the Class based on their race. All of the claims are substantially shared by every Class member. The unequal treatment and

discrimination claims arise from the same course of conduct by Amazon, and the relief sought is common.

76.  Members of the Class are unlikely to be aware of their rights under 42 U.S.C. § 1981 and Civil Code sections 51, 51.5 and 52 to be free from race discrimination, but for this lawsuit.

77.  Amazon has acted on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

78.  Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have no conflict with any Class member.

79.  Plaintiffs have retained counsel competent and experienced in federal and California discrimination class actions, including those with claims for violating 42 U.S.C. § 1981 and California Civil Code sections 51 and 51.5. For example, Plaintiffs' counsel represented the prevailing plaintiffs/appellants in the landmark California Supreme Court Unruh Civil Rights Act case of *Angelucci v. Century Supper Club* (2007) 41 Cal.5th 160, which held that discrimination victims, whether they be victims of race, sex, sexual orientation, or any other form of discrimination prohibited by the Unruh Act, did not have to first confront the discriminating business and affirmatively assert their right to equal treatment in order to have standing for an Unruh Act claim. *Angelucci* enabled race discrimination class action lawsuits under the Unruh Act, such as this one, to be viable.

80.  The people affected by Amazon's unequal treatment and discrimination can be readily identified and ascertained through Amazon's company records, its website records, logs, and data and therefore the proposed class is ascertainable.

81.  Class certification is appropriate pursuant to Fed. R. Civ. P. 23(b)(3) for monetary damages and Fed. R. Civ. P. 23(b)(2) because Amazon has acted and/or refused to act on grounds generally applicable to the Class, making appropriate declaratory, equitable, and public injunctive relief with respect to Plaintiffs and the Class as a whole. Amazon excludes members of the Class from applying for,

participating in, and benefitting from Amazon's DSP contracts with their $10,000 consideration due to the Class members' race in violation of 42 U.S.C. § 1981 which prohibits Amazon from engaging in racial discrimination in the making and enforcement of contracts. The Class members are entitled to declaratory, equitable, and public injunctive relief to end Amazon's common, unfair, and unlawful race-based discriminatory practices, programs, policies, or promotions.

82.  Class certification is also appropriate pursuant to Fed. R. Civ. P. 23(b)(3) because common questions of fact and law predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation since joinder of all members is impracticable. The Class members have been damaged and are entitled to recovery of damages under 42 U.S.C. § 1981 and California Civil Code section 52 because of Amazon's common, unfair, and unlawful race-based discriminatory practices, programs, or policies. Plaintiffs and the members of the Class will rely on common evidence to resolve their legal and factual questions, including Amazon's applicable race-based practices, programs, and policies in the relevant period. Amazon has been engaging in continuous, permanent, and substantial activity in California. There will be no undue difficulty in the management of this litigation as a class action.

83.  A class action is superior to other available methods for the fair and efficient adjudication of the present controversy. Class members are likely to have little interest in individually controlling the prosecution of separate actions because the individual statutory damages claims of each Class member are not substantial enough to warrant the attorneys' fees and court costs, as well as the time and effort, associated with individual filings and prosecution of their individual claims. In sum, for many, if not most, Class members, a class action is the only feasible mechanism that will allow them an opportunity for legal redress and justice. The conduct of this action as a class action in this forum, with respect to some or all of the issues

presented herein, presents fewer management difficulties, conserves the resources of the parties and of the court system, and protects the rights of each Class member.

84.   Moreover, individualized litigation would also present the potential for varying, inconsistent, or incompatible standards of conduct for Amazon, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. The adjudication of individual Class members' claims would also, as a practical matter, be dispositive of the interests of other members not parties to the adjudication and could substantially impair or impede the ability of other Class members to protect their interests.

## FIRST CAUSE OF ACTION
## VIOLATION OF 42 U.S.C. § 1981

85.    Plaintiffs incorporate in this cause of action the allegations contained in the preceding paragraphs of this Complaint as if they were set out in full herein.

86.   42 U.S.C. § 1981 prohibits Amazon from engaging in racial discrimination in the making and enforcement of contracts.

87.   Amazon is violating 42 U.S.C. § 1981 in the making of contracts by awarding $10,000 to its Black, Latino, and Native American contractors, while withholding this benefit from its White and Asian individuals and contractors, including White and Asian owned businesses.

88.    42 U.S.C. § 1981 provides Plaintiffs with a private right of action to sue for both damages and prospective relief. See *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 459–60 (1975).

89.   Amazon's racially discriminatory contracting practices and policies are the but-for cause of all of the Plaintiffs' present-day and ongoing injuries.

## SECOND CAUSE OF ACTION
## Violation Of The Unruh Civil Rights Act, California Civil Code Section 51

90.   Plaintiffs incorporate in this cause of action the allegations contained in the preceding paragraphs of this Complaint as if they were set out in full herein.

91.   Amazon is a "business establishment" within the meaning of California Civil Code section 51.

92.   Plaintiffs are individuals and sole proprietorship businesses. The law is well-settled that Civil Code section 51 applies to business-to-business relationships such as the Plaintiffs' sole proprietorship businesses relationship with the Amazon business in the present case. And the case law is legion ruling that Civil Code section 51 provides businesses protection from discrimination by other businesses based on the immutable personal characteristics of the business owners, such as at least the following:

*Pines v. Tomson,* 160 Cal. App. 3d 370 (1984) (ruling Civil Code section 51 and 51.5 applied to business owned by plaintiffs David Pines and George Aronek, partners doing business under the fictitious name of Grecian Art Tiles, who successfully brought a Civil Code sections 51 and 51.5 religion discrimination lawsuit against defendants' telephone directory business called the "Christian Yellow Pages"  based on the Christian Yellow Pages business not allowing the Grecian Art Tiles business to place an advertisement for the Grecian Art Tiles business in the Christian Yellow Pages because the owners were of the Jewish faith and could not and would not sign nor utter the Christian Yellow Pages business's "born-again" Christian oath).

*Entertainment Studios Network, Inc. et al. v. McDonalds USA, LLC*, No. 2:21-cv-04972-FMO-MAA, 2022 WL 17078647, C.D.CA (Sept. 16, 2022) (federal district court denied the business defendant McDonalds' motion to dismiss the business plaintiff Entertainment Studios Network, Inc.'s Unruh Act claim

based on McDonald's argument that the Unruh Act did not apply to business-to-business relationships as follows:

> With respect to defendant's argument that plaintiffs' Unruh Act claim fails because they "have not alleged that their 'relationship with [McDonald's] was similar to that of the customer in the customer-proprietor relationship,'" (Dkt. 55-1, Memo. at 29) (quoting *Bongiovanni v. State Farm Mut. Auto. Ins. Co*., 2020 WL 7861973, *2 (C.D. Cal. 2020), the court is unpersuaded. The court cannot conclude at this stage that plaintiffs were not "in a relationship with the offending business establishment [i.e., defendant] 'similar to that of the customer in the customer-proprietor relationship which the [Unruh] Act and its predecessors have most commonly covered.'" *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1124 (9th Cir. 2008) (quoting *Strother v. S. California Permanente Med. Grp*., 79 F.3d 859, 874 (9th Cir. 1996)). The Ninth Circuit has "acknowledged that California courts have allowed parties who were 'not clients, patrons, or customers, in the traditional sense' to bring claims under" the Unruh Act, including, for example, condominium owners against their condominium owners' association and female children excluded from membership in the Boys' Club. *Id*. at 1124 n. 5 (quoting *Strother*, 79 F.3d at 873). *Entertainment Studios Network, Inc. et al. v. McDonalds USA, LLC,* at p. 18.

*The Kind & Compassionate v. City of Long Beach et al*., 2 Cal.App.5th 116 (2016) (held city ordinances banning marijuana dispensaries within city limits did not violate Unruh Act.)

*Rotary Club of Duarte et al. v. Bd. Of Directors of Rotary Int'l et al.*, 178 Cal.App.3d 1035 (1986) (a 'business versus business' Unruh Act case which held that local club and international organization were "business establishments subject to the Unruh Act.")

*Dept. Of Fair Employment & Housing v. M&N Financing Corp.*, 69 Cal.App.5th 434 (2021) (California Department of Fair Employment and Housing brought Civil Code sections 51 and 51.5 action against business that purchased retail installment sales contracts from used car dealerships.)

*National Fed'n of the Blind v. Target Corp.*, 452 F.Supp.2d 946 954 (N.D.Cal. 2006) (Allegations by blind customer and organizations for the blind that retailer's website was not accessible to blind individuals, and that such inaccessibility denied blind customers full and equal access to retailer's stores as well as the ability to enjoy retailer's services offered to the public through the website, were sufficient to state claim under California's Unruh Act.)

93.   The present case is not an employment discrimination lawsuit because Amazon's DSP program is for businesses, such as Plaintiffs, who seek or intend to have a business-to-business relationship with Amazon as independent contractors, not as employees. Therefore, Civil Code section 51 applies to Plaintiffs' claims and any case law or other authorities concerning whether Civil Code section 51 applies to employment discrimination is not relevant to the present case, which would have included violations of various state and federal employment statutes if the present case concerned employment discrimination.

94.   Amazon intentionally denied and made a distinction that denied Plaintiffs and the Class full and equal accommodations, advantages, facilities, privileges, and/or services of Amazon's DSP contracts with their $10,000 in additional

consideration limited to only Black, Latino, and Native American entrepreneurs, thereby violating California's Unruh Civil Rights Act, codified as California Civil Code section 51.

95.   A substantial motivating reason for Amazon's conduct was the race of Plaintiffs and the Class.

96.   Plaintiffs and the class were by harmed by Amazon's conduct in denying Plaintiffs and the Class full and equal access to and participation in Amazon's DSP contracts with their $10,000 in additional consideration limited to only Black, Latino, and Native American entrepreneurs.

97.   Amazon's conduct in denying Plaintiffs and the Class full and equal access to and participation in Amazon's DSP contracts with their $10,000 in additional consideration limited to only Black, Latino, and Native American entrepreneurs was a substantial factor in causing harm to Plaintiffs and the Class.

98.   Pursuant to Civil Code section 52, Amazon is liable to Plaintiffs and the members of the Class for the statutory damages mandated by Civil Code section 52 for each and every offense, and attorneys' fees that may be determined by the court.

99.   Pursuant to Civil Code section 52, public injunctive relief is necessary and appropriate to prevent Amazon from continuing and repeating its discriminatory actions. Plaintiffs are entitled to public injunctive relief on behalf of themselves and the Class.

## THIRD CAUSE OF ACTION

### Violation of California Civil Code Section 51.5

100. Plaintiffs incorporate in this cause of action the allegations contained in the preceding paragraphs of this Complaint as if they were set out in full herein.

101. Amazon is a "business establishment" within the meaning of California Civil Code section 51.5.

102. Plaintiffs are individuals and sole proprietorship businesses. The law is well-settled that Civil Code section 51.5 applies to business-to-business

relationships such as the Plaintiffs' sole proprietorship businesses relationship with the Amazon business in the present case. And the case law is legion ruling that Civil Code sections 51 and 51.5 provides businesses protection from discrimination by other businesses based on the immutable personal characteristics of the business owners, such as at least the following:

*Pines v. Tomson,* 160 Cal. App. 3d 370 (1984) (ruling Civil Code section 51 and 51.5 applied to business owned by plaintiffs David Pines and George Aronek, partners doing business under the fictitious name of Grecian Art Tiles, who successfully brought a Civil Code sections 51 and 51.5 religion discrimination lawsuit against defendants' telephone directory business called the "Christian Yellow Pages" based on the Christian Yellow Pages business not allowing the Grecian Art Tiles business to place an advertisement for the Grecian Art Tiles business in the Christian Yellow Pages because the owners were of the Jewish faith and could not and would not sign nor utter the Christian Yellow Pages business's "born-again" Christian oath).

*Entertainment Studios Network, Inc. et al. v. McDonalds USA, LLC*, No. 2:21-cv-04972-FMO-MAA, 2022 WL 17078647, C.D.CA (Sept. 16, 2022) (federal district court denied the business defendant McDonalds' motion to dismiss the business plaintiff Entertainment Studios Network, Inc.'s Unruh Act claim based on McDonald's argument that the Unruh Act did not apply to business-to-business relationships as follows:

With respect to defendant's argument that plaintiffs' Unruh Act claim fails because they "have not alleged that their 'relationship with [McDonald's] was similar to that of the customer in the customer-proprietor relationship,'" (Dkt. 55-1, Memo. at 29) (quoting *Bongiovanni v. State Farm Mut. Auto. Ins. Co*.,

2020 WL 7861973, *2 (C.D. Cal. 2020), the court is unpersuaded. The court cannot conclude at this stage that plaintiffs were not "in a relationship with the offending business establishment [i.e., defendant] 'similar to that of the customer in the customer-proprietor relationship which the [Unruh] Act and its predecessors have most commonly covered.'" *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1124 (9th Cir. 2008) (quoting *Strother v. S. California Permanente Med. Grp.*, 79 F.3d 859, 874 (9th Cir. 1996)). The Ninth Circuit has "acknowledged that California courts have allowed parties who were 'not clients, patrons, or customers, in the traditional sense' to bring claims under" the Unruh Act, including, for example, condominium owners against their condominium owners' association and female children excluded from membership in the Boys' Club. *Id.* at 1124 n. 5 (quoting *Strother*, 79 F.3d at 873). *Entertainment Studios Network, Inc. et al. v. McDonalds USA, LLC*, at p. 18.

*The Kind & Compassionate v. City of Long Beach et al.*, 2 Cal.App.5th 116 (2016) (held city ordinances banning marijuana dispensaries within city limits did not violate Unruh Act.)

*Rotary Club of Duarte et al. v. Bd. Of Directors of Rotary Int'l et al.*, 178 Cal.App.3d 1035 (1986) (a 'business versus business' Unruh Act case which held that local club and international organization were "business establishments subject to the Unruh Act.")

*Dept. Of Fair Employment & Housing v. M&N Financing Corp.*, 69 Cal.App.5th 434 (2021) (California Department of Fair Employment and Housing brought Civil Code sections 51 and 51.5 action against business that purchased retail installment sales contracts from used car dealerships.)

*National Fed'n of the Blind v. Target Corp.*, 452 F.Supp.2d 946 954 (N.D.Cal. 2006) (Allegations by blind customer and organizations for the blind that retailer's website was not accessible to blind individuals, and that such inaccessibility denied blind customers full and equal access to retailer's stores as well as the ability to enjoy retailer's services offered to the public through the website, were sufficient to state claim under California's Unruh Act.)

103. The present case is not an employment discrimination lawsuit because Amazon's DSP program is for businesses, such as Plaintiffs, who seek or intend to have a business-to-business relationship with Amazon as independent contractors, not as employees. Therefore, Civil Code section 51.5 applies to Plaintiffs' claims and any case law or other authorities concerning whether Civil Code section 51.5 applies to employment discrimination is not relevant to the present case, which would have included violations of various state and federal employment statutes if the present case concerned employment discrimination.

104. Amazon discriminated against, boycotted, blacklisted, and refused to contract or trade with Plaintiffs and the Class based on their race by denying them full and equal access to apply for and/or to obtain Amazon's DSP contracts with their $10,000 in additional consideration limited to only Black, Latino, and Native American entrepreneurs, thereby violating California Civil Code section 51.5.

105. A substantial motivating reason for Amazon's conduct was the race of Plaintiffs and the Class.

106. Plaintiffs and the Class were harmed by Amazon's conduct in denying Plaintiffs and the Class full and equal access to and participation in Amazon's DSP contracts with their $10,000 in additional consideration limited to only Black, Latino, and Native American entrepreneurs.

107. Amazon's conduct in denying Plaintiffs and the Class full and equal access

to and participation in Amazon's DSP contracts with their $10,000 in additional consideration limited to only Black, Latino, and Native American entrepreneurs was a substantial factor in causing harm to Plaintiffs and the Class.

108. Pursuant to Civil Code section 52, Amazon is liable to Plaintiffs and the members of the Class for the statutory damages mandated by Civil Code section 52 for each and every offense, and attorneys' fees that may be determined by the court in addition thereto.

109. Pursuant to Civil Code section 52, public injunctive relief is necessary and appropriate to prevent Amazon from continuing and repeating its discriminatory actions alleged above. Plaintiffs are entitled to public injunctive relief on behalf of themselves and the Class.

## PRAYER FOR RELIEF

110. Public injunctive relief in the form of a preliminary and permanent injunction against Amazon and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful race-based policies, practices, customs, and usages set forth herein;

111. Declare that Amazon is violating 42 U.S.C. § 1981 by excluding Whites and Asian-Americans from the $10,000 stipend it exclusively provides to only Amazon-preferred the Black, Latino, and Native American contractors in its DSP program;

112. Certify a class under Rule 23(a) and (b)(2) and (b)(3) of the Federal Rules of Civil procedure, appoint Plaintiffs' counsel as Class Counsel, and appoint the named Plaintiffs as the Class representatives;

113. For nominal and compensatory damages to Plaintiffs and the Class;

114. For statutory damages mandated by and pursuant to California Civil Code section 52 for each and every offense committed by Amazon against Plaintiffs and

each member of the Class for violating California Civil Code sections 51 and/or 51.5;

115. Costs incurred herein, including attorneys' fees; and

116. For such other and further legal and equitable relief as this Court may deem proper, appropriate, justified, or equitable.

Dated: September 22, 2023                    Respectfully Submitted,


                                             /s/ Greg Adler
                                             Greg Adler (Cal. Bar No. 234142)
                                             GREG ADLER P.C.
                                             35111F Newark Blvd., Suite 500
                                             Newark, CA 94560
                                             Phone: 844-504-6587
                                             Fax: 469-807-8878
                                             Email: greg@adler.law
                                             *Attorney for Plaintiffs and the Proposed Class*

                                             /s/ Alfred G. Rava
                                             Alfred G. Rava (Cal. Bar No. 188318)
                                             RAVA LAW FIRM
                                             3667 Voltaire Street
                                             San Diego, California 92106
                                             Phone: 619-238-1993
                                             E-mail: alrava@cox.net
                                             *Attorney for Plaintiffs and the Proposed Class*

Exhibit 1



HOME    OPPORTUNITY    GETTING STARTED    SUCCESS STORIES    FAQ    WEBINARS    DOWNLOAD BROCHURE    SIGN OUT    START NOW



## Own your success

If you love building and leading teams, start your own business as an Amazon Delivery Service Partner, delivering smiles to customers across your community. Apply today or sign up to learn more.

**APPLY NOW**

**LEARN MORE**

## You bring leadership, we'll bring the rest

We are looking for hands-on leaders who are passionate about hiring and coaching great teams. With low startup costs, built-in demand, and access to Amazon's technology and logistics experience, this is an opportunity to build and grow a successful package delivery business. Join a community of Amazon Delivery Service Partners in one of the fastest-growing industries in the world.

## The Amazon advantage

**Low startup costs**
Start your business with as little as $10,000.

**Logistics experience not required**
Use our technology, processes, and more than 20 years of logistics experience to set up and run your delivery business.

**Focus on people, not sales**
Amazon's packages keep your business growing, so you can focus on building a great team and delivering without worrying about driving sales.

**Support, when you need it**
Amazon's experience is behind you every step of the way, from hands-on training to on-demand support to ensure your operation runs smoothly.

**Deliver smiles**
Delight thousands of customers every day as an essential part of Amazon, the most customer-centric company on Earth.



HOME    OPPORTUNITY    GETTING STARTED    SUCCESS STORIES    FAQ    WEBINARS    DOWNLOAD BROCHURE    SIGN OUT    START NOW

## Success stories

" I motivate through leading by example. I'm always in a positive mood and smile a lot. I show my team my passion for my company. I make each employee feel extremely valued for all of their hard work. I emphasize the importance of our performance together and the fact that we represent the biggest brand in the world. Each day it's all about our image and delivery success. I make sure everyone is in uniforms and delivering smiles daily. I stress punctuality and accurate delivery performance. And I try to encourage them to have fun!

**Simona**
Miami, FL
Team size: 60

**MORE SUCCESS STORIES**



## Commitment to Diversity

We're proud to announce a Diversity Grant to help reduce the barriers to entry for Black, Latinx, and Native American entrepreneurs—a $1 million commitment toward funding startup costs, offering $10,000 for each qualified candidate to build their own businesses in the U.S. With the launch of this grant program, we're investing in building a future for diverse business owners to serve their communities. If interested, please complete the diversity questions in the Financial Details section of the Application.

**APPLY NOW**





## Interested in becoming a Delivery Associate for a local Amazon DSP?

Amazon DSPs are hiring Delivery Associates (DAs) to deliver smiles to customers every day. In a Delivery Associate role, you'll earn competitive compensation, have access to benefits offered by Amazon DSPs, have opportunities for professional growth, and so much more, all while being a delivery hero in your community.

**FIND DELIVERY JOBS**





**Your success story starts here.**

APPLY NOW FOR DSP

Still have questions ? Check out our FAQs.

© 2021, Amazon.com, Inc. or its affiliates | Site terms | Privacy notice